## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ALLIANCE OF ARTISTS AND )<br>RECORDING COMPANIES, INC. )<br>700 North Fairfax Street )<br>Alexandria, VA 22314, )<br>on behalf of itself and all others )<br>similarly situated, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>GENERAL MOTORS COMPANY )<br>300 Renaissance Center L1 )<br>Detroit, MI 48243, )<br> )<br>DENSO INTERNATIONAL AMERICA, INC. )<br>24777 Denso Drive )<br>Southfield, MI 48033, )<br> )<br>FORD MOTOR COMPANY )<br>1 American Road )<br>Dearborn, MI 48126, )<br> )<br>CLARION CORPORATION OF AMERICA )<br>6200 Gateway Drive )<br>Cypress, CA 90630, )<br> )<br>Defendants. )<br>_____) | Civil Action No. 1:14-cv-1271<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

The Alliance of Artists and Recording Companies, Inc. ("AARC" or "Plaintiff"), on behalf of itself and all others similarly situated, hereby alleges as follows for its Complaint against General Motors Company ("General Motors" or "GM"), DENSO International America, Inc. ("DENSO"), Ford Motor Company ("Ford"), and Clarion Corporation of America ("Clarion") (collectively, "Defendants").

## NATURE OF THE CASE

1.      Plaintiff brings this class action for damages and to enjoin Defendants from their

violation of the Audio Home Recording Act of 1992, 17 U.S.C. §§ 1001 et seq. ("AHRA"), part

of the Copyright Law of the United States, 17 U.S.C. §§ 101 et seq.  The AHRA is a

comprehensive statutory scheme enacted in 1992 to regulate the manufacture, importation, and

distribution of digital audio recording devices.  Congress enacted the AHRA to ensure both that

consumers would have access to digital audio copying technology and that artists and other

copyright owners would be fairly compensated for the copying of their works.

2.      Defendants are multi-billion dollar companies that manufacture, import, and/or

distribute hundreds of thousands of products in the United States every year.  Defendants are also

beneficiaries of the AHRA, which shields them from liability for copyright infringement for

manufacturing, importing, and/or distributing certain recording devices as long as they

(a) incorporate certain copying control technology and (b) pay a modest royalty per device that is

then distributed to musical artists and music copyright owners.  Nonetheless, Defendants have

refused to comply with the AHRA and refused to pay the royalties that Congress has determined

they owe for the recording devices they manufacture, import, and/or distribute —

notwithstanding intensive efforts by the AARC going back at least two years to persuade

Defendants to live up to their statutory obligations.  Defendants' intransigence has left the

AARC with no choice but to file this lawsuit.

3.      Defendants have violated and continue to violate the AHRA by manufacturing or

importing and distributing digital audio recording devices without complying with the AHRA.

Defendants distribute these devices either pre-installed in vehicles or intended for use in

vehicles.  Defendants designed these devices for the express purpose of copying music CDs and

other digital musical recordings to a hard drive on the devices, and they market these devices emphasizing that copying function.  By doing so, Defendants violate the AHRA because Defendants (a) have not registered these devices with the U.S. Copyright Office; (b) have not paid royalties for these devices; and (c) have not incorporated the Serial Copy Management System or its functional equivalent in these devices, all of which are required by the AHRA.

4.      These devices clearly fall within the scope of the AHRA.  Certain other manufacturers that distribute the same type of in-vehicle CD-copying devices acknowledge that such devices are subject to the AHRA.  These manufacturers submit to the Copyright Office the required royalty payments for their devices.  Defendants, in stark contrast, continue to manufacture, import, and/or distribute such devices without complying with any of the AHRA's requirements.

**JURISDICTION AND VENUE**

5.      This Court has exclusive subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Defendants.  Defendants' acts or omissions in the District of Columbia, including their failures to file notices and statements of account with the U.S. Copyright Office in the District of Columbia, and failures to pay royalties for these devices to the Copyright Office, as required by the AHRA and the Copyright Office, have injured Plaintiff and other members of the class.  See D.C. Code § 13-423(a)(3).  In addition, Defendants' acts or omissions outside the District of Columbia, including manufacturing or importing and distributing digital audio recording devices without complying with the requirements of the AHRA, have injured members of the class within the District of Columbia.  See id. § 13-423(a)(4).  On information and belief, all Defendants regularly do and

solicit business, engage in a persistent course of conduct, and/or derive substantial revenue from their goods that are used and/or consumed in the District of Columbia. See id. In addition, on information and belief, all Defendants transact business in the District of Columbia. See id. § 13-423(a)(1).

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

8.     Plaintiff Alliance of Artists and Recording Companies, Inc. ("AARC") is a not-for-profit organization incorporated in Pennsylvania and headquartered in Virginia. The AARC represents featured recording artists and sound recording copyright owners in the areas of home taping and private copy royalties and rental and lending royalties. The AARC was formed to collect and distribute royalties collected by the United States Copyright Office under the AHRA. The AARC is the sole administrator of AHRA royalties to featured recording artists and sound recording copyright owners in the United States. The AARC is an "interested copyright party" within the meaning of 17 U.S.C. §§ 1001(7)(D) and 1009, in that it is an association or other organization representing (i) featured recording artists who perform on sound recordings that have been distributed and (ii) the owners of, inter alia, exclusive rights to reproduce sound recordings of musical works that have been embodied in digital or analog musical recordings lawfully made and distributed. The AARC is the single largest "interested copyright party" under the AHRA; it represents the recipients of more than 60% of the AHRA royalties collected and distributed by the Copyright Office.

9.     Defendant General Motors Company is a Delaware corporation with its principal place of business in Detroit, Michigan.

10.     Defendant DENSO International America, Inc., is a Delaware corporation with its principal place of business in Southfield, Michigan.

11.     Defendant Ford Motor Company is a Delaware corporation with its principal place of business in Dearborn, Michigan.

12.     Defendant Clarion Corporation of America is a California corporation with its principal place of business in Cypress, California.

## FACTUAL AND LEGAL BACKGROUND

**Requirements of the Audio Home Recording Act of 1992**

13.     The Audio Home Recording Act was enacted by Congress in 1992.  The AHRA is the result of a compromise among representatives of the music and recording industries and the consumer electronics industry, and has greatly benefitted consumers of those industries' products.  The compromise arose out of a recognition that then-nascent digital reproduction technologies might enable consumers to easily and perhaps unintentionally violate the copyrights of recording artists and record companies by enabling consumers to copy, and then recopy, copying digital musical recordings without a measurable loss in the quality of the recordings.  Copyright owners and the consumer electronics industry disputed whether the distribution of these devices would expose their manufacturers to liability for contributory copyright infringement.  As a result, each side faced uncertainty regarding the legal and economic consequences of distributing such technology.

14.     The resulting compromise avoided high-stakes uncertainty and ensured that consumers could  access these new technologies.  In lieu of an inquiry into the extent that a given device did or did not facilitate copyright infringement, the parties adopted a set of clear and simple regulatory requirements for a discrete category of devices.  The music and recording

industries agreed to bar certain infringement suits against manufacturers, importers, and distributors of "digital audio recording devices" ("DARDs") and against consumers for noncommercial use of such devices, in exchange for: (a) compensation in the form of royalty payments for each DARD distributed, and (b) a requirement that all such DARDs incorporate certain copying controls to prevent or impede "serial" copying.

15.     The AHRA enacted the royalty payment requirement by prohibiting the importation and distribution, or manufacture and distribution, of any DARD without first filing a notice with the Register of Copyrights, depositing quarterly and annual statements of account, and making royalty payments.  17 U.S.C. § 1003.  Such filings and payments must be submitted to the Copyright Office in the District of Columbia.  See, e.g., U.S. Copyright Office, Annual Statement of Account for Digital Audio Recording Products (Form DART/A) (June 2012), available at http://www.copyright.gov/forms/formdart-a.pdf.

16.     The AHRA enacted the copying control requirement by prohibiting the importation, manufacture, or distribution of any DARD that does not conform to "the Serial Copy Management System" (the "SCMS") or its functional equivalent.  17 U.S.C. § 1002(a).  The SCMS was developed as a common protocol for encoding two critical bits of information in each digital musical recording (e.g., a CD): (a) whether the recording is copyrighted; and (b) if it is copyrighted, whether the recording is an "original" or a "copy."  When a DARD makes a copy of a digital musical recording, it must conform to SCMS by encoding this copyright information in the new copy.  When copying an original recording, the DARD must mark the copy as a "copy" (rather than an original); and a DARD must recognize whether a recording is an original or a copy.  A DARD must never allow a user to copy a "copy."  Thus, the SCMS prevents

"serial" copying — such as, for example, someone obtaining a burned copy of an original CD and copying the content of that burned CD to his or her music player's hard drive.

17.     The AHRA defines a DARD as "any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a digital audio copied recording for private use."  17 U.S.C. § 1001(3) (emphasis added).  Excluded from this definition are "professional model[s]" and devices "designed and marketed primarily for the creation of sound recordings resulting from the fixation of nonmusical sounds."  Id.

18.     A "digital audio copied recording" (a "DACR") is defined by the AHRA as "a reproduction in a digital recording format of a digital musical recording, whether that reproduction is made directly from another digital musical recording or indirectly from a transmission."  17 U.S.C. § 1001(1) (emphasis added).

19.     A "digital musical recording" (a "DMR") is "a material object — (i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, and (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 1001(5)(A).  Excluded from this definition are material objects in which the only fixed sounds are "spoken word recordings" and material objects "in which one or more computer programs are fixed" — except that a DMR "may contain statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of

the fixed sounds and incidental material."  Id. § 1001(5)(B).  Music CDs are quintessential

examples of DMRs.

20.     The AHRA expressly empowers any "interested copyright party" injured by a

violation of the AHRA to sue for injunctive relief and damages.  17 U.S.C. § 1009(a).  Such

damages are paid to the Copyright Office and shared by all interested copyright parties "as

though such funds were royalty payments."  Id. § 1009(e).

21.     Defendants have violated and continue to violate the AHRA by manufacturing

and distributing,  or importing and distributing, DARDs (i) without registering the devices with

the Copyright Office, (ii) without making the royalty payments required by the AHRA, and

(iii) without ensuring that these DARDs conform to the SCMS or its functional equivalent.

**General Motors and DENSO**

22.     General Motors designs, manufactures, markets, and distributes automotive

vehicles in the United States under the Buick, Cadillac, Chevrolet, and GMC brands.  For

example, GM operates a manufacturing plant in Lansing, Michigan, where it assembles the

Cadillac CTS and Cadillac ATS.  GM distributes its vehicles in all 50 states, including the

Washington, D.C. metropolitan area.  Among other things, GM distributes vehicles for sale to

District of Columbia residents.

23.     DENSO supplies GM with devices that are installed in and distributed with GM's

vehicles.  DENSO regularly does and solicits business, engages in a persistent course of conduct,

and derives substantial revenue from goods used or consumed, in the District of Columbia.

24.     GM currently offers as a feature in many of its vehicles a device often referred to

as the "Hard Drive Device (HDD)," which records songs from CDs to the device's hard drive.

25.     GM's Hard Drive Device is available on numerous models, including its Buick

LaCrosse, Buick Regal, Cadillac CTS, Cadillac CTS-V, Cadillac SRX, Chevrolet Cruze,

Chevrolet Equinox, Chevrolet Volt, and GMC Terrain.

26.     The Hard Drive Device has been available in GM vehicles since at least the 2011

model year (which began in 2010).  For example, it was available in the 2011 Cadillac

CTS/CTS-V.

27.     GM's Hard Drive Device is capable of making a digital audio copied recording

for private use.  The device allows songs to be recorded from a user's CD player to a hard drive

with several gigabytes of memory capacity for storage of media files.  To copy an entire CD to

the hard drive, an individual user need only insert a CD, press "REC" to activate the device's

recording function, and press "Yes" to confirm that the user wishes to record all tracks from the

CD.  Alternatively, users can copy individual tracks from a CD by selecting them from a track

list before pressing REC.  The device includes a database that enables it to automatically identify

the album name, artist name, song title, and genre for each copied song.  Once a song has been

recorded to the hard drive, it can be played back directly from the hard drive without any need

for the CD.

28.     The Hard Drive Device's recording function is designed for the primary purpose

of making digital audio copied recordings for private use.  For example, a GM owner's manual

states, in the first sentence under the section heading "Hard Drive Device (HDD)":  "An HDD

allows songs to be recorded from your CD player or a mass media storage device connected by a

USB connector."

29.     All other uses of the Hard Drive Device's recording function are minor or

incidental to making digital audio copied recordings.  For example, although the device's

recording function might also be capable of saving "favorites" or updating maps for a navigation feature, such other functions are insignificant relative to its ability to copy music CDs.

30.     Moreover, a navigation/map feature is not even included on every device that has the music copying feature — certain models of the Cadillac CTS Coupe, for example, come standard with the Hard Drive Device but without the navigation system.  Making digital audio copied recordings is the core purpose for which the Hard Drive Device's recording function was designed.

31.     The Hard Drive Device's recording function is also marketed for the primary purpose of making digital audio copied recordings for private use.  For example, a GM press release regarding the entire Cadillac CTS "infotainment system" discusses the Hard Drive Device's recording function at length, but only with respect to its ability to store music:

> [M]usic from CDs can be recorded and stored on the hard drive. Music recognition software from Gracenote, a leader in global entertainment technology, is incorporated into the hard drive enabling it to recognize track listings, song titles, genres and artist info for CDs loaded into the system.  This makes cataloging and organizing stored music very convenient and similar to the digital music libraries many consumers maintain elsewhere.  Full operation of the overall navigation and audio system is maintained, even while the hard drive is ripping and storing CD tracks. . . .  To reduce driver distraction and maintain optimal focus on the ***top priority of digital music***, the hard drive will not accept photos or other sorts of data.  The hard drive will be offered as a stand-alone option on the CTS, meaning that even consumers who do not opt for the optional navigational system can still choose the hard drive as an addition to their car's more basic infotainment package.

Other GM promotional materials boast that certain GM models have a "10 GB hard drive *for music storage*."

32.     GM's marketing materials treat all other uses of the Hard Drive Device's recording function as minor or insignificant relative to making digital audio copied recordings.

Making digital audio copied recordings is marketed as the central purpose of the Hard Drive Device's recording function.

33.    GM's Hard Drive Device is a DARD.

34.    GM and/or its supplier DENSO manufactures GM's Hard Drive Devices in the United States and/or imports GM's Hard Drive Devices into the United States, and distributes those devices in the United States for ultimate transfer to consumers in the United States.

35.    Neither GM nor DENSO has filed with the Register of Copyrights any notice or statement of account pursuant to the AHRA.

36.    Neither GM nor DENSO has paid to the Register of Copyrights any royalties pursuant to the AHRA.

37.    The Hard Drive Device does not conform to the SCMS or its functional equivalent.  It does not include copying controls that verify whether a digital musical recording is an "original" or a "copy," and it does not prevent copying of a "copy."  Nor does the device record the copyright status of the copies it creates as required by the AHRA.

**Ford and Clarion**

38.    Ford designs, manufactures, markets, and distributes automotive vehicles in the United States under the Ford and Lincoln brands.  For example, Ford operates a manufacturing plant in Chicago, Illinois, where it assembles the Lincoln MKS, Ford Taurus, and Ford Explorer.  Ford distributes its vehicles in all 50 states, including the Washington, D.C. metropolitan area.  Among other things, Ford distributes vehicles for sale to District of Columbia residents.

39.    Clarion supplies Ford with devices that are installed in and distributed with Ford's vehicles.  Clarion regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed in the District of Columbia.

40.     Ford currently offers in many of its vehicles a device that includes a feature often referred to as the "Jukebox," which records songs from CDs to the device's hard drive.

41.     Ford's Jukebox device is available on numerous models, including its Ford Escape, Ford Expedition, Ford Flex, Ford Fusion, Ford Mustang, Ford Taurus, Lincoln MKS, Lincoln MKT, Lincoln MKZ, and Lincoln Navigator.

42.     The Jukebox device has been available on Ford vehicles since at least the 2011 model year.  For example, it was available in the 2011 Lincoln MKS.

43.     Ford's Jukebox device is capable of making a digital audio copied recording for private use.  For example, an owner's manual explains, "Your mobile media navigation system has a Jukebox which allows you to save desired tracks or CDs to the hard drive for later access.  The hard drive can store up to 10GB (164 hours; approximately 2,472 tracks) of music."  To copy an entire music CD, an individual user need only insert a CD, press "Record," and press "Start Recording."  The device includes a database that enables it to automatically identify the album name, artist name, song title, and genre for each copied song.  Once a song has been recorded to the hard drive, it can be played back directly from the hard drive without any need for the CD.

44.     The Jukebox device's recording function is designed for the primary purpose of making digital audio copied recordings for private use.  For instance, the only significant purpose for the device's recording function discussed in the Ford owner's manual quoted above is copying tracks from a music CD.

45.     All other uses of the Jukebox device's recording function are minor or incidental to making digital audio copied recordings.  Making digital audio copied recordings is the core purpose for which the Jukebox device's recording function was designed.

46.     The Jukebox device's recording function is also marketed for the primary purpose of making digital audio copied recordings for private use.  For example, Ford promotional materials advertise:  "Included with the system is a 10GB digital Jukebox that can hold up to 2,400 songs."  And a Ford press release touts that:  "The 'jukebox' feature on Ford's next-generation navigation system can store up to 2,400 songs in high-fidelity digital format from the user's CD collection.  Gracenote, a global leader in embedded technology, enriched content and data services for digital entertainment solutions, provides the artist/album/tracklist data for the 'jukebox,' as well as high-resolution album cover art for most major label releases for display on the navigation screen."

47.     Ford's marketing materials treat all other uses of the Jukebox device's recording function as minor or insignificant relative to making digital audio copied recordings.  Making digital audio copied recordings is marketed as the central purpose of the Jukebox device's recording function.

48.     Ford's Jukebox device is a DARD.

49.     Ford and/or its supplier Clarion manufactures Ford's Jukebox devices in the United States and/or imports Ford's Jukebox devices into the United States, and distributes those devices in the United States for ultimate transfer to consumers in the United States.

50.     Neither Ford nor Clarion has filed with the Register of Copyrights any notice or statement of account pursuant to the AHRA.

51.     Neither Ford nor Clarion has paid to the Register of Copyrights any royalties pursuant to the AHRA.

52.     The Jukebox device does not conform to the SCMS or its functional equivalent. It does not include copying controls that verify whether a digital musical recording is an

"original" or a "copy," and it does not prevent copying of a "copy."  Nor does the device record the copyright status of the copies it creates as required by the AHRA.

## CLASS ACTION ALLEGATIONS

53.     The allegations set forth in paragraphs 1 through 52 are adopted and incorporated by reference as if fully set forth herein.

54.     Pursuant to Rule 23(b)(1)(A), (b)(1)(B), and (b)(2) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class composed of itself and all other interested copyright parties.  The class is defined as all "interested copyright parties," as defined by 17 U.S.C. § 1001(7) (the "Class").

55.     The Class is so numerous that joinder of all members is impracticable.  The Class contains tens of thousands of copyright owners and featured recording artists.  These include all "featured recording artist[s] who perform[] on a sound recording that has been distributed," 17 U.S.C. § 1001(7)(C); all owners of an exclusive right to reproduce a sound recording of a musical work "that has been embodied in a digital musical recording or analog musical recording lawfully made under [Title 17] that has been distributed," 17 U.S.C. § 1001(7)(A); and all legal or beneficial owners of, and all persons who control, a right to reproduce in a digital musical recording or analog musical recording such a musical work, 17 U.S.C. § 1001(7)(B).  The Class also contains all associations or other organizations that represent the foregoing persons or are engaged in licensing rights in musical works to music users on behalf of writers and publishers. Id. § 1001(7)(D).

56.     Questions of law and fact are common to the Class.  Such common questions include:

      A.     Whether GM's Hard Drive Device is a DARD.

B.    Whether GM's Hard Drive Device conforms to the SCMS or its functional equivalent.

C.    Whether GM and/or its supplier DENSO manufactures GM's Hard Drive Devices in the United States and/or imports GM's Hard Drive Devices into the United States, and distributes those devices in the United States for ultimate transfer to consumers in the United States.

D.    Whether Ford's Jukebox device is a DARD.

E.    Whether Ford's Jukebox device conforms to the SCMS or its functional equivalent.

F.    Whether Ford and/or its supplier Clarion manufactures Ford's Jukebox devices in the United States and/or imports Ford's Jukebox devices into the United States, and distributes those devices in the United States for ultimate transfer to consumers in the United States.

G.    Whether Defendants have filed with the Register of Copyrights any notice or statement of account pursuant to the AHRA.

H.    Whether Defendants have paid to the Register of Copyrights any royalties pursuant to the AHRA.

57.    Plaintiff's claims are typical of the claims of the Class.  Plaintiff has no interests antagonistic to the claims of the Class.

58.    Plaintiff will vigorously, fairly, and adequately protect the interests of the Class. Plaintiff has retained competent counsel experienced in the prosecution of complex, class action, and copyright litigation.

59.     Given that the AHRA imposes a uniform standard of conduct on Defendants, separate actions against Defendants by individual members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their AHRA obligations.

60.     Separate actions by individual members of the Class would create a risk of inconsistent adjudications regarding Defendants' AHRA obligations that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

61.     Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive or declaratory relief is appropriate for the Class as a whole.

## COUNT I
## INJUNCTIVE RELIEF
### (Violation of 17 U.S.C. § 1003(a))

62.     The allegations set forth in paragraphs 1 through 61 are adopted and incorporated by reference as if fully set forth herein.

63.     Defendants import and distribute, or manufacture and distribute, DARDs without first filing the required notice with the Register of Copyrights, in violation of 17 U.S.C. § 1003(a).

64.     Defendants import and distribute, or manufacture and distribute, DARDs without filing the required statements of account with the Register of Copyrights, in violation of 17 U.S.C. § 1003(a).

65.     Defendants import and distribute, or manufacture and distribute, DARDs without paying the required royalties to the Register of Copyrights, in violation of 17 U.S.C. § 1003(a).

66.     Pursuant to 17 U.S.C. § 1009(c)(1), Plaintiff seeks a permanent injunction to prevent and restrain Defendants from distributing the devices described herein and any other

DARDs without paying the royalties and filing the notices and statements of account required by the AHRA.

## COUNT II
## DAMAGES
### (Violation of 17 U.S.C. § 1003(a))

67.      The allegations set forth in paragraphs 1 through 66 are adopted and incorporated by reference as if fully set forth herein.

68.      Defendants have imported and distributed, or manufactured and distributed, and continue to import and distribute, or manufacture and distribute, DARDs without first filing the required notice with the Register of Copyrights, in violation of 17 U.S.C. § 1003(a).

69.      Defendants have imported and distributed, or manufactured and distributed, and continue to import and distribute, or manufacture and distribute, DARDs without filing the required statements of account with the Register of Copyrights, in violation of 17 U.S.C. § 1003(a).

70.      Defendants have imported and distributed, or manufactured and distributed, and continue to import and distribute, or manufacture and distribute, DARDs without paying the required royalties to the Register of Copyrights, in violation of 17 U.S.C. § 1003(a).

71.      Pursuant to 17 U.S.C. § 1009(c)(2) and (d)(1)(A), Plaintiff seeks actual damages equal to the unpaid royalties on the DARDs imported and distributed, or manufactured and distributed, by any Defendant during the three years immediately prior to the filing of this Complaint and from the date of filing until the date of judgment, plus an additional amount equal to 50 percent of the actual damages, all to be paid to the Register of Copyrights.

**COUNT III**
**INJUNCTIVE RELIEF**
**(Violation of 17 U.S.C. § 1002(a))**

72.     The allegations set forth in paragraphs 1 through 71 are adopted and incorporated by reference as if fully set forth herein.

73.     Defendants import, manufacture, or distribute DARDs that do not conform to the SCMS, do not conform to a system that has the same functional characteristics as the SCMS, and do not conform to any other system certified by the Secretary of Commerce as prohibiting unauthorized serial copying, in violation of 17 U.S.C. § 1002(a).

74.     Pursuant to 17 U.S.C. § 1009(c)(1), Plaintiff seeks a permanent injunction to prevent and restrain Defendants from distributing the devices described herein and any other DARDs that do not conform to the SCMS or its functional equivalent as required by the AHRA.

**COUNT IV**
**DAMAGES**
**(Violation of 17 U.S.C. § 1002(a))**

75.     The allegations set forth in paragraphs 1 through 74 are adopted and incorporated by reference as if fully set forth herein.

76.     Defendants have imported, manufactured, or distributed DARDs that do not conform to the SCMS, do not conform to a system that has the same functional characteristics as the SCMS, and do not conform to any other system certified by the Secretary of Commerce as prohibiting unauthorized serial copying, in violation of 17 U.S.C. § 1002(a).

77.     Pursuant to 17 U.S.C. § 1009(c)(2) and (d)(1)(B)(i), Plaintiff seeks statutory damages equal to $2,500 per DARD manufactured, imported, or distributed by any Defendant during the three years immediately prior to the filing of this Complaint and from the date of filing until the date of judgment, to be paid to the Register of Copyrights.

**COUNT V**
**DECLARATORY RELIEF**
**(Violation of 17 U.S.C. §§ 1002 and 1003)**

78.     The allegations set forth in paragraphs 1 through 77 are adopted and incorporated

by reference as if fully set forth herein.

79.     An actual, justiciable controversy exists between Plaintiff and Defendants.

80.     Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaration as to the following:

a)      that Defendants have imported, manufactured, and/or distributed DARDs;

b)      that Defendants continue to import, manufacture, and/or distribute

DARDs;

c)      that Defendants have not filed the required notice with the Register of

Copyrights, in violation of 17 U.S.C. § 1003(a);

d)      that Defendants have not filed the required statements of account with the

Register of Copyrights, in violation of 17 U.S.C. § 1003(a);

e)      that Defendants have not paid the required royalties to the Register of

Copyrights, in violation of 17 U.S.C. § 1003(a);

f)      that Defendants have imported, manufactured, and/or distributed DARDs

that do not conform to the SCMS, do not conform to a system that has the

same functional characteristics as the SCMS, and do not conform to any

other system certified by the Secretary of Commerce as prohibiting

unauthorized serial copying, in violation of 17 U.S.C. § 1002(a); and

g)      that Defendants must comply with the AHRA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment and relief

as follows:

1.      For an order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of the Class; designating Plaintiff as Class representative; and appointing the undersigned counsel as Class counsel;

2.      For a permanent injunction enjoining Defendants and their officers, directors, agents, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with each or any of them, from directly or indirectly violating the AHRA, including by (i) importing, manufacturing, advertising for sale, or distributing GM's Hard Drive Device, Ford's Jukebox device, and any other devices subject to the AHRA without paying the royalties or filing the notices or statements of account required by the AHRA, or by (ii) importing, manufacturing, or distributing GM's Hard Drive Device, Ford's Jukebox device, and any other devices subject to the AHRA that do not conform to the SCMS or its functional equivalent as required by the AHRA;

3.      For actual damages equal to the unpaid royalties on the DARDs imported and distributed, or manufactured and distributed, by any Defendant during the three years immediately prior to the filing of this Complaint and from the date of filing until the date of judgment, to be paid to the Register of Copyrights;

4.      For additional damages equal to 50 percent of the actual damages, to be paid to the Register of Copyrights;

5.      For statutory damages equal to $2,500 per DARD manufactured, imported, or distributed by any Defendant during the three years immediately prior to the filing of this Complaint and from the date of filing until the date of judgment, to be paid to the Register of Copyrights;

6.      For pre- and post-judgment interest;

7.    For a declaration that Defendants' manufacture, importation, and/or distribution

of DARDs, including GM's Hard Drive Device and Ford's Jukebox device, violates the AHRA;

8.    For costs and attorneys' fees; and

9.    For such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

Dated:  July 25, 2014                              Respectfully submitted,


                                                   Dustin Cho (D.C. Bar No. 1017751)
                                                   **COVINGTON & BURLING LLP**
                                                   1201 Pennsylvania Avenue NW
                                                   Washington, DC 20004
                                                   (202) 662-6000 (telephone)
                                                   (202) 662-6291 (fax)
                                                   dcho@cov.com

                                                   Jonathan M. Sperling*
                                                   **COVINGTON & BURLING LLP**
                                                   The New York Times Building
                                                   620 Eighth Avenue
                                                   New York, NY 10018
                                                   (212) 841-1000 (telephone)
                                                   (212) 841-1010 (fax)
                                                   jsperling@cov.com
                                                   *Application for admission pro hac vice pending

                                                   Attorneys for Plaintiff Alliance of Artists and
                                                   Recording Companies, Inc.