## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC., | ) Case No. 1:14-cv-1271-KBJ<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| GENERAL MOTORS LLC, et al., | )<br>) |
| Defendants. | )<br>) |
| | )<br>) |
| GENERAL MOTORS LLC, | )<br>) |
| Counterclaimant, | )<br>) |
| v. | )<br>) |
| ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC., | )<br>)<br>) |
| Counterclaim Defendant. | )<br>)<br>) |

## DEFENDANT GENERAL MOTORS LLC'S
## COUNTERCLAIM AND AMENDED ANSWER

Defendant and Counterclaimant General Motors LLC ("GM") amends its answer and asserts a counterclaim, stating here its complete counterclaim and answer against Plaintiff and Counterclaim Defendant Alliance of Artists and Recording Companies, Inc. ("AARC").

## COUNTERCLAIM FOR DECLARATORY RELIEF

## OVERVIEW

1.      This case is an effort by a royalty-collecting organization to classify in-dash vehicle systems that GM provides for navigation and music use as the equivalent of home digital

audio recording devices, like consumer digital audio tape recorders and consumer minidisc
recorders, and thereby levy against GM a fee of up to $8 per automobile.  (GM refers to both
types of its systems as navigation and music systems.)

2.      GM seeks a judicial ruling that, because the systems it includes in its automobiles
fall outside the limited scope of the esoteric Audio Home Recording Act of 1992 ("AHRA"), it
need not pay royalties of up to $8 per automobile to the Copyright Office and need not alter the
design of its in-dash systems to meet the requirements of the AHRA.

3.      GM asserts this counterclaim to establish that, within the deliberate sequence of
specific definitions of the AHRA (definitions that exist nowhere outside the AHRA, and which
significantly narrow the words from their ordinary non-statutory meaning), GM's in-dash
navigation and music systems do not meet the criteria for being "digital audio recording
devices."  Not all devices that record digital audio are "digital audio recording devices" within
the deliberate, specific, and counter-intuitive definitions of the AHRA.

4.      GM also asserts this counterclaim to establish that the AHRA suffers numerous
constitutional defects that prevent its application to GM in this case.

5.      Furthermore, GM asserts this counterclaim to clarify that the plaintiff AARC
cannot demonstrate any harm from the failure of the in-dash navigation and music systems of
GM's automobiles to conform to design mandates of the AHRA.  Simply put, GM's in-dash
navigation and music systems are incapable of facilitating "serial copying" and of causing the
harms that the AHRA aimed to prevent.

6.      Moreover, GM asserts this counterclaim to establish that AARC is a wholly
inappropriate plaintiff class representative and that there is no justification for class-action
treatment of this case.

7.     By way of background, the Audio Home Recording Act of 1992 was the outgrowth of disputes in the late 1980s as to whether makers and distributors of digital audio tape recorders and blank digital recording media engaged in contributory infringement of the copyright rights of songwriters and others by making those recorders available to the public.

8.     The major development underlying the disputes was that digital audio tape recorders and similar consumer devices could make digital reproductions that were for practical purposes "perfect":  digital technologies could create exact duplicates of music files from commercial music CD recordings.  Those same technologies could cause generation after generation of exact duplicates of those music files, for example tape after tape, without the degradation of quality that characterized analog duplication of musical recordings such as analog cassette tapes.  Third- or fourth-generation analog audiotape reproductions might have noticeable deterioration in quality from the original, whereas third-, fourth-, or further-generation digital reproductions on digital audio recording media would be identical to the original, with no loss of quality from one generation to the next.  The legislative history and text of the AHRA make clear that a core concept and concern of the law was what the AHRA defined as "serial copying."

9.     To resolve the disputes, representatives of the commercial music industry and the consumer electronics industry negotiated a compromise to promote jointly a new law that became the AHRA.

10.     The automobile industry did not participate in those negotiations or the compromise.

11.     The compromise legislation (a) established royalty rates upon statutorily defined "digital audio recording devices" and "digital audio recording media"; (b) imposed limitations upon the design of statutorily defined "digital audio recording devices"; and (c) prohibited

certain infringement lawsuits based on the manufacture, importation, or distribution of a statutorily defined "digital audio recording device," a statutorily defined "digital audio recording medium," an analog recording device, or an analog recording medium, or based on the use by a consumer of a statutorily defined "digital audio recording device" or analog recording device for making statutorily defined "digital musical recordings" or analog musical recordings.

12. The legal backdrop of the underlying disputes was the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984).  In that case, the Supreme Court recognized the doctrine of contributory copyright infringement, which lower courts at the time had held could apply when a defendant, with knowledge of an infringement, induced, caused, or materially contributed to that infringement.  The Supreme Court in *Sony* established that constructive knowledge of infringement could not arise from merely generalized knowledge that the public might engage in infringing uses, so long as the product was capable of substantial non-infringing use.

13. Resolution of the disputes over the advent of digital audio tape recorders avoided an effort by copyright claimants to attack *Sony* or circumvent it in the context of personal copying of commercial music (as opposed to personal copying of television broadcasts of motion pictures).

14. In *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005), the Court applied *Sony*'s constructive knowledge analysis to the new intent element of secondary liability:  "*Sony* barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement."  *Id.,* 545 U.S. at 933.

15.     The Supreme Court in *Sony* also established that the making by a consumer of a videotape of a motion picture, from broadcast television, for purposes of time-shifting was fair use.

16.     Similarly when a consumer, who has lawfully purchased music, stores that music on a personal device, for personal use and the purpose of "format shifting" or "space shifting," that consumer engages in fair use.

17.     In certain models, GM automobiles allow consumers who have lawfully purchased music to store that music on their own automobiles' navigation or music systems.

18.     When a consumer stores music from a commercial CD he or she owns onto an automobile's navigation or music system for personal use by later playing the music back inside the automobile, the consumer engages in fair use.

19.     When a consumer has transferred music he or she owns onto a removable storage medium, such as a USB drive, and then transfers music from the removable storage medium to an automobile's navigation or music system for the purpose of playing the music in the automobile at a later time, the transfers are fair uses.

20.     Fair uses are authorized under section 107 of the Copyright Act, 17 U.S.C. § 107.

21.     There is no question in this case of any contributory infringement by GM.

22.     GM's in-dash navigation and music systems are capable of substantial noninfringing uses by consumers.

23.     GM has no intent to induce or encourage copyright infringement by consumers using GM's in-dash navigation and music systems.

24.     Neither AARC nor any record label or recording artist it represents has ever accused GM of engaging in contributory copyright infringement.  GM is unaware that AARC, or

any record label or recording artist it represents, has ever accused a GM customer of engaging in copyright infringement through use of GM's in-dash navigation and music systems.

25.     This case instead concerns AARC's claims that (a) GM has a duty to design and market its automobiles' in-dash navigation and music systems differently and (b) GM has a duty to pay royalties to the Copyright Office (for later partial distribution to AARC and others) for the privilege of providing in-dash navigation and music systems that allow consumers to store their own music in their own automobiles.

## PARTIES

26.     Defendant GM is a Delaware limited liability company with its principal place of business in Detroit, Michigan.  Its automotive brands in the United States include Buick, Cadillac, Chevrolet and GMC.

27.     According to the allegations in its Complaint, AARC is a Pennsylvania corporation with its headquarters in Virginia.

28.     AARC has one principal function:  to collect AHRA royalties from the United States Copyright Office (or analogous royalties from other foreign government agencies) and to distribute them, after deducting its own expenses, to record labels and others.  On its website, AARC states:  "The Alliance of Artists and Recording Companies, Inc. (AARC) is a nonprofit organization that collects and distributes Audio Home Recording Act royalties to featured recording artists and sound recording copyright owners (usually record companies)."  It also refers to the royalties as "hometaping royalties."  On its website, AARC further claims to represent "over 142,000 featured recording artists, sound recording copyright owners, and record companies."  AARC claims to be an "interested copyright party" within the definition of the AHRA.

29.     AARC depicts the royalty distribution system under the AHRA, and its place within that system, with the following chart on its website ("DART" refers to "digital audio recording technology"):



30.     AARC is one of six major entities collecting royalties under the AHRA (the others being ASCAP, BMI, SESAC, Harry Fox Agency, and AFM and SAG/AFTRA Intellectual Property Rights Distribution Fund).

31.     To collect DART royalties from the Copyright Office, one must either directly, or through an intermediary such as AARC, file a claim during January or February of the year

following the year for which one seeks royalties.  If one fails to file a timely claim for a

particular year, one forfeits the royalties for that year.

32.     AARC collects money in part by threatening a variety of companies with lawsuits

just like this one, seeking potentially extravagant statutory damages and inflated royalties.

33.     AARC acknowledges that it may collect money it does not even deserve.  It states

the following on its web site at www.aarcroyalties.com:  "AARC's acceptance of any payments

under the Audio Home Recording Act ('AHRA') and/or its implementing regulations does not in

any way express or imply AARC's acknowledgment that such payments are required or

sufficient, or that the device or medium at issue is subject to the AHRA or that it meets any of

the AHRA's definitions or requirements."

34.     AARC also tries to have its cake and eat it too, by *both* collecting royalties for

devices and media that the AHRA covers *and also* reserving the right to sue companies for

copyright infringement despite the AHRA's prohibition on infringement actions pertaining to the

same devices or media.  AARC also says on its web site:  "Notwithstanding AARC's acceptance

of any such payments, AARC, its members and other copyright owners reserve all rights to take

enforcement action against any entity that is . . . violating any provision of law, including but not

limited to any of the exclusive rights provided in Section 106 of the Copyright Act."

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C.

§§ 1331, 1338, 2201 and 2202.

36.     This Court has personal jurisdiction over AARC because, among other things,

AARC does business, and has filed this lawsuit, in this judicial district.

37.     Venue is proper here because AARC resides within this district within the meaning of 28 U.S.C. § 1961(c).

38.     AARC's Complaint has established a real controversy between AARC and GM with respect to whether certain in-dash navigation and music systems in certain GM vehicles are "digital audio recording devices" ("DARDs") under the AHRA, whether GM must therefore pay royalties on them, and whether GM has a further obligation to alter their designs and their marketing.

## GM'S "INFOTAINMENT" NAVIGATION AND MUSIC SYSTEMS

39.     In the 2011 model year and more recently, GM has offered in-dash "infotainment systems."

40.     An infotainment system allows the driver or passengers in a vehicle to access information and entertainment systems in the vehicle.  For example, GM infotainment systems include a radio, CD player, DVD player, audio player for other types of files (including MP3 files), and USB connector.

41.     GM's infotainment systems have multiple purposes, including in-car navigation, radio controls, CD playback, DVD playback, USB connectivity, and, as an option on certain vehicle makes and models, the ability to store music from CDs.

42.     GM's marketing materials related to its infotainment systems describe the systems as having multiple purposes, including in-car navigation, radio controls, CD playback, DVD playback, USB connectivity, and the ability to store music from CDs.

43.     Most vehicles that GM has sold with in-dash infotainment systems having music storage also have the in-car navigation feature.  Those systems include computer programs to supply and manage the navigation functions as well as storage for map data.

44.     For the 2015 model year, all in-dash GM infotainment systems with music storage also include the navigation feature.

45.     Even the infotainment systems that lack a navigation feature contain computer programs that do not pertain only to stored music.  They also contain, for example, the Gracenote database software.  That software provides the album name, artist name, song title, and genre for songs in the Gracenote database for use in helping to identify and manage the playing of music that may reside on CDs in the dash, even where consumers store no music in the in-dash system.  That Gracenote software works with CD playback even when a user has never stored any music in the vehicle's infotainment system.  The Gracenote software also incorporates speech elements to support voice recognition, including voice recognition to control playback of music that is not fixed on the hard drive of the navigation and music systems.

46.     GM's in-dash infotainment systems with storage contain standard hard drives from hard drive manufacturers.  After assembly of the systems, the systems contain computer programs necessary for users to operate the GM infotainment devices, including the user interface, navigation software (if navigation is included), video display software, music playback software, and a variety of other functions that have nothing to do with audio recording.

47.     The recording functionality in the GM in-dash navigation and music systems with storage is a standard magnetic head resting on a moving actuator arm in order to read and write digital data to the platter.  The equipment has been optimized for use in an automotive environment to protect against unintended head movement.

48.     Each of the computer programs in the GM in-dash infotainment devices uses the same standard physical recording functionality to record any digital data.

49.     GM's in-dash navigation and music systems do not enable consumers to record or store music or other audio onto new CDs or other removable media that can serve as a source of further reproductions.

50.     GM's in-dash navigation and music systems do not have any digital output.  Their only output is to play music through the system's speakers for a driver and passengers to enjoy in the automobile.

51.     GM's in-dash navigation and music systems do not enable consumers to remove the in-dash storage media for use in other devices.

## THE INAPPLICABILITY OF THE AUDIO HOME RECORDING ACT

## TO GM'S NAVIGATION AND MUSIC SYSTEMS

### *The Relationship Between the Definition of "Digital Audio Recording Device"*

### *and Other Statutory Definitions in the AHRA*

52.     The AHRA contains a deliberately nested set of definitions that require close attention.  Congress created a new, specialized vocabulary that applies only to Chapter 10 of Title 17 and has its own definitions in Section 1001.  17 U.S.C. § 1001.

53.     The definitions in section 1001 provide the essential foundation for interpretation of other sections of the AHRA.

54.     The major question of statutory interpretation in this lawsuit is whether GM's in-dash navigation and music systems are "digital audio recording devices" within the meaning of the statute.

55.     The AHRA defines a "digital audio recording device" as "any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is

11

designed or marketed for the primary purpose of, and that is capable of, making a digital audio

recording for private use."

56.     The AHRA in turn defines a "digital audio copied recording" as a "reproduction

in a digital recording format of a digital musical recording, whether that reproduction is made

directly from another digital musical recording or indirectly from a transmission."

57.     The AHRA then defines a "digital musical recording" in relevant part as "a

material object" "(i) in which are fixed, in a digital recording format, only sounds, and material,

statements, or instructions incidental to those fixed sounds, if any, and (ii) from which the sounds

and material can be perceived, reproduced, or otherwise communicated, either directly or with

the aid of a machine or device."

58.     The structure and language of the AHRA make clear that a digital audio recording

device and a digital audio recording medium are complementary.

59.     Under section 1001(4), a "digital audio recording medium" is any material object

in a form commonly distributed for use by individuals, that is primarily marketed or most

commonly used by consumers for the purpose of making digital audio copied recordings by use

of a digital audio recording device."  "Such term does not include any material object— (i) that

embodies a sound recording at the time it is first distributed by the importer or manufacturer; or

(ii) that is primarily marketed and most commonly used by consumers either for the purpose of

making copies of motion pictures or other audiovisual works or for the purpose of making copies

of nonmusical literary works, including computer programs or data bases."

60.     The storage medium in a GM infotainment system is not a digital audio recording

medium.

61.     The immunity under section 1008 of the AHRA extends, in part, to consumers who use a "digital audio recording device" or "digital audio recording medium" for making "digital musical recordings."

62.     The AHRA envisions that a "digital audio recording device" acts on a "digital audio recording medium" to create a "digital audio copied recording" from a "digital musical recording."

63.     In enacting the AHRA Congress assumed that a "digital audio recording device" acts on a "digital audio recording medium" to create a "digital audio copied recording" from a "digital musical recording."

64.     As the immunity provision makes clear, the AHRA also envisions that a "digital audio copied recording" is itself a "digital musical recording."  Indeed, it is a reproduction of a "digital musical recording" in a digital recording format.

65.     The immunity provision recognizes that the typical use by a consumer of a "digital audio recording device" is to make a "digital musical recording."  That section states, in relevant part:  "No action may be brought under this title alleging infringement of copyright . . . based on the noncommercial use by a consumer of [a digital audio recording] device or [digital audio recording medium] for making digital musical recordings . . . ."  The immunity does not discuss a consumer's use of a "digital audio recording device" to make a "digital audio copied recording," even though the definition of a "digital audio recording device" in section 1001 focuses (in part) specifically on the relationship between such a device and a "digital audio copied recording."

66.     According to section 1001(5)(A) of the AHRA, 17 U.S.C. § 1001(5)(A), a "digital musical recording" must be a "material object."

67.     According to section 1001(1) of the AHRA, 17 U.S.C. §§ 1001(1), a "digital audio copied recording" is a "reproduction in a digital recording format of a digital musical recording."

68.     All "digital musical recordings" within the meaning of the AHRA are material objects.

69.     Under the plain terms of the very specific provision in section 1001(1), a "digital audio copied recording" is a reproduction in a digital recording format of a material object, namely a "digital musical recording."

70.     To reproduce a material object requires more than duplication of a file.

71.     In the context of the AHRA and the definition of a "digital audio copied recording," reproduction of the material object that is a digital musical recording under section 1001(1) requires that a "digital musical recording" be not only a source of a reproduction but also the product of the reproduction.  In other words, a "digital audio copied recording" must also be, at a minimum, a "digital musical recording."

72.     For a digital audio recording device to be capable of making a digital audio copied recording, it must be capable of reproducing a material object that qualifies as a digital musical recording.

73.     GM's in-dash navigation and music systems do not reproduce any material objects that qualify as "digital musical recordings."

74.     AARC lacks any evidence that GM's in-dash navigation and music systems reproduce any material objects that qualify as "digital musical recordings."

75.     GM's in-dash navigation and music systems are not capable of reproducing any material objects that qualify as "digital musical recordings."

76.     AARC lacks any evidence that GM's in-dash navigation and music systems are capable of reproducing any material objects that qualify as "digital musical recordings."

77.     All the GM in-dash navigation and music systems provide storage only on material objects in which one or more computer programs are fixed that are used for purposes other than to bring about the perception, reproduction, or communication of fixed sounds stored on the systems.

78.     No storage medium in which are fixed one or more programs, other than "statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material," can be a "digital musical recording."

79.     The GM in-dash navigation and music systems are incapable of reproducing music in a digital recording format in the form of a material object.

80.     GM's in-dash navigation and music systems do not store or record to any removable media.

81.     GM's in-dash navigation and music systems do not store or record to any detachable media.

82.     An ordinary consumer cannot use the GM in-dash navigation and music systems to export music stored on GM's in-dash navigation and music systems to any other device or medium.

83.     An ordinary consumer cannot use the GM in-dash navigation and music systems to record music from GM's in-dash navigation and music systems to any other device or medium.

84.     The design restrictions of the AHRA upon "digital audio recording devices" (discussed below) apply only to devices that are capable of recording onto "digital audio recording media" that can be used in other "digital audio recording devices."  All the "digital audio recording devices" that the legislative history describes – digital audio tape recorders, minidisc recorders, and consumer CD duplicators – fit exactly that pattern.

85.     GM's in-dash navigation and music systems are not "digital audio recording devices."

86.     GM's in-dash navigation and music systems are not "digital audio recording media."

### *"Serial Copying," the "Serial Copy Management System," the*

### *Design Restriction of the AHRA, and the Role of the Secretary of Commerce*

87.     The AHRA contains stated restrictions on the design of "digital audio recording devices."  It provides, in section 1002:

> (a) Prohibition on Importation, Manufacture, and Distribution.— No person shall import, manufacture, or distribute any digital audio recording device or digital audio interface device that does not conform to—
>
> (1) the Serial Copy Management System;
>
> (2) a system that has the same functional characteristics as the Serial Copy Management System and requires that copyright and generation status information be accurately sent, received, and acted upon between devices using the system's method of serial copying regulation and devices using the Serial Copy Management System; or
>
> (3) any other system certified by the Secretary of Commerce as prohibiting unauthorized serial copying.
>
> (b) Development of Verification Procedure.— The Secretary of Commerce shall establish a procedure to verify, upon the petition of an interested party, that a system meets the standards set forth in subsection (a)(2).

16

88.     Section 1001 of the AHRA states:  "The term 'serial copying' means the duplication in a digital format of a copyrighted musical work or sound recording from a digital reproduction of a digital musical recording.  The term 'digital reproduction of a digital musical recording' does not include a digital musical recording as distributed, by authority of the copyright owner, for ultimate sale to consumers."

89.     "Serial copying" thus involves (a) a "digital musical recording," (b) a digital reproduction of the "digital musical recording," and then (c) the duplication of a copyrighted musical work or sound recording from the digital reproduction.  At least three generations of reproduction or duplication from the originally distributed commercial music product are necessary in order to constitute "serial copying."

90.     Under that definition of "serial copying," the making by a consumer of a digital reproduction of a genuine, commercial CD that the consumer legitimately purchased is not an instance of "serial copying" within the meaning of the AHRA.

91.     If a consumer stores, on the consumer's own in-dash automobile system, music from a genuine, commercial CD that the consumer legitimately purchased, that is not an instance of "unauthorized serial copying" within the meaning of the AHRA.

92.     Neither the AHRA nor any part of Title 17 defines the "Serial Copy Management System" to which section 1002 refers.

93.     Congress deleted from draft legislation language that would define or provide specifications for "Serial Copy Management System" before it enacted the AHRA.

94.     No other binding federal law or regulation establishes the meaning of "Serial Copy Management System."

95.     GM believes, and therefore alleges, that, in violation of section 1002(b), the

Secretary of Commerce has never established a procedure to verify whether a system meets the

standards in section 1002(a)(2).

96.     GM believes, and therefore alleges, that no interested party has ever petitioned the

Secretary of Commerce to verify whether a system meets the requirements of section 1002(a)(2).

97.     GM believes, and therefore alleges, that the Secretary of Commerce has never

certified a system as "prohibiting unauthorized serial copying."

98.     GM believes, and therefore alleges, that the Secretary of Commerce has never

issued regulations for certification of a system as "prohibiting unauthorized serial copying."

99.     GM believes and therefore alleges that AARC lacks any evidence that the

Secretary of Commerce has ever certified a system as "prohibiting unauthorized serial copying"

as set forth in 17 U.S.C. Section 1002(a)(3).

100.    GM believes and therefore alleges that  AARC has never asked the Secretary of

Commerce to verify whether GM's in-dash navigation and music systems meet the standards set

forth in 17 U.S.C. Section 1002(a)(2).

101.    GM believes and therefore alleges that AARC lacks any evidence that any third

party has ever asked the Secretary of Commerce to verify that a system meets the standards set

forth in 17 U.S.C. Section 1002(a)(2).

102.    GM believes and therefore alleges that the phrase "Audio Home Recording Act,"

the acronym "AHRA," the phrase "Serial Copy Management System," the acronym "SCMS"

meaning "serial copy management system,"  the phrase "digital audio recording device," the

acronym "DARD" (other than as a typographical error involving the word "standard"), and the

phrase "serial copying" do not appear on the web site of the Department of Commerce and do not appear in any regulations that the Department of Commerce has promulgated.

103.     Many common devices used for reproducing recorded music, such as mobile phones, tablets, portable MP3 music players, and desktop and laptop computers, have no obligation to comply with the AHRA, to prevent serial copying, or to create, preserve or modify headers with copyright and generation status information on music files when making reproductions of music files, including from digital musical recordings.

104.     MP3 music files generally lack copyright and generation status information.

105.     Other compressed music files generally lack copyright and generation status information.

106.     Consumer ownership of AHRA-regulated CD duplicators and CD recorders is extremely rare in the United States today.

107.     GM's in-dash navigation and music systems cannot accept AHRA-regulated minidiscs for playback or storage.

108.     GM's in-dash navigation and music systems cannot accept AHRA-regulated digital audio tapes for playback or storage.

109.     Extremely few media in common consumer use today that a GM in-dash navigation or music system can accept have copyright and generation status information that indicates the material is copyright-protected and the generation status is "copy" (not an original).

110.     GM believes, and therefore alleges, that AARC has no evidence of any ordinary consumer, unrelated to Plaintiff, ever putting into a GM in-dash navigation or music system a consumer-created music file with headers that indicate the material is copyright-protected and has a generation status of "copy."

111.     GM believes, and therefore alleges, that AARC has no evidence that any different design of GM's in-dash navigation or music systems, to comply with the design mandates of the AHRA, would result in any significantly different function in ordinary consumer use.

112.     The GM in-dash navigation and music systems prohibit unauthorized serial copying.

113.     Not all serial copying is unauthorized.  Fair use is authorized by section 107 of the Copyright Act, 17 U.S.C. § 107.  The introductory language of both sections 106 and 107 make clear that the rights of a copyright holder are "subject to" section 107, which states that fair use is not an infringement of copyright.

114.     The GM in-dash navigation and music systems prohibit serial copying in general, because they do not effectuate the creation of any recordings on media that can reasonably serve as the source of further reproductions.

### UNSUITABILITY OF CLASS TREATMENT AND ATYPICALITY OF AARC

115.     No person or entity is entitled to royalties under AHRA for any year in which that person or entity failed to timely file a claim in the Copyright Office.

116.     To be timely in claiming royalties for a particular year, a claimant must file a claim during January or February of the following year.  No person or entity is entitled to royalties for a particular year without having timely filed a claim for such royalties.

117.     A person or entity that failed to file a timely claim for royalties for a given year lacks standing to sue for royalties for that year.

118.     A person or entity that failed to file a timely claim for royalties for a given year cannot belong to a class of plaintiffs who sue for those royalties.

119.    The AHRA defines the "interested copyright parties" who may make a claim for royalties.

120.    AARC claims to be an "interested copyright party" for the purpose of claiming royalties.

121.    AARC is one of a small group of major representatives whose purpose is receiving royalties under the AHRA.  Others include ASCAP, BMI, SESAC, Harry Fox Agency, and AFM/AFTRA Intellectual Property Rights Distribution Fund.

122.    AARC has brought this lawsuit in its capacity as a collecting entity, not as a copyright holder or performer.

123.    As a collecting entity, AARC is not typical of the persons or other entities it represents for the purpose of collecting royalties.

124.    GM believes and therefore alleges that AARC distributes approximately 60 percent of the royalties it pays out to sound recording copyright owners, chiefly record labels, and 40 percent of the royalties it pays out to featured artists.  The sums it pays to a typical record company or sound recording copyright owner are vastly different from the sums it pays to a typical featured performer.

125.    AARC does not have claims in common with the persons and other entities it represents for AHRA purposes.

126.    GM believes, and therefore alleges, that AARC does not own any sound recording copyrights.

127.    GM believes, and therefore alleges, that AARC has not been a featured artist in any sound recording.

128.    GM believes, and therefore alleges, that AARC does not represent persons in their capacity as non-featured artists in sound recordings for AHRA purposes.

129.    GM believes, and therefore alleges, that AARC has never been a non-featured artist in any sound recording.

130.    GM believes, and therefore alleges, that AARC does not represent persons or entities in their capacity as music publishers for AHRA purposes.

131.    GM believes, and therefore alleges, that AARC has never been a music publisher.

132.    GM believes, and therefore alleges, that AARC does not represent persons in their capacity as songwriters for AHRA purposes.

133.    GM believes, and therefore alleges, that AARC has never been a songwriter.

134.    GM believes, and therefore alleges, that AARC decides on its own how to allocate royalties to the persons and entities it represents.

135.    AARC's claims are not typical of the class it purports to represent.

136.    AARC and the other major royalty collectors under AHRA stand in a vastly different position from small claimants.

137.    The number of major royalty collectors under AHRA – ASCAP, BMI, SESAC, Harry Fox Agency, AFM and SAG/AFTRA Intellectual Property Rights Distribution Fund, and AARC – is not sufficiently numerous to justify class treatment of this case.

## LACK OF HARM TO AARC AND THOSE IT REPRESENTS FROM THE DESIGN OF GM'S IN-DASH NAVIGATION AND MUSIC SYSTEMS

138.    AARC has suffered no harm from any alleged violation by GM of section 1002 of the AHRA.

139.     The persons and entities AARC represents have suffered no harm from any alleged violation by GM of section 1002 of the AHRA.

140.     AARC has no evidence that it, or any person or entity it represents, has suffered harm from any alleged violation by GM of section 1002 of the AHRA.

141.     AARC has no evidence that any alteration of GM's in-dash navigation and music systems to conform to SCMS or its equivalent, or to prohibit unauthorized serial copying, would promote or increase music sales, leading to greater pass-through income to AARC or the persons it represents.

### FIRST COUNTERCLAIM FOR RELIEF

**(Declaratory Relief Under the Audio Home Recording Act, 17 U.S.C. §§ 1001 *et seq.*)**

142.     GM restates and incorporates by reference the previous paragraphs of the counterclaim.

143.     A real controversy exists between GM and AARC relating to the GM in-dash navigation and music systems at issue in Plaintiff's complaint.

144.      GM's in-dash navigation and music systems do not fall within the scope of the Audio Home Recording Act.

145.     GM has no obligation to conform its in-dash navigation and music systems to the Serial Copy Management System, a functional equivalent of SCMS, or any other provision of the AHRA, or to make royalty payments pursuant to that statute.

146.     In light of the 22-year long failure of the Secretary of Commerce to satisfy section 1002(b) of the AHRA, and the Secretary's failure ever to promulgate relevant regulations, GM's in-dash navigation and music systems meet the standards of section 1002(a)(2) for all relevant purposes.

147.    In light of the Secretary of Commerce's 22-year failure to promulgate relevant regulations, GM's in-dash navigation and music systems adequately prohibit unauthorized serial copying.

148.    In the alternative, the AHRA is unenforceable in this context because:

(a)    The AHRA is unconstitutionally vague and violates due process because of its failure to define "Serial Copy Management System" and the failure of the Secretary of Commerce to establish the procedures required by the AHRA or any regulations to comply with it;

(b)    It lacks a Constitutional foundation because Congress lacked authority to enact it in the absence of an explicit nexus to interstate, foreign, or Indian commerce; and/or

(c)    It violates the First Amendment by taxing and improperly burdening speech and technologies facilitating free speech.

149.    Unless the Court grants the declaratory relief that GM seeks, AARC will continue to assert its allegations of wrongdoing against GM and others and will continue to cause GM irreparable injury and damage.  A judicial determination and declaration thus are necessary to protect GM from uncertainty and harm.

## ANSWER

## GENERAL DENIAL

Unless specifically admitted below, GM denies each and every allegation in the Complaint.

## RESPONSE TO SPECIFIC ALLEGATIONS

GM hereby answers the numbered paragraphs of the Complaint with the following correspondingly numbered responses:

## NATURE OF THE CASE

1.      GM admits that the Complaint purports to seek, on a class basis, damages and an injunction against Defendants for alleged violations of the Audio Home Recording Act of 1992, 17 U.S.C. §§ 1001 *et seq.* ("AHRA"), incorporated within the Copyright Law of the United States, 17 U.S.C. §§ 101 *et seq.*  GM further admits that the AHRA regulates the manufacture, importation and distribution of "digital audio recording devices" ("DARDs", devices defined in 17 U.S.C. § 1001).  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 1 of the Complaint and on that basis denies them.

2.      GM admits that it is a multi-billion dollar company that manufactures, imports and distributes automobiles and related products in the United States every year.  The remaining allegations of Paragraph 2 state conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies that it manufactures, imports and/or distributes DARDs and further denies that it has committed the acts complained of in the Complaint unless otherwise specifically admitted elsewhere in this Answer.  GM denies the remaining allegations in Paragraph 2 of the Complaint as they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 2 of the Complaint and on that basis denies them.

3.      Paragraph 3 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained in Paragraph 3 of the Complaint as they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 3 of the Complaint and on that basis denies them.

4.      Paragraph 4 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies that it manufactures, sells or distributes any products or devices that fall within the scope of the AHRA or that it is otherwise obligated to comply with the AHRA's requirements.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 4 of the Complaint and on that basis denies them.

**JURISDICTION AND VENUE**

5.      GM admits the allegations in Paragraph 5 of the Complaint, except that it denies that it has committed the acts complained of in the Complaint unless otherwise specifically admitted elsewhere in this Answer.

6.      GM admits that it regularly does and solicits business, engages in a persistent course of conduct, and derives revenue from goods that are sold and/or marketed in the District of Columbia such that this Court has general personal jurisdiction over GM.  GM denies the remaining allegations in Paragraph 6 of the Complaint as they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 6 of the Complaint and on that basis denies them.

7.      GM admits the allegations in Paragraph 7 of the Complaint, except that it denies that it has committed the acts complained of in the Complaint unless otherwise specifically admitted elsewhere in this Answer.

**PARTIES**

8.      GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 8 of the Complaint and on that basis denies them.

9.      GM admits the allegations of Paragraph 9 of the Complaint.

10.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint and on that basis denies them.

11.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 11 of the Complaint and on that basis denies them.

12.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint and on that basis denies them.

## **FACTUAL BACKGROUND**

13.     Paragraph 13 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM admits that the AHRA was enacted by Congress in 1992. GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 13 of the Complaint and on that basis denies them.

14.     Paragraph 14 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint and on that basis denies them.

15.     Paragraph 15 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM admits the allegations in Paragraph 15 of the Complaint, except that GM denies that it is an importer, distributor, or manufacturer of DARDs or that GM otherwise has any obligation to comply with the notice and royalty provisions of 17 U.S.C. Section 1003.

16.     Paragraph 16 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM admits that 17 U.S.C. Section 1002(a)(1)-(3) prohibits the importation, manufacture, or distribution of any DARD that does not conform to (1) the Serial Copy Management System; (2) "a system that has the same functional characteristics as the Serial Copy Management System and requires that copyright and generation status information be accurately sent, received, and acted upon between devices using the system's method of serial copying regulation and devices using the Serial Copy Management System; or (3) "any other system certified by the Secretary of Commerce as prohibiting unauthorized serial copying."  GM denies that it is an importer, distributor, or manufacturer of DARDs or that GM otherwise has any obligation to comply with the Incorporation of Copying Control provisions of 17 U.S.C. Section 1002(a).  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 16 of the Complaint and on that basis denies them.

17.     Paragraph 17 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM admits the allegations in Paragraph 17 of the Complaint, except that GM denies that it is an importer, distributor, or manufacturer of a DARD as that term is defined in 17 U.S.C. Section 1001(3).

18.     GM admits the allegations in Paragraph 18 of the Complaint.

19.     Paragraph 19 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM admits that 17 U.S.C. Section 1001(5) defines the term "digital musical recording" as that term is used in the AHRA.  GM lacks sufficient information

to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint and on that basis denies them.

20.     Paragraph 20 of the Complaint states conclusions of law and legal argument regarding the AHRA and its legislative history to which no response is required.  To the extent a response is deemed necessary, GM admits that 17 U.S.C. Section 1009(a) provides that "[a]ny interested copyright party injured by a violation of section 1002 or 1003 may bring a civil action in an appropriate United States district court against any person for such violation."  GM admits that 17 U.S.C. Section 1009(e) provides that "[a]ny award of damages under subsection (d) shall be deposited with the Register pursuant to section 1005 for distribution to interested copyright parties as though such funds were royalty payments made pursuant to section 1003."  GM denies the remaining allegations in Paragraph 20 of the Complaint.

21.     GM denies the allegations in Paragraph 21 of the Complaint as they relate to GM. GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 21 of the Complaint and on that basis denies them.

22.     GM admits the allegations in Paragraph 22 of the Complaint.

23.     GM admits that DENSO supplies GM with devices that are installed in and distributed in certain GM vehicles.  GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint and on that basis denies them.

24.     GM admits that  devices, referred to as a Hard Drive Device ("HDD"), are features available on three 2015 model year vehicles sold under GM brands.  GM admits that one feature, among many, of each Hard Drive Device is the ability to record songs from CDs to the device's hard drive.  GM denies that any Hard Drive Device is a DARD under the AHRA and denies the remaining allegations of Paragraph 24.

25.     GM admits that a Hard Drive Device is available on the 2015 model year Cadillac CTS Coupe, GMC Savana Van and Chevrolet Express Vans.  GM denies the remaining allegations in Paragraph 25 of the Complaint.

26.     GM admits that Hard Drive Devices were available on certain GM vehicle models since at least the 2011 model year and that a Hard Drive Device was an available feature on the 2011 Cadillac CTS/CTS-V.  GM denies that the Hard Drive Devices are DARDs as defined in the AHRA.

27.     GM denies that any Hard Drive Device in its vehicles is capable of making a "digital audio copied recording" as that term is defined in the AHRA.  GM admits that the Hard Drive Devices allow for songs to be recorded from a user's CD to a hard drive with several gigabytes of available memory.  Depending on available memory, an entire CD can also be recorded.  GM's Hard Drive Devices contain the Gracenote database that provides album name, artist name, song title, and genre for songs included in the Gracenote database.  Songs that are recorded onto the user's Hard Drive Device can be played back directly from the hard drive without any need for the CD.  GM denies the remaining allegations in Paragraph 27 of the Complaint.

28.     GM denies that the primary purpose of the design of any GM vehicle Hard Drive Device's recording feature is the making of digital audio copied recordings for private use and further denies that the Hard Drive Devices  in GM vehicles are capable of making a digital audio copied recording as that term is defined in the AHRA.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 28 of the Complaint and on that basis denies them.

29.     GM denies the allegations in Paragraph 29 of the Complaint.

30.     GM denies that the Hard Drive Devices were designed to, or are otherwise capable of making, a "digital audio copied recording" as that term is defined in the AHRA.  GM denies that certain 2015 model year GM models come standard with a Hard Drive Device that does not have a navigation feature.  GM denies that making "digital audio copied recordings" is the core purpose of the design of any Hard Drive Device's recording function.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 30 of the Complaint and on that basis denies them.

31.     GM denies that any GM vehicle's Hard Drive Device's recording function is marketed for the primary purpose of making digital audio copied recordings for private use.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 31 of the Complaint, as the sources of the referenced quotations are not specified, and on that basis denies those allegations.

32.     GM admits that the Hard Drive Devices have multiple features and functionalities.  GM denies that the Hard Drive Devices make digital audio copied recordings as that term is defined in the AHRA, and it denies that making digital audio copied recordings is marketed as the central purpose of any Hard Drive Device's recording function.  GM denies the remaining allegations in Paragraph 32 of the Complaint.

33.     Paragraph 33 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies the allegations in Paragraph 33 of the Complaint.

34.     GM admits that DENSO is a GM supplier of GM's Hard Drive Devices in the United States.  GM denies the remaining allegations in Paragraph 34 of the Complaint.

35.     GM admits that it has not filed any notices or statements of account with the Register of Copyrights pursuant to the AHRA.  GM denies that it has an obligation to do so under the AHRA or otherwise.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 35 of the Complaint and on that basis denies them.

36.     GM admits that it has not paid to the Register of Copyrights any royalties pursuant to the AHRA.  GM denies that it has an obligation to do so under the AHRA or otherwise.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 36 of the Complaint and on that basis denies them.

37.     Paragraph 37 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies that the Hard Drive Devices are digital audio recording devices as that term is defined in the AHRA such that it is under any obligation to conform to SCMS or any functional equivalent.  GM denies the remaining allegations in Paragraph 37 of the Complaint.

38.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint and on that basis denies them.

39.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 39 of the Complaint and on that basis denies them.

40.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint and on that basis denies them.

41.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint and on that basis denies them.

42.     GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint and on that basis denies them.

43.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 43 of the Complaint and on that basis denies them.

44.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 44 of the Complaint and on that basis denies them.

45.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 45 of the Complaint and on that basis denies them.

46.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 46 of the Complaint and on that basis denies them.

47.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 47 of the Complaint and on that basis denies them.

48.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 48 of the Complaint and on that basis denies them.

49.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 49 of the Complaint and on that basis denies them.

50.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 50 of the Complaint and on that basis denies them.

51.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 51 of the Complaint and on that basis denies them.

52.    GM lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 52 of the Complaint and on that basis denies them.

## CLASS ACTION ALLEGATIONS

53.    GM repeats and incorporates here its responses to paragraphs 1-52 above.

54.     The allegations of Paragraph 54 merely seek to characterize and assert legal conclusions regarding AARC's claims regarding a putative class pursuant to 17 U.S.C. §1001(7), and therefore no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained Paragraph 54 of the Complaint, except it admits that AARC purports to bring this action on behalf of itself and a putative class.  GM further denies that class treatment is appropriate.

55.     The allegations of Paragraph 55 merely seek to characterize and assert legal conclusions regarding AARC's claims regarding a putative class pursuant to 17 U.S.C. §1001(7), and therefore no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained Paragraph 55 of the Complaint, except it admits that AARC purports to bring this action on behalf of itself and a putative class.  GM further denies that class treatment is appropriate.

56.     The allegations of Paragraph 56 merely seek to characterize and assert legal conclusions regarding AARC's claims regarding a putative class pursuant to 17 U.S.C. §1001(7), and therefore no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained in Paragraph 56(A)-(C) of the Complaint as they relate to GM.  GM further denies that class treatment is appropriate.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 56 of the Complaint and on that basis denies them.

57.     The allegations of Paragraph 57 merely seek to characterize and assert legal conclusions regarding AARC's claims regarding a putative class and regarding Plaintiff, and therefore no response is required.  To the extent a response is deemed necessary, GM denies the

allegations contained in Paragraph 57 of the Complaint.  GM further denies that class treatment is appropriate.

58.     The allegations of Paragraph 58 merely seek to characterize and assert legal conclusions regarding AARC's claims regarding a putative class and regarding Plaintiff, and therefore no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained in Paragraph 58 of the Complaint.  GM further denies that class treatment is appropriate.

59.     Paragraph 59 of the Complaint states conclusions of law and characterizations regarding the AHRA to which no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained in Paragraph 59 of the Complaint.  GM further denies that class treatment is appropriate.

60.     Paragraph 60 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained in Paragraph 60 of the Complaint.  GM further denies that class treatment is appropriate.

61.     Paragraph 61 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed necessary, GM denies the allegations contained in Paragraph 61 of the Complaint.  GM further denies that class treatment is appropriate.

## COUNT I
### INJUNCTIVE RELIEF
### (17 U.S.C. § 1003(a))

62.     GM repeats and incorporates here its responses to paragraphs 1-61 above.

63.     GM denies the allegations in Paragraph 63 of the Complaint to the extent they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 63 of the Complaint and on that basis denies them.

64.     GM denies the allegations in Paragraph 64 of the Complaint to the extent they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 64 of the Complaint and on that basis denies them.

65.     GM denies the allegations in Paragraph 65 of the Complaint to the extent they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 65 of the Complaint and on that basis denies them.

66.     GM admits that the Complaint purports to seek a permanent injunction enjoining Defendants.  GM denies that it manufacturers, imports or distributes DARDs or otherwise has any liability under the AHRA.  GM denies the remaining allegations in Paragraph 66 of the Complaint.

**COUNT II**
**DAMAGES**
**(17 U.S.C. § 1003(a))**

67.     GM repeats and incorporates here its responses to paragraphs 1-66 above.

68.     GM denies the allegations in Paragraph 68 of the Complaint to the extent they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 68 of the Complaint and on that basis denies them.

69.     GM denies the allegations in Paragraph 69 of the Complaint to the extent they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 69 of the Complaint and on that basis denies them.

70.     GM denies the allegations in Paragraph 70 of the Complaint to the extent they relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 70 of the Complaint and on that basis denies them.

71.     GM admits that the Complaint purports to seek damages pursuant to 17 U.S.C.

§ 1009(c)(2).  GM denies that it has any liability under the AHRA, or that AARC is otherwise

entitled to damages from any action or event alleged in the Complaint.  GM lacks sufficient

information to form a belief as to the truth of the remaining allegations in Paragraph 71 of the

Complaint and on that basis denies them.

**COUNT III**
**INJUNCTIVE RELIEF**
**(17 U.S.C. § 1002(a))**

72.     GM repeats and incorporates here its responses to paragraphs 1-71above.

73.     GM denies the allegations in Paragraph 73 of the Complaint to the extent they

relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining

allegations in Paragraph 73 of the Complaint and on that basis denies them.

74.     GM admits that the Complaint purports to seek a permanent injunction enjoining

Defendants.  GM denies that it manufacturers, imports or distributes DARDs or that it otherwise

has any liability under the AHRA.  GM denies the remaining allegations in Paragraph 74 of the

Complaint.

**COUNT IV**
**DAMAGES**
**(17 U.S.C. § 1002(a))**

75.     GM repeats and incorporates here its responses to paragraphs 1-74 above.

76.     GM denies the allegations in Paragraph 76 of the Complaint to the extent they

relate to GM.  GM lacks sufficient information to form a belief as to the truth of the remaining

allegations in Paragraph 76 of the Complaint and on that basis denies them.

77.     GM admits that the Complaint purports to seek damages pursuant to 17 U.S.C.

§ 1009(c)(2) and (d)(1)(B)(i).  GM denies that it has any liability under the AHRA, or that

AARC is otherwise entitled to damages from any action or event alleged in the Complaint.  GM

lacks sufficient information to form a belief as to the truth of the remaining allegations in

Paragraph 77 of the Complaint and, on that basis, denies them.

**COUNT V**
**DECLARATORY RELIEF**
**(17 U.S.C. §§ 1002 and 1003)**

78.     GM repeats and incorporates here its responses to paragraphs 1-79 above.

79.     GM admits the allegations in Paragraph 79.

80.     GM admits that the Complaint purports to seek a judicial declaration against the

Defendants.  GM denies that AARC is entitled to any such declaratory relief, that GM has

violated the AHRA, or otherwise has any liability for any action or event alleged in the

Complaint.  GM denies the remaining allegations of Paragraph 80 of the Complaint.

**DEFENSES TO PLAINTIFF'S COMPLAINT**

GM asserts the following defenses, whether affirmative or otherwise.  GM reserves all

further defenses that may now or in the future exist based on discovery and further factual

investigation in the case.

**FIRST DEFENSE**
**(Due Process Violation)**

Plaintiff's Complaint, and each purported cause of action contained therein, is barred as it

relies on statutes that are unconstitutionally vague and violate due process: they are so indefinite

as to give no fair warning of the conduct they seek to regulate, the applicable penalties allow for

arbitrary and discriminatory enforcement, and determination of the scope and meaning of the

statutes at issue requires speculation.

**SECOND DEFENSE**
**(Statute Unconstitutionally Vague)**

Plaintiff's Complaint, and each purported cause of action contained therein, is barred as Section 1002 of the AHRA's purported prohibition on the importation, manufacture and distribution of digital audio recording devices that do not comply with the Serial Copy Management System, a system "that has the same functional characteristics as the Serial Copy Management System," or "any other system certified by the Secretary of Commerce as prohibiting unauthorized serial copying" is unconstitutionally vague and violates due process. GM believes and therefore alleges that the AHRA uses the defined term "Serial Management Copy System" without defining it, and a definition for which Congress chose to omit from the law; the Secretary of Commerce, contrary to the requirement of section 1002(b), has never established a procedure to verify, upon the petition of an interested party, that a system meets the standard of having the same functional characteristics as the Serial Copy Management System; no interested party has ever petitioned the Secretary of Commerce to establish such a verification procedure; and the Secretary of Commerce has never promulgated or instituted rules or procedures for certifying a system as prohibiting unauthorized serial copying.  As a consequence, Section 1002 of the AHRA lacks any constitutionally or statutorily enforceable standard.

**THIRD DEFENSE**
**(Statute Exceeds Congress' Constitutional Authority)**

Plaintiff's Complaint, and each purported cause of action contained therein, is barred as the AHRA is unconstitutional and unenforceable as it exceeds Congress' limited authority under the United States Constitution, Article 1, Section 8, Clause 3, to regulate commerce "with foreign Nations, among the several States, and with the Indian Tribes."  The Audio Home Recording Act imposes obligations and engages in regulations that do not depend in any way

upon the existence of interstate or foreign commerce.  Moreover, the Audio Home Recording

Act does not rest upon the Copyright Clause of the United States Constitution, Article I,

Section 8, Clause 8, because it does not secure or protect any rights of an author for limited

times.

### FOURTH DEFENSE
### (Statute Violates the First Amendment)

Plaintiff's Complaint, and each purported cause of action contained therein, is barred as

the AHRA is unconstitutional and unenforceable as it violates the First Amendment by

burdening free expression with special technology restrictions and with a special tax in the nature

of money royalties due to be paid to the Copyright Office for the privilege of manufacturing,

importing, or distributing equipment for the recording of expression.  Both the restrictions and

the tax significantly and improperly burden free expression.  For example, a person who wishes

to use a digital audio recording device and a corresponding medium subject to the statute for the

sole purpose of recording one's grandmother recounting an oral history would have to pay

additional money because of the imposition of a requirement that a manufacturer, importer, or

distributor of digital audio recording devices or digital audio recording media pay money to the

Copyright Office for the benefit of commercial entertainers and entertainment companies who

have no relationship whatever to the use of the devices or media.

### FIFTH DEFENSE
### (Capability – Material Object)

Plaintiff's Complaint, and each purported cause of action contained therein, fails because

each GM Hard Drive Device is not a "digital audio recording device," as defined by the AHRA:

each Hard Drive Device is not capable of making a "digital audio copied recording" because a

user cannot use the HDD to reproduce a "digital musical recording" that is a "material object."

## SIXTH DEFENSE
### (Capability – Digital Musical Recordings)

Plaintiff's Complaint, and each purported cause of action contained therein, fails because each GM Hard Drive Device is not a "digital audio recording device" under the AHRA in that each Hard Drive Device contains fixed computer programs beyond statements or instructions constituting the sounds and incidental material and beyond statements or instructions related to the perception, reproduction, or communication of fixed sounds and incidental material on the Hard Drive Device itself.  Material objects, such as GM's Hard Drive Devices, that contain such computer programs are not "digital musical recordings" under the AHRA, and GM's Hard Drive Devices are therefore not capable of making a "digital audio copied recording" as is necessary for a device to be classified as a "digital audio recording device."

## SEVENTH DEFENSE
### (Primary Purpose)

Plaintiff's Complaint, and each purported cause of action contained therein, fails because each GM Hard Drive Device is not a "digital audio recording device," as defined by the AHRA: each Hard Drive Device's digital recording function is not "designed or marketed for the primary purpose of…making a digital audio copied recording for private use."

## EIGHTH DEFENSE
### (Failure to State a Cause of Action)

The Complaint and each cause of action it contains fails to state facts sufficient to constitute a claim on which relief may be granted.

## NINTH DEFENSE
### (Laches)

The doctrine of laches bars AARC's claims, in that AARC has unreasonably delayed in the enforcement of its rights, if any, despite its full awareness of GM's actions.

**TENTH DEFENSE**
**(Waiver, Acquiescence, Estoppel)**

The doctrines of acquiescence, waiver and estoppel bar AARC's claims, in that AARC's conduct implied consent to GM's actions.

**ELEVENTH DEFENSE**
**(Statute of Limitations)**

The relevant statute of limitations bars AARC's claims whole or in part.

**TWELFTH DEFENSE**
**(Unjust Enrichment)**

Plaintiff and the members of the alleged class would be unjustly enriched if they were permitted to obtain any recovery in this action.

**THIRTEENTH DEFENSE**
**(Abstention, Exhaustion, Deference, and Ripeness)**

Plaintiff's claims are barred under doctrines of abstention, exhaustion, deference, and ripeness or justiciability by virtue of the fact that Plaintiff has never petitioned the Secretary of Commerce for verification of whether GM's in-dash navigation and music systems meet the standards of 17 U.S.C. 1002(a).

**<u>PRAYER FOR RELIEF</u>**

GM asks this Court to enter a judgment in its favor and against Plaintiff as follows:

A.      That the Court grant GM the declaratory relief it seeks in this Counterclaim;

B.      That the Court dismiss Plaintiff's Complaint in its entirety, with prejudice, with AARC taking nothing by way of its claims, and enter judgment on the Complaint in favor of GM;

C.      That the Court award GM its reasonable attorneys' fees and costs incurred in connection with this action; and

D.      That the Court grant GM any other relief that the Court considers just and

equitable.

## **DEMAND FOR JURY TRIAL**

GM hereby demands a trial by jury of all issues triable of right by a jury.


Dated:   October 31, 2014                         Respectfully submitted,


                                        By: /s/ *Andrew P. Bridges*
                                              Andrew P. Bridges (U.S. Dist. Ct. Bar ID AR0002)
                                              David L. Hayes (admission *pro hac vice pending)*
                                              Mary E. Milionis (admission *pro hac vice pending)*
                                              FENWICK & WEST LLP
                                              555 California Street, 12th Floor
                                              San Francisco, CA  94104
                                              Telephone:  415.875.2300
                                              Facsimile:   415.281.1350

                                              Attorneys for Defendant
                                              GENERAL MOTORS LLC

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2014, I electronically filed the foregoing document

with the clerk of the court for the U.S. District Court, District of Columbia, using the electronic

case filing system of the court, and that a copy was served on the following counsel of record via

ECF:


Richard B. Dagen
Michael Bednarek
AXINN VELTROP & HARKRIDER, LLP
950 F Street, NW
Washington, DC 2004
Telephone: (202) 912-4700
Fax: (202) 912-4701
Email: rdagen@axinn.com
Email: mbednarek@axinn.com

Joshua Hersh Packman
BAKER BOTTS, LLP
The Warner Building
1299 Pennsylvania Avenue, NW, Suite 1300
Washington, DC 20004-2400
Telephone: (202) 639-7700
Email: Joshua.packman@bakerbotts.com


Van H. Beckwith
BAKER & BOTTS, L.L.P.
2001 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6849
Email: van.beckwith@bakerbotts.com

Annette L. Hurst
Steven J. Routh
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8509
Email: srouth@orrick.com


James M. Burger
THOMPSON COBURN LLP
1909 K Street, N.W. Suite 600
Washington, D.C. 20006-1167
Telephone: (202) 585-6909
Email: jburger@thomponscoburn.com


_/s/ Andrew P. Bridges_
Andrew P. Bridges (U.S. Dist. Ct. Bar ID AR0002)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:    415.875.2300
Facsimile:    415.281.1350