**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> GENERAL MOTORS LLC, *et al.*, <br><br> Defendants. | Civ. No. 1:14-cv-01271-KBJ <br><br> Honorable Judge Ketanji Brown Jackson |
| ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHRYSLER GROUP LLC, <br> (now known as FCA US LLC), <br> MITSUBISHI ELECTRIC AUTOMOTIVE AMERICA, INC., <br><br> Defendants. | Civ. No. 1:14-cv-01920-KBJ (consolidated) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF
<u>MITSUBISHI ELECTRIC AUTOMOTIVE AMERICA, INC.</u>**

Seth D. Greenstein (D.C. Bar No. 416733)
David D. Golden (D.C. Bar No. 985047)
Robert S. Schwartz (D.C. Bar No. 283713)
CONSTANTINE CANNON, LLP
1001 Pennsylvania Avenue, NW, Suite 1300N
Washington, DC 20004
Phone: 202-204-3500
Facsimile: 202-204-3501
sgreenstein@constantinecannon.com
dgolden@constantinecannon.com
rschwartz@constantinecannon.com

*Attorneys for Defendant Mitsubishi Electric
Automotive America, Inc*

Date:  March 12, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT.............................................1

SUMMARY OF MATERIAL FACTS........................................................................4

ARGUMENT................................................................................................................7

I.      Summary Judgment is Warranted Because the MEAA Systems Are Not "Digital
        Audio Recording Devices" Subject to the AHRA. ...........................................7

        A.      Standards for Summary Judgment.......................................................9

        B.      The AHRA definitions limit the scope of devices subject to the Act, and
                deliberately exclude devices that copy and store data and programs other than
                prerecorded music...............................................................................9

                1.      A "digital musical recording" cannot be a material object that includes
                        computer programs or data unrelated to musical recordings. ..................10

                2.      A "digital audio copied recording" that reproduces a "digital musical
                        recording" must itself be a "digital musical recording." ..........................11

                3.      A "digital audio recording device" must be capable of reproducing  a
                        "digital musical recording" onto a "digital musical recording.".............13

        C.      The requirement that a "Digital Audio Recording Device" must be capable of
                making a "Digital Musical Recording" is the only interpretation consistent
                with the plain meaning of the AHRA as a whole. ...............................14

        D.      The MEAA-supplied infotainment systems are not "Digital Musical
                Recordings," and do not make "Digital Audio Copied Recordings.".................17

                1.      Software and data on the MEAA systems as sold to Chrysler exempt
                        the systems from the "digital musical recording" definition in Section
                        1001(5)(B) and, therefore, from the "digital audio recording device"
                        definition. ...........................................................................17

                2.      Data recorded to the hard disk drives put the MEAA systems outside
                        the definition of a "digital audio recording device." ...............................19

CONCLUSION...................................................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                                                                                          **Page**

*Am. Fed'n of Gov't Employees v. Shinseki,* 709 F.3d 29 (D.C. Cir. 2013)................................13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...............................................................9

*Atl. Recording Corp. v. XM Satellite Radio, Inc.*, No. 06-Civ. -3733, 2007 WL 136186
       (S.D.N.Y. Jan. 19, 2007)...............................................................................................12

*Chickasaw Nation v. United States,* 534 U.S. 84 (2001) ............................................................17

*Consumer Prod. Safety Comm'n v. GTE Sylvania Inc.,* 447 U.S. 102 (1980).........................14

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000) ........................................16

*Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564 (1982)................................................14, 16

*Laningham v. U.S. Navy,* 813 F.2d 1236 (D.C. Cir. 1987) .........................................................9

*McCready v. Nicholson,* 465 F.3d 1 (D.C. Cir. 2006) ................................................................9

*Pub. Investors Arb. Bar Ass'n v. SEC*, 771 F.3d 1 (D.C. Cir. 2014) ........................................13

*Ratzlaf et ux. v. United States,* 510 U.S. 135 (1994)................................................................13

*\*Recording Indus. Ass'n of America v. Diamond Multimedia Sys., Inc.,*
       180 F.3d 1072 (9th Cir. 1999) ...............................................................................*passim*

*Tao v. Freeh,* 27 F.3d 635 (D.C. Cir. 1994) ...............................................................................9

*Tri-State Hospital Supply Corp. v. United States,* 341 F.3d 571 (D.C. Cir. 2003)...................16

*United States v. Atl. Research Corp.*, 551 U.S. 128 (2007) ......................................................17

*United States v. Project on Gov't Oversight*, 616 F.3d 544 (D.C. Cir. 2010)...........................13

**STATUTES**

17 U.S.C. § 101.........................................................................................................................10

17 U.S.C. § 115(d) ....................................................................................................................10

17 U.S.C. § 507(b) ......................................................................................................................4

*\*17 U.S.C. § 1001 et seq* .................................................................................................*passim*

17 U.S.C. § 1001 ...................................................................................................................9, 14

\*17 U.S.C. § 1001(1) .................................................................................2, 11, 12, 13, 17

\*17 U.S.C. § 1001(3) .................................................................................1, 3, 7, 13, 14

17 U.S.C. § 1001(4) ...........................................................................................................11

\*17 U.S.C. § 1001(5) ....................................................................................................1, 10

17 U.S.C. § 1001(5)(A) ...........................................................................................10, 17, 18

17 U.S.C. § 1001(5)(A)(i) ...............................................................................................10, 19

17 U.S.C. § 1001(5)(B) ...................................................................................................18, 20

17 U.S.C. § 1001(5)(B)(ii) .................................................................................................18

17 U.S.C. § 1001(5)(C) ........................................................................................................20

17 U.S.C. § 1002.........................................................................................................1, 9, 21

17 U.S.C. § 1002(a) .............................................................................................................8

17 U.S.C. § 1002(a)(2) .......................................................................................................16

17 U.S.C. § 1003.........................................................................................................1, 9, 21

17 U.S.C. § 1003(a) .............................................................................................................8

17 U.S.C. § 1008.................................................................................................3, 8, 14, 15, 16

17 U.S.C. § 1009.........................................................................................................3, 8

17 U.S.C. § 1009(f) .............................................................................................................16

17 U.S.C. § 1009(g) .............................................................................................................16

## RULES

Fed. R. Civ. P. 56.................................................................................................................9

Fed. R. Civ. P. 56(a).............................................................................................................9

## LEGISLATIVE HISTORY

H.R. 4567, 102d Cong. Sec. 2 § 1001(1)(A) & 2 (1992)........................................................17

H. Rep. No. 102-780 (1992) ...........................................................................................14, 15

H. Rep. No. 102-873 (1992) ................................................................................. 14, 15

S. Rep. No. 102-294 (1992) ............................................................................. 11, 14, 15

**OTHER AUTHORITIES**

Amy Roberts, *The 'Serial' podcast: By the numbers*, CNN (Dec. 23, 2014),
http://www.cnn.com/2014/12/18/showbiz/feat-serial-podcast-btn/ ......................... 20

Dictionary.com, http://dictionary.reference.com/browse/podcast ........................... 20

Kevin Roose, *What's Behind the Great Podcast Renaissance?*, New York Magazine
online (Oct. 30, 2014), http://nymag.com/daily/intelligencer/2014/10/
whats-behind-the-great-podcast-renaissance.html ...................................... 20

Merriam Webster, http://www.merriam-webster.com/dictionary/audiobook .......................... 20

Norman J. Singer & Shambie Singer,
Statutes and Statutory Construction § 46.3 (7th ed. 2014) .......................... 13

Press Release, Chairman Goodlatte's Remarks to the Chamber of
Commerce's IP Summit (Nov. 18, 2014), *available at*
http://judiciary.house.gov/index.cfm/press-releases?id
=8E8EA645-5060-4E8B-8C21-452A14C0C7A5 ......................................... 8

Recording Industry Association of America ("RIAA"),
News and Notes on 2014 Mid-Year Industry Shipment and Revenue
Statistics, http://riaa.com/media/1806D32F-B3DD-19D3-70A4-
4C31C0217836.pdf .................................................................. 3

Wikipedia, http://en.wikipedia.org/wiki/Flash_memory ......................................... 2

Wikipedia, http://en.wikipedia.org/wiki/Hard_disk_drive ....................................... 2

Wikipedia, http://en.wikipedia.org/wiki/Logfile ............................................... 6

Wikipedia, http://en.wikipedia.org/wiki/USB_flash_drive ....................................... 2

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Audio Home Recording Act of 1992, 17 U.S.C. § 1001 *et seq.* ("AHRA"), does not apply to every device capable of copying recorded music. Congress confined the AHRA to a narrowly-drawn category of "digital audio recording devices"— traditional consumer electronics equipment that could proliferate serial digital copies of music on media designed to record only sounds. Congress intentionally excluded from the AHRA's reach, and its royalty and serial copy protection obligations, computer and information technology products and media for recording multiple types of data.

Defendant Mitsubishi Electric Automotive America, Inc. ("MEAA") supplies multimedia car infotainment systems to defendant FCA US LLC (formerly known as Chrysler Group LLC, hereinafter "Chrysler"). To prevail on any of its claims under Sections 1002 and 1003, plaintiff Alliance of Artists and Recording Companies ("AARC") must prove that the infotainment systems that MEAA supplies to Chrysler fit the AHRA's definition of "digital audio recording device." This AARC cannot prove. The AHRA deliberately excludes devices such as the MEAA infotainment systems, through the following series of nested definitions:

- A "digital musical recording" is a material object "in which are fixed, in a digital recording format, *only* sounds, and material, statements, or instructions incidental to those fixed sounds." Section 1001(5) (emphasis added). Nothing else can be included on that material object and still be a "digital musical recording."

- A "digital audio recording device" must be "capable of making, a digital audio copied recording."  Section 1001(3).

- A "digital audio copied recording" is defined as a reproduction of a "digital musical recording … made directly from another digital musical recording… ."

Because a digital audio copied recording is made from "another" digital musical recording, both the digital musical recording *and* the digital audio copied recording must be "digital musical recordings." Section 1001(1).

- Therefore, if a recording device does not reproduce a "digital musical recording" (a material object with *only* sounds) from "another digital musical recording," that device is not a "digital audio recording device" as required by the AHRA.

Summary judgment is warranted here because the MEAA car infotainment systems are not "digital audio recording devices." Unlike car radios of the past, at the core of MEAA's multifunction systems are the type of products Congress exempted from the AHRA: sophisticated computers that store a variety of data on a hard disk drive.[1] As supplied to Chrysler by MEAA, the hard disk drives contain computer programs, graphics, and data—but *no* fixed sounds. When in use by Chrysler's customers, the systems automatically record data to the hard drive that are not sounds or related to recorded sounds. Even the files that Chrysler's customers can copy to the hard disk drive include multiple types of digital files beyond the reach of the AHRA, such as photographs and MP3 or Windows Media format audio files copied from computers on Universal Serial Bus ("USB") drives[2] and recordable optical discs. Because the MEAA infotainment systems make reproductions onto material objects (the hard disk drives) that do not contain "only sounds," these material objects are not "digital musical recordings"; they are not capable of making "digital audio copied recordings"; and they are not "digital audio recording devices." They are exempt from the AHRA.

---

[1]     "Hard disk drives" are data storage devices commonly used in computers on which digital information is written to and read from one or more rapidly rotating magnetic disks by one or more magnetic heads. *See, e.g.,* Wikipedia, http://en.wikipedia.org/wiki/Hard_disk_drive (last visited Feb. 10, 2015).

[2]     "USB drives" are inexpensive thumb-sized portable storage devices commonly used to transfer all types of digital files between computers and other devices that connect via an interface known as the Universal Serial Bus. *See, e.g.,* Wikipedia, http://en.wikipedia.org/wiki/USB_flash_drive (last visited Feb. 10, 2015). They use "flash" memory chips that can be written to and erased hundreds of thousands of times. Wikipedia, http://en.wikipedia.org/wiki/Flash_memory (last visited Feb. 10, 2015).

The only appellate case to interpret the defined terms at the heart of the AHRA—"digital audio recording device," "digital musical recording," and "digital audio copied recording"— reinforces how these limitations and exclusions were integral to the fabric of the AHRA, and why summary judgment should be granted to MEAA. In *Recording Indus. Ass'n of America v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072 (9th Cir. 1999) (hereinafter "*Rio*"), the Ninth Circuit held that MP3-format music players were not "digital audio recording devices," so exempted them from the AHRA under the following logic. Those players copied music files from computer hard disk drives. Those drives contained more than "only sounds," and so could not be "digital musical recordings." Since the source of the copies made by the MP3 players was not a "digital musical recording," the copies they made could not be "digital audio copied recordings" (*i.e.*, copies from "another digital musical recording"). Because the MP3 players were not "capable of making a digital audio copied recording," as a matter of law they could not meet the definition of "digital audio recording devices" under AHRA Section 1001(3).[3]  This reasoning applies with equal force to MEAA's infotainment units.

Moreover, this is the only interpretation consistent with AHRA Sections 1008 and 1009, which use the term "digital musical recordings" to subsume "digital audio copied recordings." The Section 1008 immunity from suit granted to consumers for making "digital musical recordings" would be meaningless unless "digital musical recordings" included the "digital audio copied recordings" made therefrom. Similarly, the Section 1009 impoundment and destruction

---

[3]      Despite AARC's stubborn insistence that *Rio* was wrongly decided, the *Rio* decision paved the way for the explosion of mobile digital music on players like the iPod and Android phone and iPhones—which, like the MEAA products at issue here, store music and other types of files on internal memory as one of their multiple functions. Lawful online digital media stores like iTunes, eMusic.com, and Amazon Music are the direct outgrowth of the *Rio* decision, and have proved a boon to the "interested copyright parties" that AARC represents. If AARC seriously intends to reverse the *Rio* decision through this case, it would upend a market that, in the first half of 2014, brought recording companies nearly twice the revenue from sales of digital music downloads in the United States as from compact disc sales. Recording Industry Association of America ("RIAA"), News and Notes on 2014 Mid-Year Industry Shipment and Revenue Statistics, http://riaa.com/media/1806D32F-B3DD-19D3-70A4-4C31C0217836.pdf (last visited Feb. 18, 2015).

remedies for illicit "digital musical recordings" would be toothless if they left untouched the serial "digital audio copied recordings" at which the AHRA is aimed.

By this Motion, MEAA seeks summary judgment based on a straightforward defense of statutory interpretation that would resolve this litigation expeditiously in MEAA's favor, based on undisputed facts and requiring limited discovery. For these reasons, as explained below, MEAA asks the Court to grant summary judgment in favor of MEAA and against AARC, and to dismiss the Complaint against MEAA.

## SUMMARY OF MATERIAL FACTS

The Declaration of Douglas Ray, Director of Audio, Video, and Communications for MEAA, attached hereto (hereinafter "Ray Decl."), summarizes the key facts demonstrating why the hard-disk drive-based infotainment systems supplied by MEAA to Chrysler are not "digital audio recording devices" and, therefore, are not subject to the AHRA.[4]

1.     The MEAA-supplied infotainment systems combine the functions of an AM/FM radio, a Sirius XM satellite radio, a CD player, a DVD video player, and an MP3-type personal music player. *See* Golden Decl. Ex. A at 49-66. The systems are controlled and operated by a sophisticated computing device, consisting of a central processing unit to control its operations; random access memory for the system to internally process and execute operations; and a hard disk drive with 40 gigabytes (GB) of storage capacity for computer programs and data. Ray Decl. ¶ 3. The consumer interface with the unit consists of a series of buttons and a liquid crystal display (LCD) touch screen. *Id.*; Golden Decl. Ex. A at 10-12.

---

[4]     The Ray Declaration covers all MEAA infotainment systems supplied to Chrysler during the relevant period beginning November 2011. Ray Decl. ¶ 2.  *See* 17 U.S.C. § 507(b)(prescribing three-year statute of limitations for civil actions under title 17). MEAA also attaches to the Declaration of David Golden excerpts from a Chrysler Owner's Manual for the 2015 model year that describes the operation of these systems, including the systems supplied by MEAA ("Golden Decl. Ex. A").The full version of the manual is available from the Chrysler website at http://tinyurl.com/pud72av (last visited March 5, 2015).

2.      When supplied to Chrysler, the hard disk drives in the MEAA infotainment systems contain a variety of software programs and data, but no recorded sounds. Ray Decl. ¶ 6. MEAA copies these programs and data onto the system hard disk drive by inserting a USB storage device into the USB input port on the front of the unit, or an optical disc (*e.g.*, a CD or DVD) into the CD/DVD drive. *Id.* ¶ 7.

- The *software programs* on the hard disk drive include a back-up copy of all computer programs necessary for the operations performed by the unit. *Id.* ¶ 6(a). A Chrysler dealer or authorized service center can update the software by copying the new software to the hard disk drive, as above, via either a USB drive inserted in the USB port or a CD or DVD in the optical disc drive. *Id.* ¶¶ 7, 11; Golden Decl. Ex. A at 134-135.

- *Data* loaded by MEAA onto the hard disk drives include graphics and a table of channels used by the Sirius XM radio to display channel information and logos on the LCD screen. Ray Decl. ¶ 6(d). The unit automatically records updated channel information and graphics onto the hard disk drive in response to data signals received by the units in Sirius XM broadcasts. *Id.* The hard disk drive as supplied by MEAA also contains a database, known as CDDB or "Gracenote," comprising information concerning 650,000 of the most popular sound recordings on CD, including the name of the artist, album title, song titles, song durations, and in many cases album cover art. *Id.* ¶ 6(e); *see* Gracenote, http://www.gracenote.com/auto/ (last visited Feb. 25, 2015). When a consumer plays a prerecorded audio CD, the system searches the Gracenote database for matching information and, if found, will display it on the LCD screen. *Id.*; Golden

Decl. Ex. A at 42-44. In this operation, *no* songs are stored on the unit's hard disk drive. The Gracenote system functions as support for playback of commercially-released CDs, and helps the consumer control playback of the CD on a song-by-song basis. Ray Decl. ¶ 6(e).

3.       When in use, the system automatically records to the hard disk drive information describing each operation performed by the system. *Id.* ¶ 8. This "logfile" is used by the dealer to troubleshoot system malfunctions, and is a typical function of computer systems. *Id.*[5]

4.       Regardless of whether a Chrysler owner ever copies any media to the hard disk drive or uses the system only to listen to radio and play CDs, all this software and data will remain on the hard disk drive; the Sirius XM graphics will be displayed when tuned to a particular channel; the Gracenote database information can be accessed when commercial CDs are played; and the logfile information and backup software will be available to the dealer.

5.       Chrysler's customers may record several different types of digital files to the hard disk drive other than tracks from a prerecorded audio CD. Graphics, such as photographs, in the JPEG (.jpg) format can be recorded to the hard disk drive from a recordable optical disc or from a USB storage device connected to the front of the unit. *Id.* ¶ 10(a)(i), (b); Golden Decl. Ex. A at 63-66. Music files in the MP3, Windows Media Audio (WMA), or certain AAC formats obtained from a computer can be copied to the hard disk drive from a USB storage device, or from a recordable optical disc. Ray Decl. ¶ 10(a)(ii), (b); Golden Decl. Ex. A at 50-55. The USB storage devices or optical discs used to transfer these digital files to the MEAA infotainment system hard disk drive are data storage media typically used with computers to copy and store a

---

[5]       According to Wikipedia, "[i]n computing, a logfile is a file that records either events that occur in an operating system or other software runs… ." Wikipedia, http://en.wikipedia.org/wiki/Logfile (last visited Feb. 16, 2015).

variety of digital file types, such as word processing documents, spreadsheets, presentations, .pdf files, and so forth. The MEAA systems will read or copy digital files containing photographs (in the .jpg format) and computer digital audio (in the MP3, WMA, or certain AAC formats).

6.  Chrysler's customers also can transfer audio tracks from prerecorded CDs to the MEAA system hard disk drive. At the customer's request, tracks from such a CD will be stored in the AAC format on the hard disk drive. *Id.* ¶ 10(c). If the Gracenote database on the hard disk drive contains information for that CD, that information may be displayed when files recorded from that CD are played back from the hard drive. *Id.*

7.  All this software and data are recorded to the MEAA infotainment system hard disk drives using the same "recording function"—*i.e.*, recording from an optical disc or a USB storage device to the hard disks by magnetic heads—regardless of whether the copy is made by MEAA or by a Chrysler customer. *Id.* ¶¶ 7, 9.

8.  Finally, the MEAA infotainment systems cannot do "serial copying." The hard disk drive will not record any CD audio tracks that are marked as copies from a recordable CD that is a "digital audio recording medium." *Id.* ¶ 10(d).  Software and data from the hard disk drive cannot be transferred by the Chrysler customer to another computer or storage medium; the files can only be accessed by authorized Chrysler service centers. *Id.* ¶ 12.

## ARGUMENT

### I.  Summary Judgment is Warranted Because the MEAA Systems Are Not "Digital Audio Recording Devices" Subject to the AHRA.

As the Ninth Circuit observed, the AHRA "does not broadly prohibit digital serial copying of copyright protected recordings. Instead, the Act places restrictions only upon a specific type of recording device"—a "digital audio recording device" as defined by Section

1001(3). *Rio*, 180 F.3d at 1075.[6] Each count of AARC's Complaint requires AARC to prove that

a system supplied by MEAA is a "digital audio recording device," which it is not.[7]

  While MEAA's Answer and Affirmative Defenses asserts several reasons why these

infotainment systems are *not* "digital audio recording devices." MEAA raises only one,

dispositive, defense in this motion:

> *The MEAA car infotainment systems are not "digital audio recording devices"*
> *because they are not capable of making a "digital audio copied recording" as*
> *defined by the AHRA.*[8]

  As explained below, not every digital reproduction of digital music creates a "digital

audio copied recording." Because a direct reproduction to a "digital audio copied recording"

must come from "another digital musical recording," the AHRA definitions require that *both* the

source of the recording *and* the "digital audio copied recording" must be "digital musical

recordings." Sections 1008 and 1009 of the AHRA reinforce this plain statutory language, and

have meaning only if every "digital audio copied recording" made by a "digital audio recording

device" is also a "digital musical recording."

  The MEAA infotainment systems do not satisfy these requirements. Their hard disk

drives, when sold to Chrysler and later in use by the car buyer, contain software programs, data,

---

[6]  The Chairman of the House Judiciary Committee, Rep. Robert Goodlatte, recently referenced the narrow focus of the AHRA on devices that record on removable media:

> The 13 chapters of today's Title 17 have some obvious issues.  I'm not sure how many of you ever owned a digital audio tape recorder, usually known as a DAT recorder, and I'm not even sure how many of us would even recognize one. Yet Chapter 10 of Title 17 is focused on DAT recorders.

Press Release, Chairman Goodlatte's Remarks to the Chamber of Commerce's IP Summit (Nov. 18, 2014), *available at* http://judiciary.house.gov/index.cfm/press-releases?id=8E8EA645-5060-4E8B-8C21-452A14C0C7A5 (last visited Feb. 16, 2015).

[7]  Counts III, IV and V allege a violation of 17 U.S.C. § 1002(a) ("No person shall import, manufacture, or distribute any *digital audio recording device*") (emphasis added).  Counts I, II and V allege a violation of 17 U.S.C. § 17 U.S.C. § 1003(a) ("No person shall import into [sic] and distribute, or manufacture and distribute, any *digital audio recording device… .*") (emphasis added).

[8]  First Affirmative Defense, Answer and Affirmative Defenses of Def. MEAA, Dkt. No. 56, at 15 (Feb. 23, 2015).

and graphics necessary to their ordinary functions, but unrelated to any recorded music. Therefore, the hard disk drives in the MEAA infotainment systems (the "material objects") cannot be "digital musical recordings," and cannot be capable of making a "digital audio copied recording." These inherent characteristics of the MEAA systems exclude them from the definition of a "digital audio recording device" and thus from the ambit of the AHRA.

### A.    Standards for Summary Judgment

Under Federal Rules of Civil Procedure 56, summary judgment should be granted when the record shows no genuine issue of material fact and the moving party is otherwise entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C. Cir. 1994). To defeat summary judgment, the non-moving party bears the burden to show the existence of a genuine and material issue that could affect the outcome of the litigation in the non-movant's favor. *Anderson,* 477 U.S. at 247-248; *Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C. Cir. 1987). When ruling on a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party. *McCready v. Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006).

Summary judgment should be granted to MEAA. There is no set of facts under which an MEAA system could be deemed to make a "digital musical recording" and, therefore, could be deemed to be a "digital audio recording device" capable of making a "digital audio copied recording," as required for liability under either Section 1002 or 1003 of the AHRA.

### B.    The AHRA definitions limit the scope of devices subject to the Act, and deliberately exclude devices that copy and store data and programs other than prerecorded music.

Section 1001 delineates the scope of the AHRA "through a set of nested definitions." *Rio,* 180 F.3d at 1075. Three terms weave the "nest" pertinent to this case: a "*digital audio recording*

*device*" must be capable of making a "*digital audio copied recording*," which in turn must be a

"*digital musical recording*." MEAA reviews these definitions in reverse order below.

> 1.      A "*digital musical recording*" cannot be a material object that includes computer programs or data unrelated to musical recordings.

Under Section 1001(5):

(A) A "digital musical recording" is a *material object* —

> (i) in which are fixed, in a digital recording format, *only sounds, and material, statements, or instructions incidental to those fixed sounds,* if any, … .

(B) A "digital musical recording" *does not include a material object* —

> (ii) *in which one or more computer programs are fixed*, except that a digital musical recording may contain statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material.

(emphasis added). The italicized language highlights two important limitations in the definition.

First, a "digital musical recording" must be a material object. It is *not* the digital data that

constitute the song in the form of a digital music "file." Rather, it is the medium (such as an

optical disc or digital tape) on which the digital data constituting a song are recorded.[9] Second,

not every material object on which digital music data can be recorded is a "digital musical

recording." The definition covers only those material objects that are dedicated to the recording

of digital music—where "*only* sounds, and material, statements, or instructions incidental to

those fixed sounds" are fixed. 17 U.S.C. § 1001(5)(A)(i) (emphasis added). Subparagraph (B)(ii)

reinforces that circumscription by exempting from the "digital musical recording" definition any

material object "in which one or more computer programs are fixed" other than programs used to

reproduce the sounds.

---

[9]      This distinction is mirrored in Title 17 in the Section 101 definition of "phonorecord" (a "material object" in which a sound recording is fixed) and the Section 115(d) definition of "digital phonorecord delivery" (a data "transmission" of a sound recording).

By these limitations, Congress deliberately excluded from the AHRA's purview digital computing products like MEAA's infotainment systems that inherently record multiple types of data and not just music. For example, computers record data to a variety of material objects, including hard disk drives, recordable optical discs (such as a CD-R, CD-RW, or DVD-R), USB drives, and various configurations of memory cards.[10] Congress excluded both computing devices and the media they record to from the scope of the AHRA.[11]  Reviewing legislative history, the *Rio* court observed:

> A footnote makes explicit that this definition only extends to the material objects in which songs are normally fixed: '[t]hat is recorded compact discs, digital audio tapes, audio cassettes, long-playing albums, digital compact cassettes, and mini-discs.' [S. Rep. 102-294 (1992), *reprinted at* 1992 WL 133198, at 118-19 n.36.] There are simply no grounds in either the plain language of the definition or in the legislative history for interpreting the term 'digital musical recording' to include songs fixed on computer hard drives.

*Rio*, 180 F.3d at 1077.

Accordingly, not every material object that can record digital music is a "digital musical recording." And, crucial to the resolution of this case, material objects that store a variety of data types, such as the hard disk drives used in the MEAA systems and the USB drives and optical data discs that supply data to those hard disk drives, cannot be "digital musical recordings."

### 2. A "<u>*digital audio copied recording*</u>" that reproduces a "*digital musical recording*" must itself be a "*digital musical recording*."

Section 1001(1) defines a "digital audio copied recording" as "a reproduction in a digital recording format of a digital musical recording, whether that reproduction is made directly from

---

[10]    Computer-based recording media such as hard disk drives, flash memory, or the now-obsolete floppy discs were exempt from the AHRA royalty requirements. Where computers and consumer electronics products could use the same type of recordable media, the consumer electronics industry developed music-specific recordable media that met the definition of "digital audio recording medium" in Section 1001(4), while the computer-based media remained exempt. *Compare, e.g.,* Amazon.com, http://tinyurl.com/mz67hsk (Maxell 120-minute Digital Audio Tape) *and* Amazon.com, http://tinyurl.com/pq9g5jz (HP DAT 72 GB Data Cartridge); and Maxell, http://maxell-usa.com/product_468.html (Maxell CD-R 80 Music) and Maxell, http://maxell-usa.com/product_544.html (Maxell CD-R Data); *see also* Amazon.com, http://tinyurl.com/nn4kjq3 (Sony MiniDisc format).

[11]    *See Rio*, 180 F.3d at 1076-1077.

*another digital musical recording* or indirectly from a transmission." *Id.* (emphasis added). The "digital audio copied recording" definition includes two important limitations.

<u>First</u>, a "digital audio copied recording" must be a digital reproduction of a "digital musical recording." As the *Rio* case holds, not every reproduction of digital music makes a "digital audio copied recording." Reproductions of music files from a material object that is not a "digital musical recording" (such as from a computer hard disk drive, USB drive, optical data disc, or memory card) are not "digital audio copied recordings."[12]

<u>Second</u>, and outcome-determinative for this Motion, the word "*another*" performs a crucial limiting function in the definition and statutory scheme. The plain meaning of "*another*" requires that both the "digital audio copied recording" and the object from which the recording is made be "digital musical recordings." A "digital audio copied recording" can be a reproduction from "*another* digital musical recording" only if both the source "digital musical recording" and the target "digital audio copied recording" are "digital musical recordings."[13] To hold otherwise would ignore the plain meaning of the statute. If Congress had not intended to require the "digital audio copied recording" to also be a "digital musical recording," the "digital audio copied recording" definition would read "whether that reproduction is made directly from *a* digital musical recording," instead of "*another* digital musical recording."

---

[12]      *See Rio*, 180 F.3d at 1076-1077.

[13]      Plaintiff admits that in another case ten major record labels—which presumably are "interested copyright parties" represented in this litigation by AARC—advanced the same statutory interpretation that MEAA makes here. They *agreed* that "[b]oth the source and the final product of a 'digital audio copied recording' must be a 'digital musical recording.'" *See* AARC Opp'n to Mem. of P. & A. to Def. General Motors LLC's Mot. for J. on the Pleadings, Dkt. 53, at 24 n.18 (Feb. 17, 2015) ("AARC Opp'n"). The decision in that case, *Atl. Recording Corp. v. XM Satellite Radio, Inc.*, No. 06-Civ.-3733, 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007), is inapposite. It found, under a different clause of Section 1001(1), that a device that records a digital broadcast transmission could make a "digital audio copied recording." *Id.* at *4 n.4; 17 U.S.C. § 1001(1) (alternatively defining a "digital audio copied recording" as a digital reproduction of a "digital musical recording" made "indirectly from a transmission"). MEAA infotainment systems do not have that capability. *See* Ray Decl. ¶ 10(d).

Absent a clear indication to the contrary, a statute should be read so that no word, clause, sentence, or phrase is negated or rendered meaningless.[14] The limiting term "another" performs a specific and important function in the AHRA text. It requires that the "digital audio copied recording" that makes a recording from a "digital musical recording" must also be a material object that meets the definition of a "digital musical recording." It adds an important limitation to the definition, and does not contravene the plain meaning of the definition. Nor is there any indication that the definition was intended to be interpreted contrary to its plain meaning. By using "another," Congress focused the definition on the making of copies on material objects dedicated to the recording of sounds, and exempted recordings made to computer-based storage media, such as the hard disk drives in the MEAA infotainment systems, in a manner consistent with the purpose of the statute as a whole.

Accordingly, the plain meaning and principles of statutory interpretation reinforce the conclusion that, under Section 1001(1), a recording directly from a "digital musical recording" is *not* a "digital audio copied recording" unless that recording is *also* a "digital musical recording."

### 3.   A *"digital audio recording device"* must be capable of reproducing a *"digital musical recording" onto a "digital musical recording."*

A " 'digital audio recording device' is any machine or device of a type commonly distributed to individuals for use by individuals, … that *is capable of, making a digital audio copied recording* for private use… ." 17 U.S.C. § 1001(3) (emphasis added). Thus, any recording device that is not capable of making a "digital audio copied recording" is not a "digital audio recording device."

---

[14]    Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 46.3 (7th ed. 2014). *See, e.g.*, *Ratzlaf et ux. v. United States*, 510 U.S. 135, 140-41 (1994); *Pub. Investors Arb. Bar Ass'n v. SEC*, 771 F.3d 1, 8-9 (D.C. Cir. 2014); *Am. Fed'n of Gov't Employees v. Shinseki*, 709 F.3d 29, 33-34 (D.C. Cir. 2013); *United States v. Project on Gov't Oversight*, 616 F.3d 544, 561 (D.C. Cir. 2010).

As established above, a "digital audio copied recording" must also be a "digital musical recording." Therefore, under the plain language of Section 1001(3), a recording device can qualify as a "digital audio recording device" only if it is "capable of" making a "digital musical recording." Applying well-established canons of statutory interpretation, that plain meaning of the statute is decisive. The starting point for interpreting a statute is the text of the statute itself; and where, as here, Congress expresses its will in "reasonably plain terms, 'that language must ordinarily be regarded as conclusive.' " *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570 (1982), quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania Inc.,* 447 U.S. 102, 108 (1980).

**C.      The requirement that a "Digital Audio Recording Device" must be capable of making a "Digital Musical Recording" is the only interpretation consistent with the plain meaning of the AHRA as a whole.**

The previous section explains why, under the plain language of Section 1001, for a product to be a "digital audio recording device," the "digital audio copied recording" it makes must itself be a "digital musical recording." This interpretation is also the only one consistent with the rest of the statute.

First, it is the only interpretation consistent with Section 1008, which grants immunity from copyright infringement suit to consumers who make digital or analog copies of musical recordings. Section 1008 effectuates this central purpose of the AHRA—"to ensure the right of consumers to make analog or digital audio recordings of copyrighted music for their private, noncommercial use."[15] This immunity provides the only affirmative benefit consumers and manufacturers receive from the AHRA.[16] Therefore, it is crucially important that Congress

---

[15]      S. Rep. No. 102-294, at 30 (1992). *See also* H. Rep. No. 102-873, at 9 (1992) ("The purpose of H.R. 3204 is to provide a legal and administrative framework within which digital audio recording technology may be made available to consumers.").

[16]      *See* H. Rep. No. 102-780 Part 1, at 22 (1992), noting that "[t]he benefits to consumers of the legislation of release from liability regarding home copying and eventual access to digital technology outweigh the limited of burdens [sic] having to indirectly pay royalties and enduring some limits on taping through technological fixes."

granted this immunity from suit to any consumer who uses a "digital audio recording device" to

make "digital musical recordings"—*not* "digital audio copied recordings":

> No action may be brought under this title alleging infringement of copyright
> based on the manufacture, importation, or distribution of a digital audio recording
> device, a digital audio recording medium, an analog recording device, or an
> analog recording medium, or based on the noncommercial use by a consumer of
> such a device or medium *for making digital musical recordings* or analog musical
> recordings.

17 U.S.C. § 1008 (emphasis added).

This intentionally-broad immunity makes sense only because the "digital audio copied

recording" made by the "digital audio recording device" is itself a "digital musical recording."

Otherwise, the exemption would be a null set – it would fail to immunize the consumers who

used digital audio recording devices to make copies of digital musical recordings, and would

eviscerate the statute's core purpose.

This interpretation is further confirmed by legislative history. The House Report by the

Committee on the Judiciary explained: "In the case of home taping, the exemption protects all

noncommercial copying by consumers of digital and analog musical recordings." H. Rep. No.

102-873 (Part 1), at 24. The House Committee on Energy and Commerce similarly wrote: "In

short, the reported legislation would clearly establish that consumers cannot be sued for making

analog or digital audio copies for private noncommercial use." H. Rep. No. 102-780 Part 1, at

20).[17] Congress thus equated the acts of "*making* digital musical recordings" in the statutory text

---

[17]     *See also* S. Rep. No. 102-294, at 51:

> [A] key purpose of [the bill] is to insure the right of consumers to make analog or digital audio
> recordings of copyrighted music for private, noncommercial use.  Section 1002(a)(2) states that
> the copying of an audiogram by a consumer for private, noncommercial use is not for direct or
> indirect commercial advantage and is therefore not actionable. Thus, for purposes of illustration,
> the making of an audiogram by a consumer for use in his or her home, car, or portable tape player,
> or for a family member, is protected by the prohibition against copyright infringement actions
> contained in this legislation.

and "*copying*" of digital musical recordings on a digital audio recording device, and reinforced the intention under the AHRA that every "digital audio copied recording" made by the consumer with a "digital audio recording device" has to be a "digital musical recording."

<u>Second</u>, the remedial impoundment and destruction provisions of Section 1009(f) and (g) make sense only if a "digital audio copied recording" must also be a "digital musical recording."[18] If a "digital musical recording" covers an original recording but not a copy, then Section 1009(f) and (g) would only empower a court to order impoundment and destruction of commercially-sold music CDs used to make copies in violation of the AHRA, but not the illicit copies themselves. Congress could not have intended a result so contrary to the remedial purposes of impoundment and destruction. Courts should avoid such absurd interpretations where, as here, "alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors,* 458 U.S. at 575; *see Tri-State Hospital Supply Corp. v. United States,* 341 F.3d 571, 577-578 (D.C. Cir. 2003) ("[b]y adhering to the ordinary meaning… we avoid such an illogical result.").

It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000). The context of the AHRA thus compels the conclusion that "digital musical recording" encompasses both the original recording and the "digital audio copied recording" made therefrom.[19]

---

In the final House bill and as enacted, the term "audiogram" later was replaced by "digital musical recording"; the example in Section 1002(a)(2) was removed as superfluous; and Section 1002 was renumbered as Section 1008.

[18]     Section 1009(f) empowers a court to order impoundment of "any digital musical recording … that is in the custody or control of the alleged violator and that the court has reasonable cause to believe … was involved in a violation of section 1002." Section 1009(g) permits a court, as part of a final judgment, to order "the destruction of any … digital musical recording" that was involved in a violation of section 1002 or was in the custody or control of the violator or impounded under Section 1009(f).

[19]     AARC suggests that such a reading renders superfluous the requirement that a "digital audio copied recording" must be in "a digital recording format," *see* AARC Opp'n at 26. The phrase "in a digital recording

**D.    The MEAA-supplied infotainment systems are not "Digital Musical Recordings," and do not make "Digital Audio Copied Recordings."**

The MEAA-supplied car infotainment systems are not covered by the AHRA because, as supplied, the material objects used for recording (the hard disk drives) contain *only* software and data and *no* sounds. Therefore, the systems are not capable of making "digital audio copied recordings" to a "digital musical recording" from "another digital musical recording"—and do not meet that key element of the "digital audio recording device" definition.

**1.    *Software and data on the MEAA systems as sold to Chrysler exempt the systems from the "digital musical recording" definition in Section 1001(5)(B) and, therefore, from the "digital audio recording device" definition.***

MEAA preloads the hard disk drives of the infotainment systems supplied to Chrysler with several categories of data and software that place them outside the "digital musical recording" definition (no matter what material Chrysler's customers later may add). The primary elements of Section 1001(5)(A) require that a "digital musical recording" must be a material object "(i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, … ." Those material objects (the hard disk drives) contain *no* fixed sounds—only software programs and data *other than* sounds; and the copies of the operating system software on the drives are used for installation and repair purposes, not to reproduce or render sound recordings.

---

format" in the definition of "digital audio copied recording" is merely a vestige left over from earlier versions of the bill in which, unlike the AHRA as enacted, the phrase limited the bill to the digital copying of an "audiogram" which could be in either analog or digital format. *Compare* H.R. 4567, 102d Cong. Sec. 2 § 1001(1)(A) & (2) (1992), *with* 17 U.S.C. § 1001(1) & (5). Regardless, statutory canons prefer redundancy to the result from AARC's interpretation—which negates the meaning of a statutory term (*i.e.*, by reading the word "another" out of the definition entirely), or contravenes the purposes of the statute (*i.e.*, by rendering Sections 1008 and 1009 meaningless and absurd). "The canon requiring a court to give effect to each word '*if possible*' is sometimes offset by the canon that permits a court to reject words 'as surplusage' if 'inadvertently inserted or if repugnant to the rest of the statute… .' " *Chickasaw Nation v. United* States, 534 U.S. 84, 94 (2001) (citation omitted); *see United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007) ("It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity.").

Moreover, the software and data MEAA loads to the drives are not incidental to fixed sounds. For example, graphics data recorded on the drives are used in connection with the branding of the car and the operation of the Sirius XM radio. Information in the Gracenote database is used to display information about the content of prerecorded CDs inserted into the optical disc drive by the consumer, even if no sounds are fixed on the drive. If the car owner never recorded any sounds to the hard disk drive, these data would perform their intended function to enable channel identification and track selection of prerecorded audio CDs.

Thus, MEAA hard disk drives fall within the Section 1001(5)(B) exception, by which a "digital musical recording" "does not include a material object … (ii) in which one or more computer programs are fixed" other than programs constituting the fixed sounds, programs used to render the sounds, and incidental material. This conclusion is consistent with the *Rio* decision in which the Ninth Circuit found that multipurpose hard disk drives, like those in the MEAA infotainment systems, are not "digital musical recordings."[20] Notably, the statute specifically states the exception in absolute rather than relative terms, turning on whether the object contains "one or more computer programs… ." 17 U.S.C. §1001(5)(B)(ii). Thus, Congress intended that the presence of *even one* computer program is sufficient to exempt a hard disk drive from the "digital musical recording" definition.

---

[20]   The Ninth Circuit found that multipurpose hard disk drives are not "digital musical recordings" because:

The typical computer hard drive from which a Rio directly records is, of course, a material object. However, hard drives ordinarily contain much more than 'only sounds, and material, statements, or instructions incidental to those fixed sounds.' Indeed, almost all hard drives contain numerous programs … and databases that are not incidental to any sound files that may be stored on the hard drive.

*Rio,* 180 F.3d at 1076, *quoting* Section 1001(5)(A).

Because the MEAA hard disk drives cannot be "digital musical recordings," they cannot be capable of making a "digital audio copied recording." Therefore, the MEAA systems cannot be "digital audio recording devices."

**2.      *Data recorded to the hard disk drives put the MEAA systems outside the definition of a "digital audio recording device."***

The discussion in Section 1 above is dispositive of the case and requires summary judgment to be entered in favor of MEAA. To the extent any recordings made to the MEAA hard disk drives following their delivery to Chrysler could be relevant to the determination, such recordings also take the systems outside the "digital musical recording" definition. Three additional factors demonstrate why the MEAA drives do not meet the "digital audio recording device" definition.

First, once installed in the Chrysler vehicles, the MEAA infotainment systems use the recording function to record data other than sounds to the hard disk drive. The system automatically records to the hard disk drive a "logfile" of data showing how the car owner used, for example, the terrestrial or satellite radios, the USB input port, or the CD or DVD player. The logged data are used by the dealer to troubleshoot system faults or errors. The logfile data are not used to reproduce or render sounds recorded on the hard disk drive, and the data covering the radio and CD playback functions of the unit are not incidental to any sounds fixed on the hard disk drive as required by Section 1001(5)(A)(i). This function of recording and saving log data for equipment troubleshooting purposes is a characteristic function for computers, not "digital audio recording devices." Similarly, the hard disk drives will copy updated graphics and channel data for the Sirius XM radios from Sirius XM broadcasts. Thus, the recording of these data also takes the MEAA systems outside the definitions of a "digital musical recording," and therefore outside the definition of a "digital audio recording device."

Second, the car owner can copy files to the hard disk drives other than sounds. The unit allows consumers to copy photographs to the hard disk drive for display on the LCD screen. Similarly, popular types of "spoken word recordings" for car listening that are exempt from the AHRA,[21] such as audiobooks[22] and podcasts,[23] can be uploaded to the MEAA hard disk drives only from USB drives or optical media. These data also take the unit outside the definition of a "digital audio recording device," inasmuch as they are types of data that cannot be present on a "digital musical recording" under Section 1001(5)(B) and (C).

Third, the system's recording function does not make "digital audio copied recordings" (as required by the "digital audio recording device" definition) when it copies from sources that are not "digital musical recordings." The photographs, digital music, audio book and podcast files that a Chrysler customer downloads from a computer can be recorded by the MEAA hard disk drives only from a USB drive or from a recordable optical disc. USB drives and recordable CDs and DVDs are computer media, not "digital musical recordings." They are multipurpose storage devices, designed to store any type of file capable of being stored on a computer hard disk drive: software programs, spreadsheets, presentation files, document files, .pdf files, graphics, and so forth. They are no different from the computer hard disk drives in the *Rio* case that were held not to be "digital musical recordings." As the Ninth Circuit made clear in *Rio*, a

---

[21]       *See* 17 U.S.C. § 1001(5)(B) and (C) (excluding from "digital musical recording" material objects that do not contain only sounds or in which the fixed sounds consist entirely of "spoken word recordings.").

[22]       An "audiobook," which existed when the AHRA was enacted, is defined as "a recording of a book or magazine being read." Merriam Webster, http://www.merriam-webster.com/dictionary/audiobook (last visited Feb. 16, 2015).

[23]       A "podcast" is a type of exempt "spoken word recording" that did not exist when the AHRA was enacted. A podcast is defined as "a digital audio or video file or recording, usually part of a themed series, that can be downloaded from a website to a media player or computer."  *See* Dictionary.com, http://dictionary.reference.com/browse/podcast (last visited Feb. 16, 2015). A convenient way to hear podcasts is to download them by computer and record them onto car hard disk drives such as in the MEAA infotainment systems. *See* Kevin Roose, *What's Behind the Great Podcast Renaissance?*,  New York Magazine online (Oct. 30, 2014), http://nymag.com/daily/intelligencer/2014/10/whats-behind-the-great-podcast-renaissance.html (last visited Feb. 16, 2015); *see* Amy Roberts, *The 'Serial' podcast: By the numbers*, CNN (Dec. 23, 2014), http://www.cnn.com/2014/12/18/showbiz/feat-serial-podcast-btn/ (last visited Feb. 16, 2015) (the most popular podcast, "Serial," has been downloaded more than 40 million times).

material object that includes programs and data other than sounds and material relating specifically to those recorded sounds cannot be a "digital musical recording"; the device that records from that object is not making a "digital audio copied recording"; and, therefore, that device—here the MEAA infotainment system—cannot be a "digital audio recording device." *Id.*, 180 F.3d at 1076.

## CONCLUSION

The MEAA infotainment systems are not "digital audio recording devices." When supplied to Chrysler, the hard disk drives contain no recorded sounds. They come prerecorded with software, database information, and graphics files that remain on the drives, and thus place the drives outside the definition of "digital musical recording." In operation, the hard disk drives automatically log operational data that also fall outside the "digital musical recording" definition.

Thus, as supplied by MEAA and throughout their useful lives, the MEAA infotainment system hard disk drives are not "material objects" within the definition of "digital musical recording," and cannot reproduce from "*another* digital musical recording" as the definition of "digital audio copied recording" requires.  Because the MEAA systems are not capable of making a "digital audio copied recording," they are not "digital audio recording devices." Because AARC cannot prove that the MEAA infotainment systems are "digital audio recording devices," AARC cannot prove the central element of any of its claims under Sections 1002 and 1003.

WHEREFORE, MEAA asks the Court to grant summary judgment to MEAA and against AARC, and to dismiss the Complaint.

Dated:  March 12, 2015                    Respectfully submitted,


                                          By: /s/ Seth D. Greenstein
                                          _____

                                          Seth D. Greenstein (D.C. Bar No. 416733)
                                          David D. Golden (D.C. Bar No. 985047)
                                          Robert S. Schwartz (D.C. Bar No. 283713)
                                          CONSTANTINE CANNON, LLP
                                          1001 Pennsylvania Avenue, NW
                                          Suite 1300N
                                          Washington, DC 20004
                                          Phone: 202-204-3514
                                          Facsimile: 202-204-3501
                                          sgreenstein@constantinecannon.com
                                          dgolden@constantinecannon.com
                                          rschwartz@constantinecannon.com

                                          *Attorneys for Defendant Mitsubishi Electric
                                          Automotive America, Inc.*