**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
**ALLIANCE OF ARTISTS AND** )
**RECORDING COMPANIES, INC.,** )
)
**Plaintiff,** )
)
**v.** )          **Case No. 14-cv-1271 (KBJ)**
)
**GENERAL MOTORS LLC,** )          ORAL ARGUMENT REQUESTED
)
**DENSO INTERNATIONAL AMERICA, INC.,** )
)
**FORD MOTOR COMPANY, and** )
)
**CLARION CORPORATION OF AMERICA,** )
)
**Defendants.** )
_____)


**REPLY IN SUPPORT OF FORD MOTOR COMPANY AND CLARION
CORPORATION OF AMERICA'S MOTION TO DISMISS PLAINTIFF'S CLASS
ACTION COMPLAINT**

Van H. Beckwith (admitted *pro hac vice*)
Paul J. Reilly (admitted *pro hac vice*)
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
Telephone: (214) 953-6505
Facsimile:  (214) 661-4505
E-mail:  Van.Beckwith@bakerbotts.com
E-mail:  Paul.Reilly@bakerbotts.com

Joshua H. Packman (D.C. Bar No. 1015463)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
Telephone: (202) 639-7726
Facsimile:  (202) 585-1053
E-mail:  Joshua.Packman@bakerbotts.com

## TABLE OF CONTENTS

**Page**

**I.**   **The Ford–Clarion Nav System is Not a DARD**................................................... 1

**II.**   **The Nav System Lacks the Capabilities Required of a DARD**........................................ 4

   A.   Contrary to Plaintiff's Assertions, a DARD Must Record From a DMR........................... 5

   B.   Contrary to Plaintiff's Assertions, a DARD Must Record to a DMR ............................. 7

   C.   The Nav System's Hard Drive is Not a DMR Because it Contains Computer Programs Unrelated to Playing Music and Data Other than Sounds ....................................... 10

**III.**   **The Primary Function of the Nav System's Recording Function is Not to Make DACRs** ........................................................................................ 14

**IV.**   **Conclusion** ........................................................................... 16

# **TABLE OF AUTHORITIES**

**Cases**

*Recording Indus. Ass'n of Am., Inc. v. Diamond Multimedia Sys.*, 180 F.3d 1072 (9th Cir. 1999) ................................................................................................................................... passim

*Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, No. 06-cv-3733 (DAB), 2007 WL 136186 (S.D.N.Y. Jan 19, 2007) ........................................................................................... 9, 10

*Claybrook v. Slater*, 111 F.3d 904 (D.C.Cir. 1997) .................................................................... 7

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ...................................... 14

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003) .................................................... 4

*Kelly v. Robinson*, 479 U.S. 36 (1986) ...................................................................................... 1

*Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59 (D.D.C. 2008) ................. 13, 14

*McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488 (1931) ....................................................... 1

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) ............................................. 13

*Vanover v. Hantman*, 77 F. Supp. 2d 91 (D.D.C. 1999) ........................................................... 13

**Statutes**

*17 U.S.C. § 1001(1) ........................................................................................................... passim

*17 U.S.C. § 1001(3) ........................................................................................................... passim

*17 U.S.C. § 1001(5) ........................................................................................................... passim

17 U.S.C. § 1001(5)(B)(ii) ....................................................................................................... 10

17 U.S.C. § 1001(7) ................................................................................................................... 6

17 U.S.C. § 1006(a), (c) ............................................................................................................. 6

17 U.S.C. § 1008 ..................................................................................................................... 6, 9

17 U.S.C. § 1009(f)–(g) .............................................................................................................. 9

**Other Authorities**

*Sony History, Chapter 7: Making Digital Audio a Reality*, Sony, http://www.sony.net/SonyInfo/CorporateInfo/History/SonyHistory/2-07.html ...................... 10

Webster's Third New International Dictionary, Unabridged (2015) ............................................ 8

**Treatises**

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8B.02[A][1][a][ii] (Matthew Bender, Rev. Ed. 2014) ........................................................................................................ 15

**Legislative History**

H.R. Rep. No. 102-873, pt. 1 (1992) ........................................................................................... 8

S. Rep. No. 102-294 (1992) ................................................................................................ 5, 8, 9

# I.   **The Ford–Clarion Nav System is Not a DARD**

While Plaintiff's Opposition (ECF No. 52) is long, complicated, and at times tortured, the issue raised by Defendants Ford and Clarion's Motion to Dismiss (ECF No. 30) is quite simple: whether Ford and Clarion's automotive Nav System is a device governed by the Audio Home Recording Act of 1992 (AHRA), 17 U.S.C. §§ 1001, *et seq*.   The Motion establishes—and nothing in the Opposition alters the conclusion—that the Nav System[1] is not a device governed by the Act.

The simple and undeniable logic is this: the Act covers only Digital Audio Recording Devices ("DARD").  Devices that are not DARDs are not subject to the Act's royalty or serial copy management system requirements ("SCMS").  Ford and Clarion's accused Nav System is not a DARD.

To reach that conclusion, it is appropriate to sort through the AHRA's nested definitions to decide whether, based on the pleadings, the Ford–Clarion NAV system is a DARD.[2]  Three definitions in particular must be considered.  The term Digital Audio Copied Recording ("DACR") is employed in the definition of DARD, and the defined term Digital Musical Recording ("DMR") is employed in the definition of DACR.  The graphic below depicts this relationship:

---

[1] Throughout its papers, Plaintiff refers to the "Jukebox" as though it were a device.  The "Jukebox," however, is simply a feature of the Defendants' Nav System.

[2] Although certain sections of the AHRA may be unconstitutionally vague, and Defendants reserve the right to address those at the appropriate time, the statutory definitions at issue are clear and unambiguous.  Nevertheless, the Court may wish to consider the legislative history to better appreciate the AHRA's historical context. *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys.*, 180 F.3d 1072, 1077 & n.4 (9th Cir. 1999) (noting that the legislative history "is consistent with the statute's plain meaning.").  Indeed, in the Motion to Dismiss, Defendants refer to legislative history to provide historical context for the AHRA to illustrate that the Nav System falls outside the statute's scope not by happenstance or fluke, but because the Nav System doesn't present the problem that the Act sought to redress.  To the extent that the Court elects to consider the legislative history, however, Defendants note that the Court should not give any weight to witness statements made in committee hearings that were not made by Members of Congress or later included in the official legislative report. *See Kelly v. Robinson*, 479 U.S. 36, 51 n.13 (1986) (citing *McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 493–94 (1931)) (declining to accord any significance to comments not made by a Member of Congress and not included in the official Senate and House reports).

1

A *"**digital audio recording device**" is any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a* **digital audio copied recording** *for private use, except for —*

   *(A) professional model products, and*

   *(B) dictation machines, answering machines, and other audio recording equipment that is designed and marketed primarily for the creation of sound recordings resulting from the fixation of nonmusical sounds.*

§1001(3) - DARD



A *"**digital audio copied recording**" is a reproduction in a digital recording format of a* **digital musical recording**, *whether that reproduction is made directly from another* **digital musical recording** *or indirectly from a transmission.*

§1001(1) - DACR



*(A) A "**digital musical recording**" is a material object —*

   *(i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, and*

   *(ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.*

*(B) A "digital musical recording" does not include a material object —*

   *(i) in which the fixed sounds consist entirely of spoken word recordings, or*

   *(ii) in which one or more computer programs are fixed, except that a digital musical recording may contain statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material.*

§1001(5) - DMR

Given this interdependence, it is instructive to replace the terms of art DACR and DMR with their definitions within the text of 17 U.S.C. § 1001(3).  Viewed this way, a DARD is as follows:



> any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making
>
> > a reproduction in a digital recording format of a
> >
> > > *material object (i) in which are fixed, in a digital record-ing format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, and (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device[, and (iii) not] in which one or more computer programs are fixed, except [any programs used to bring about perception of the fixed sounds]*
> >
> > , whether that reproduction is made directly from another
> >
> > > *material object [as described above],*
> >
> > or indirectly from a transmission,
>
> for private use.

Simply put, the Act imposes three distinct criteria for a device to qualify as a DARD.  A DARD must (1) be commonly distributed to individuals, (2) have the particular primary purpose of reproducing certain media containing musical recordings, and (3) have the ability to reproduce those media.  A device that lacks even one of these characteristics is not a DARD and is beyond

the scope of the Act.  A lawsuit seeking to enforce the Act against such a device must be dismissed.

Plaintiff's protracted brief offers misplaced and confused analysis in an attempt to shoehorn Defendants' Nav System into the Act's purview.  For example, Plaintiff argues at length about fair use, which is not at issue in this case.[3]  Plaintiff distorts the language of the Act to contend that the Nav System possesses both the capabilities and the primary purpose of a DARD, and it protests Defendants' citation to a document that is central to its Complaint: the Ford Nav System manual.  Notwithstanding such arguments, the Complaint's own allegations and reliance on the manual establish that Defendants' Nav System is not a DARD.  The Nav System cannot reproduce objects as a DARD must.  Further, making such copies is not the primary purpose of its recording function.[4]

## II.    The Nav System Lacks the Capabilities Required of a DARD

As provided in 17 U.S.C. § 1001(1), (3), (5), a DARD must be capable of reproducing a particular type of a material object or media containing recorded music—a DMR.  In other words, a DARD must copy music from a particular type of source media to a particular type of copied media—and both of those media must qualify as DMRs.  Per 17 U.S.C. § 1001(5), a DMR is a physical object, such as a CD or a mini-disc, that contains *only* music and perhaps other material "incidental" to that music, such as instructions necessary to play the music; a DMR, by its definition, cannot contain data or computer programs that are not related to playing

---

[3] Defendants briefly mention fair use in their motion to dismiss to explain the concept of "space shifting."  Defs.' Mot. to Dismiss 2 n.2, 12, Oct. 10, 2014, ECF No. 30-1.  While space shifting arguably constitutes fair use, *see Recording Indus. Ass'n of Am., Inc. v. Diamond Multimedia Sys.*, 180 F.3d 1072, 1079 (9th Cir. 1999); *In re Aimster Copyright Litig.*, 334 F.3d 643, 652–53 (7th Cir. 2003), the issue is tangential to Defendants' argument, which is that the Nav System's recording function is neither capable of, nor designed and marketed for the primary purpose of, making "digital audio copied recordings" as defined by the statute.  17 U.S.C. § 1001(1), (3), (5).

[4] Defendants' device also does not meet the third requirement because it is not commonly distributed to individuals; rather, Nav Systems are sold to automobile manufacturers who integrate them into vehicles during the assembly process.

the music.  The Nav System is not a DARD, in part, because it is only capable of importing music onto its own hard drive, which contains multiple computer programs unrelated to music and data other than sounds and is therefore not a DMR.

A.     Contrary to Plaintiff's Assertions, a DARD Must Record From a DMR

A DARD must record music from a DMR.  It may do so *directly* from such an object (for example, by copying sound recordings off a CD inserted into the DARD) or *indirectly* from a transmission.  The Ninth Circuit has confirmed this.  *Recording Indus. Ass'n of Am., Inc. v. Diamond Multimedia Sys.*, 180 F. 3d 1072, 1076 (9th Cir. 1999) ("[T]o be a digital audio recording device, the Rio must be able to reproduce, either 'directly' or 'from a transmission,' a 'digital musical recording.'").

Plaintiff surmises, without support and contrary to the plain language of the statute, that the items listed after the word "whether" in the phrase "whether that reproduction is made directly from another digital musical recording or indirectly from a transmission" are merely examples.  Pl.'s Opp'n 31–32, Feb. 17, 2015, ECF No. 52.  Plaintiff then leaps to the conclusion that a DARD can copy from anything—including analog sources.[5]   Plaintiff fails to realize, however, that the phrase simply lists the methods by which a DARD can reproduce a DMR.  A DARD must create a "*reproduction in a digital recording format of a digital musical recording, whether that reproduction is made directly from another digital musical recording or indirectly*

---

[5] Plaintiff attempts to prove this argument by pointing to Defendants' citation to the list of objects included in the Senate Report as examples of an "audiogram."  Pl.'s Opp'n 31.  Defendants cited to this list merely to show that Congress intended the term digital musical recording (which replaced "audiogram" in the Senate bill) to include only material objects.  Mot. to Dismiss 7–8.  Plaintiff fails to note, however, that the definition of audiogram in the Senate bill did not require sounds to be fixed "in a digital recording format."  *Compare* 17 U.S.C. § 1001(5) (definition of digital musical recording), *with* S. Rep. No. 102-294, at 2 (1992) ("An 'audiogram' is a material object (i) in which are fixed, by any method now known or later developed, only sounds (and not, for example, a motion picture or other audiovisual work even though it may be accompanied by sounds), and material, statements or instructions incidental to those fixed sounds, if any, and (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.").

*from a transmission.*" *See supra* Section I.  As *Diamond Multimedia* correctly noted: "[t]he focus of the statutory language seems to be on the two means of reproducing the underlying digital music recording—either directly from that recording, or indirectly, by reproducing the recording from a transmission."  *Diamond Multimedia*, 180 F.3d at 1080.  The two methods are mutually exclusive—"direct" and "indirect."  No other option exists.  An open-ended reading of "whether," therefore, would be illogical and, more importantly, would not change the statutory requirement that the source media copied by the DARD and the resulting copied media both be DMRs.[6]  Contrary to Plaintiff's convoluted reading of the statute, the Court should not extend the statute's reach in an attempt to regulate devices that do not copy from DMRs.

Plaintiff also argues that giving the statute its plain meaning must be incorrect because Congress intended the statute to address copying from analog sources.  This is little more than wishful thinking.  The word "analog" appears in 10 specific instances in the statute, but not anywhere in the definitions of what a DARD is or how it functions.  17 U.S.C. § 1001(3).  Instead, it appears in the definition of an "interested copyright party," *id.* § 1001(7), in the section granting those parties entitlement to royalties, *id.* § 1006(a), (c), and in the section that prohibits certain infringement actions, *id.* § 1008.  Congress instead made clear that DARDs are *digital* audio recording devices that copy *digital* musical recordings to create *digital* audio copied recordings.

In its discussion on this topic, Plaintiff mistakenly asserts that if the Court were to require the source of the copied material to be a DMR, then "a device could be a DARD and then not a DARD on back-to-back songs" if, for example, the device recorded a radio station

---

[6] It bears mention, too, that Plaintiff's reading would make the entire defined term "digital musical recording" superfluous, as it appears to contend that neither the source nor the reproduction need to be digital musical recordings.

broadcast of a DMR followed by a broadcast of an analog record.  Pl.'s Opp'n 31.  The AHRA does not require such conclusions.  A device is not a DARD only while in the process of reproducing a DMR; rather, it is a DARD, in part, because of its capacity to do so in a particular manner.

Nevertheless, the source of the music that the Nav System records is not at issue in this case—the Nav System stores music from CDs, which the parties agree are DMRs.

B.      Contrary to Plaintiff's Assertions, a DARD Must Record to a DMR

A DARD must place the copied recording on a DMR.  Contrary to Plaintiff's claims, this is not at odds with the Act's intent; more critically, it is clear on the face of the statute.  The statute requires that a DARD create a "*reproduction in a digital recording format of a digital musical recording, whether that reproduction is made directly from <u>another</u> digital musical recording or indirectly from a transmission*."  *See supra* Section I.  The adjective "another" signals the presence of a second DMR—the reproduction previously described.

Plaintiff contends that it is "contrived" to give the adjective "another" its plain English meaning, but offers no alternative.  Pl.'s Opp'n 5.  Plaintiff claims that Defendants cite no "statutory language" to support this reading, *id.* at 29; Defendants, however, cite directly to the statute.  Plaintiff further claims that Defendants offer no "legislative history" to support its position.  *Id.*  Of course, to do so would be unnecessary and inappropriate where the Act's terms are not vague and ambiguous.  *See Claybrook v. Slater*, 111 F.3d 904, 907 (D.C.Cir. 1997) ("If statutory language is clear . . . it is both unnecessary and inappropriate to track legislative history.")  However, even if the Court were to look beyond the statute, the history establishes that Congress enacted the AHRA to address serial copying, or the ability to make unlimited

generations of perfect copies from a single musical recording. See H.R. Rep. No. 102-873, pt. 1, at 18 (1992); S. Rep. No. 102-294, at 34–36 (1992). A plain reading of the statute—which excludes Defendants' Nav System device, which is incapable of making a copy that can be further reproduced—does not "frustrate" the purpose of the Act.[7]

To avoid this, Plaintiff fixates on the word "reproduction"[8] in the definition, but ignores what must be reproduced. Plaintiff argues that the Nav System is a DARD because it "reproduces" a sound recording fixed on a CD by fixing a new copy of that sound recording on the Nav System's hard drive. Pl.'s Opp'n 36–38. In so arguing, Plaintiff consciously avoids the distinction between (1) the defined term DMR, which is a *material object* in which a sound recording is fixed, and (2) the sound recording fixed in that DMR. Congress could have defined a DARD as any device capable of making a reproduction of a sound recording. Instead, Congress defined a DARD as a device capable of making a reproduction of a material object having specific qualities, and not merely of the sound recording fixed therein. *See supra* Section I. Indeed, the use of the language "making a reproduction" (in which "reproduction" is a noun) instead of the verb "reproducing" implies that the DARD is defined by the creation of a new object with all the qualities of a DMR. The Nav System cannot make a material object having the required statutory characteristics of a DMR because its hard drive includes various computer programs unrelated to reproducing or playing music recordings and data other than sounds. Thus, the Nav System does not meet the Act's definition of a DARD as a matter of law.

---

[7] Plaintiff concedes that the AHRA's SCMS requirements only apply to DARDs. Pl.'s Opp'n 40.

[8] The Copyright Act does not define "reproduction." The dictionary defines "reproduction" to mean "a representation in another form or medium" or "an exact copy: [a] replica." Webster's Third New International Dictionary, Unabridged (2015). Since the statutory definitions indicate that a DARD makes the reproduction from "another digital musical recording," 17 U.S.C. § 1001(1), the object reproduced must have the same characteristics as the original. Thus, "reproduction" for purposes of § 1001(1) must mean "an exact copy."

The Act shows further internal consistency on this point.  For example, the AHRA's immunity provision prohibits copyright actions "based on the noncommercial use by a consumer of . . . a [digital audio recording] device . . . for making digital musical recordings." 17 U.S.C. § 1008.  If a DARD need not produce a DMR as Plaintiff argues, the immunity provision would provide consumers no protection.  This would run counter to the purpose of the statute: "to ensure the right of consumers to make analog or digital audio recordings of copyrighted music for their private, noncommercial use."  S. Rep. 102-294, at 30.

As a further example, the AHRA's remedies provision provides statutory authority for impounding or destroying DARDs and DMRs that violate the Act.  17 U.S.C. § 1009(f)–(g).  If, as Plaintiff suggests, a DARD need not produce a DMR, the Act would allow impounding or destruction of lawfully purchased CDs, for example, but not the copies produced in the course of the violation.  That result is absurd.

Plaintiff looks to *Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, No. 06-cv-3733 (DAB), 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007), to suggest that the District Court for the Southern District of New York has held that DARDs need not record to DMRs.  The Court held nothing of the sort.  In that case, Defendant XM Satellite moved to dismiss various allegations of copyright infringement stemming from its satellite radio services by claiming that its radio receiver was a DARD and was therefore protected under the AHRA's immunity provision, 17 U.S.C. § 1008.  *XM*, 2007 WL 136186, at *1, *4.  *XM* is irrelevant for purposes of this case, however, because the *XM* court never actually found that the relevant device was a DARD. Instead, the Court simply noted that it would consider the device a DARD "at this stage of the proceeding . . . until proven otherwise by means of discovery."  *Id.* at *4 n.4.  That is, the court assumed *arguendo* that the XM device was a DARD and concluded that the statutory immunity

9

XM claimed would not apply anyway. *Id.* at *7–8. Moreover, the XM court only assumed that XM's device would qualify as a DARD because it recorded from transmissions. *Id.* at *4 n.4. Plaintiff does not allege that the Nav System records from transmissions. Complaint ¶¶ 40, 43–44, 46.[9] Nor does it. Thus, *XM* sheds no light on whether the Nav System is a DARD.

C.  The Nav System's Hard Drive is Not a DMR Because it Contains Computer Programs Unrelated to Playing Music and Data Other than Sounds

As discussed above, to be a DARD, a device must be able to reproduce a DMR by creating a second DMR. The resulting DMR is termed a Digital Audio Copied Recording ("DACR"). 17 U.S.C. § 1001(1). DMRs are material objects that contain *only* sounds and incidental materials. Moreover, an object that contains one or more computer programs is not a DMR. Therefore, neither are they DACRs.[10]

---

[9] Plaintiff also claims that the presence of software on the XM device demonstrates that a DARD can contain software. Pl.'s Opp'n at 20–21 & n.13. Plaintiff's argument is erroneous, however, because it fails to appreciate that the definition of a digital musical recording excludes material objects in which computer programs are fixed, except that the object may include the software used to bring about the perception of the fixed sounds. 17 U.S.C. § 1001(5)(B)(ii). The XM device only contained software pertaining to playing the stored music; in contrast, the Nav System contains software wholly unrelated to playing music. See Defs.' Mot. to Dismiss Ex. A 32–41, 121, 126, Oct. 10, 2014, ECF No. 30-3 (voice recognition software and GPS navigation software).

[10] Plaintiff contends that this reading makes the defined term DACR superfluous. This is inaccurate. Since both the source a DARD copies from and the reproduction a DARD creates qualify as DMRs, the term DACR serves to distinguish clearly between the source object and the second object the DARD creates as a reproduction. *See* 17 U.S.C. § 1001(1), (5).

Plaintiff also asserts that, when read this way, the language "in digital recording format" becomes redundant. This, too, is wrong. If the statute had failed to specify that DARDs must make reproductions "in a digital recording format," then the statute would also apply to devices that made reproductions only in analog formats. Early digital recording devices were adaptors that worked in conjunction with VCRs to make *digital* audio recordings on the same tapes that were more typically used to make *analog* recordings—both audio and video—from television broadcasts. *See, e.g., Sony History, Chapter 7: Making Digital Audio a Reality*, Sony, http://www.sony.net/SonyInfo/CorporateInfo/History/SonyHistory/2-07.html. If we hypothesize a device designed primarily to make analog reproductions of musical recordings from CDs to Betamax cassettes, for example, then the language "in a digital format" becomes critical. A Betamax cassette is a DMR if it contains music in a digital format; thus the fact that our hypothetical device is capable of recording to such cassettes—albeit in an analog format—would make it a DARD were it not for the language "in a digital recording format." Thus, the language "in a digital recording format" performs a critical, independent function.

Plaintiff has pleaded, correctly, that the Nav System "allows [users] to save desired tracks or CDs *to the hard drive* for later access."  Compl. ¶ 43 (emphasis added).  The Nav System's hard drive contains various computer programs, including navigation software, Defs.' Mot. to Dismiss Ex. A 121, 126, Oct. 10, 2014, ECF No. 30-3, voice recognition software, *id.* at 32–41, an operating system, *id.* at 5, and so forth.  The Nav System's hard drive also contains data other than sounds, including photos, *id.* at 23–24; maps, *id.* at 121, 126; and other driver-supplied information such as an address book, favorite destinations, previous destinations, or areas to avoid, *id.* at 93–96.  Thus, the Nav System's hard drive (1) contains computer programs unrelated to playing music and (2) contains data other than sounds.  Therefore, the Nav System's hard drive cannot be a DMR notwithstanding any music stored on it.

The Court of Appeals for the Ninth Circuit confirmed this when it concluded that Diamond Multimedia's Rio device was not a DARD under the AHRA.  In that case, the plaintiffs claimed that the defendant's handheld mp3 player, the Rio, was a DARD.  *Diamond Multimedia*, 180 F.3d at 1073.  The Rio worked with proprietary software that the user would install on his personal computer, which would then copy music files from the hard drive of the user's computer to the Rio device.  *Id.* at 1074–75.  The Court noted that the key issue was "whether the Rio is able directly to reproduce a digital music recording—which is a specific type of material object in which only sounds are fixed (or material and instructions incidental to those sounds)."  *Id.* at 1076.  If not, the device was not a DARD.  *See id*.  The Court found that the Rio was not a DARD because it only recorded from a computer's hard drive, which did not qualify as a DMR because of the presence of other data and programs.  *Id*.

The Ninth Circuit determined that the Rio device was not a DARD because it did not make reproductions *from* a DMR.  Here, we are considering a device that does not record *to* a

DMR.  The question in both instances, however, is whether a hard drive is the type of material object that is considered a DMR.  As the statute makes clear and as the Ninth Circuit has confirmed, the answer is no.

In its effort further to confuse this issue, Plaintiff conflates the question of a device's capability with the separate question of its primary purpose.  This error is critical because "capability" and "primary purpose" are separate elements, each of which must be present in order for a device to be a DARD.  Plaintiff notes an unrelated discussion in the legislative history that explains that computers cannot be DARDs because their recording functions do not exist primarily to make the necessary recordings.  Plaintiff's arguments fail on two levels.  First, the statute makes clear that DMRs cannot contain data other than sounds and cannot contain computer programs unrelated to playing any fixed sounds.  17 U.S.C. § 1001(5).  Given this definition of DMR, any device that records the contents of a computer's hard drive to a CD is not a DARD; likewise, any device that records the contents of a CD to a computer's hard drive is not a DARD.  A computer on either end of the process places it beyond the Act's scope if its hard drive contains either software unrelated to playing any fixed sounds or information other than sounds and material incidental to those sounds.  This is true regardless of the primary purpose of the device's recording function.  Second, as discussed more fully in Section III below, the primary purpose of the Nav System's recording function, like that of other computers, is not to make DACRs.

Plaintiff argues that a device can be a DARD even if it is incapable of recording to a separate material object.  Pl.'s Opp'n 28–42.  Again, Plaintiff misses the point.  A DARD is defined by the statute as a device that is capable of making a reproduction of a DMR—that is, it records music from one DMR to another DMR in a digital format.  17 U.S.C. § 1001(1), (3).

The Nav System records only to its own hard drive, a material object that contains both computer programs and data other than sounds and thus will never qualify as a DMR. For this reason, the Nav System does not possess the capability required of a DARD. While it is perhaps conceptually possible that a device could be a DARD without recording to a separate material object, the Nav System is not such a device.

Finally, AARC objects to the Court considering the manual attached as Exhibit A to Defendants' motion to dismiss. Pl.'s Opp'n 42–44. "'[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.'" *Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 65–66 (D.D.C. 2008) (quoting *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)). In *Marshall*, the court considered the exhibits attached to the motion papers because they were "either referred to in or characterized by the pleading" and were "central to [the plaintiff's] claims." *Id.* at 66.

Mischaracterizing this Court's opinion in *Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013), AARC argues that it has not necessarily relied on the manual because it has minimally quoted from it. In *Patterson*, this Court refused to consider a police officer's *Gerstein* affidavit attached to the defendants' motion to dismiss because the plaintiff's complaint "d[id] not discuss [the *Gerstein* affidavit] extensively and minimally quote[d] from it only to impugn [it]." *Id.* at 307. In contrast, AARC relies on the manual as its purported proof that the Nav System "is capable of making a digital audio copied recording for private use." Complaint, ¶ 43. Moreover, AARC also uses the manual as its purported proof that the Nav System's "recording function is designed for the primary purpose of making digital audio copied recordings for private use" by stating that "the only significant purpose for the device's recording function

13

discussed in the . . . manual . . . is copying tracks from a music CD." *Id.* ¶ 44.  In stating that the manual includes no other discussion of the Nav System's recording function, AARC has "characterized" the manual in its pleading.  *Marshall*, 536 F. Supp. 2d at 66.  Implicitly, AARC must have reviewed the entire manual to make such a statement characterizing its contents. Thus, AARC is on notice of the manual's contents, and the Court may properly consider it.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

### III.   The Primary Function of the Nav System's Recording Function is Not to Make DACRs

As noted above, a DARD is defined, in part, as a device "the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a digital audio copied recording for private use."  17 U.S.C. § 1001(3).  Defendants' motion to dismiss focuses on the capability element and addresses the primary purpose element only in a footnote.  Defs.' Mot. to Dismiss 9 n.4, Oct. 10 2014, ECF No. 30-1.  Nevertheless, Plaintiff spends much of its opposition arguing that the Nav System is designed and marketed for the primary purpose of "copying music."  *See, e.g.*, Pl.'s Opp'n 17–21.  The Court need not address Plaintiff's primary purpose argument because Defendants' capability argument is dispositive; should it choose to do so, however, the Court may also dismiss the case on the independent ground that the primary purpose of the Nav System's recording function is not to make DACRs.

In order for a device to be a DARD, the primary purpose of its recording function must be to create DACRs.  As discussed at length above, the Nav System cannot create a DACR; as

14

such, this is not its primary purpose. That is, the primary purpose of an object cannot be to do something that it is incapable of doing.

Moreover, as the pleadings make clear, the Nav System records music by means of its hard drive. The Ninth Circuit, quoting the Senate Report, found that "'the typical personal computer would not fall within the definition of "digital audio recording device,"' . . . because a personal computer's 'recording function is designed and marketed primarily for the recording of data and computer programs.'" *Diamond Multimedia*, 180 F.3d at 1078. Plaintiff attempts to distinguish the Nav System by focusing on the words "typical" and "general purpose," *e.g.*, Opp'n at 21–25, but such arguments lack proper footing and are unavailing.

As with other computers, the purpose of the Nav System's recording function is not specific, but general. *See Diamond Multimedia*, 180 F.3d at 1078. The Nav System's recording function operates on a variety of digital data, including music, photos, databases of information (e.g., maps), and programs. Defs.' Mot. to Dismiss Ex. A 23–24, 32–41, 93–96, 121, 126. The hard drive is not designed or marketed to record just one type of data or information—it is designed to record all of them. Thus, like other computers' recording functions, the purpose of the Nav System's recording function is general; it records a variety of data and programs for the driver's use and convenience.

In evaluating the Plaintiff's argument, the Court should remember that time has "relegat[ed] the AHRA largely to obscurity." 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8B.02[A][1][a][ii], at 8B-29 (Matthew Bender, Rev. Ed. 2014). "[B]y the time that consumer interest in digital music finally percolated into the courts, the technology had already shifted sufficiently to place the affected conduct outside the AHRA." *Id.* Simply put,

computers have changed considerably in the 23 years since the AHRA's passage.  While the Nav System may not resemble the desktop computers that existed in 1992 at first glance, the Nav System has more in common with them or with modern computers, *e.g.*, laptops and smartphones, than with the boom boxes and tape decks that the AHRA actually regulates.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the claims in Complaint against Defendants Ford and Clarion must be dismissed in their entirety.

Dated:          March 13, 2015              Respectfully submitted,

/s/ Van H. Beckwith
Van H. Beckwith (admitted *pro hac vice*)
Paul J. Reilly (admitted *pro hac vice*)
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
Telephone: (214) 953-6505
Facsimile:  (214) 661-4505
E-mail:  Van.Beckwith@bakerbotts.com
E-mail:  Paul.Reilly@bakerbotts.com

Joshua H. Packman (D.C. Bar No. 1015463)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
Telephone: (202) 639-7726
Facsimile:  (202) 585-1053
E-mail:  Joshua.Packman@bakerbotts.com

*Counsel for Defendants Ford Motor Company and Clarion Corporation of America*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following counsel of record via ECF:

Richard B. Dagen
Michael D. Bednarek
Daniel K. Oakes
Morris A. Bloom
AXINN, VELTROP & HARKRIDER LLP
950 F Street, NW
Washington, DC 20004
Telephone: (202) 912-4700
Facsimile:  (202) 912-4701
rdagen@axinn.com
mbednarek@axinn.com
doakes@axinn.com
mbloom@axinn.com

Annette L. Hurst
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5700
ahurst@orrick.com

Steven John Routh
Orrick, Herrington & Sutcliffe, LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile:  (202) 339-8500
srouth@orrick.com

James Mitchell Burger
Thompson Coburn LLP
1909 K Street, NW, Suite 600
Washington, DC 20006-1167
Telephone: (202) 585-6909
Facsimile: (202) 318-8809 jburger@thompsoncoburn.com

Andrew P. Bridges
David L. Hayes
Mary E. Milionis
FENWICK & WEST LLP

555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile:  (415) 281-1350
abridges@fenwick.com
DHayes@fenwick.com
MMilionis@fenwick.com

David D. Golden
Seth D. Greenstein
Robert S. Schwartz
CONSTANTINE CANNON, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile:  (202) 204-3501
dgolden@constantinecannon.com
sgreenstein@constantinecannon.com
rschwartz@constantinecannon.com

Megan S. Woodworth
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4507
Facsimile:  (202) 344-8300
MSWoodworth@Venable.com


/s/ Van H. Beckwith
Van H. Beckwith

*Counsel for Defendants Ford Motor Company and
Clarion Corp. of America*

2