## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC., | ) ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| GENERAL MOTORS COMPANY, *et al.*, | ) ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Civil Action No. 14-cv-1271 (KBJ)

## <u>MEMORANDUM OPINION</u>

The Audio Home Recording Act of 1992 ("AHRA"), 17 U.S.C. §§ 1001 *et seq.*, requires manufacturers, importers, and distributers of "digital audio recording devices" ("DARDs") to incorporate certain copying control technology into their devices and pay a set royalty amount for each device.  The AHRA is part of federal copyright law, and a non-profit organization called the Alliance of Artists and Recording Companies ("AARC") assists the U.S. Copyright Office in enforcing the AHRA's provisions by, among other things, collecting AHRA royalties and distributing them to featured recording artists and sound recording copyright owners.  (*See* Compl. ("GM Compl."), ECF No. 1, ¶ 8); *see also* Justin M. Jacobson, *What Is the AARC?*, 56 J. Copyright Soc'y U.S.A. 213, 215 (2008).  In the instant action, the AARC contends that automobile suppliers DENSO International America, Clarion Corporation of America, and Mitsubishi Electric Automotive America have developed certain audio technology that car manufacturers General Motors Company, Inc., Ford Motor Company, and FCA

US (collectively, "Defendants") have been installing in certain car models since 2008.[1] The AARC believes these audio devices qualify as DARDs for AHRA purposes; its five-count complaint seeks an injunction, a declaratory judgment, and monetary damages, claiming that Defendants should be paying royalties and implementing copying control technology when vehicles equipped with these devices are made and marketed, and that Defendants have violated the AHRA because they have done no such thing to date. (*See* GM Compl. ¶¶ 52-70; FCA Compl. ¶¶ 53-70.)[2]

Before this Court at present are a motion to dismiss that Ford and Clarion have filed jointly under Federal Rule of Civil Procedure 12(b)(6), and a motion for judgment on the pleadings that General Motors has submitted pursuant to Rule 12(c).  (*See* ECF Nos. 30, 48.)  Both dispositive motions make essentially the same argument: that none of the devices at issue, as described in the complaint, satisfies the AHRA's multi-faceted DARD definition, and thus the statute's mandated royalty payments and technology limits do not apply.  This Court largely agrees with these defendants' interpretation of the statute for the reasons explained below, but it also concludes that the allegations that the AARC makes regarding the devices at issue are sufficient to survive the Rule 12 motions.  Accordingly, and as set forth in the separate order that accompanies this Memorandum Opinion, these motions will be **DENIED**.

---

[1] Defendant FCA US LLC originally appeared in this case as "Chrysler Group LLC."  (*See* Complaint ("FCA Compl."), *Alliance of Artists & Recording Cos. v. Chrysler Group et al.*, No. 14-cv-1920 (D.D.C. Nov. 14, 2014), ECF No. 1).)  This Court granted FCA leave to change its name on February 12, 2015. (*See* Minute Order of February 12, 2015, *Alliance of Artists & Recording Cos. v. Chrysler Group et al.*, No. 14-cv-1920 (D.D.C. Feb. 12, 2015).)

[2] The AARC's allegations are contained in two substantively identical complaints that the organization filed against two different groups of automakers.  (*See* GM Compl.; FCA Compl.)  This Court has consolidated the two complaints into a single action (*see* Minute Order of Feb. 10, 2015), and this Memorandum Opinion will treat the two pleadings as if AARC had filed a single complaint, with the exception of citation references.

I.      BACKGROUND

A.      The Audio Home Recording Act Of 1992

In the 1980s, the music industry faced a growing problem in the form of emerging digital technology that allowed users to create multi-generation copies of sound recordings without losing sound quality.  This was a new issue for the industry because, with older analog technology, each successive copy of the same sound recording sounded worse; consequently, consumers always had an incentive to purchase the original recording from its manufacturer.  *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1073 (9th Cir. 1999).  By contrast, Digital Audio Tape ("DAT") machines and other new digital recording technology could produce a copy of an original audio recording, then copy that copy of the original, then copy the copy of the copy of the original, and so forth and so on, and the copies sounded just as good as the original recording, leading the music industry to fear that it could lose significant revenue.  *See* H.R. Rep. No. 102-873, pt. 1, at 18 (1992).[3] At the same time, the high-tech manufacturers and users of DAT machines and other digital audio recording technology were becoming increasingly concerned that the production and use of devices that could produce such high-quality copies of protected material would expose them to liability for copyright infringement on a massive scale. *See* Jacobson, *supra*, at 213.  These various concerns led to protracted negotiations in Congress, which ultimately culminated in the Audio Home Recording Act of 1992

---

[3] For the uninitiated, "[a] DAT machine[] function[s] much like a CD player" insofar as it "converts a digital signal to an analog format for playback[.]"  Note, Aaron L. Melville, *The Future of the Audio Home Recording Act of 1992: Has It Survived the Millennium Bug?*, 7 B.U. J. Sci. & Tech. L. 372, 378 (2001) (citations omitted).  But it also "contains an important feature not previously available on consumer music devices: the ability to *digitally* record music.  Such technology would allow consumers to record a CD using a DAT recorder, resulting in a 'perfect' replica of the original."  *Id.* (emphasis added).

("AHRA"), 17 U.S.C. § 1001 *et seq.*

It is well-established that the AHRA was a "grand compromise" between the stakeholders insofar as the statute was designed to address both the serial copying problem that concerned the music industry and the high-tech industry's fear of widespread copyright infringement liability.  Lee A. Hollaar, *Legal Protection of Digital Information* 150 (2002); *see also The Audio Home Recording Act of 1991: Hearing on S. 1623 Before the S. Subcomm. on Patents, Copyrights & Trademarks of the S. Comm. on the Judiciary*, 102d Cong. 1 (1991) [hereinafter *1991 Senate Hearing*] (statement of Sen. Dennis DeConcini) ("[This bill] represents a historical compromise among opposing segments of the entertainment and electronic industries.  As in all such compromises, all parties had to give a little to gain a little.").  Significantly for present purposes, one by-product of the extensive negotiations is the particular and carefully defined scope of the statute:  rather than "prohibit[ing] digital serial copying of copyright protected audio recordings" altogether, "the Act [instead] places restrictions only upon a specific type of recording device[,]" *Diamond*, 180 F.3d at 1075, and it provides immunity from copyright infringement lawsuits if the manufacturers of those particular devices comply with the statutory restrictions.

To this end, the AHRA contains a lengthy "Definitions" section that prescribes the statute's reach by laying out the intended meaning of a "digital audio recording device" (a.k.a. DARD), which is the only type of recording device to which the statutory requirements pertain.  *See* 17 U.S.C. § 1001.  Then, on the restrictions side of the AHRA balance, the statute imposes two limitations on electronics manufacturers and distributers with respect to the production of DARDs.  First, it requires that DARDs

be manufactured to "conform to the Serial Copy Management System [or] a system that has the same functional characteristics[,]" 17 U.S.C. § 1002(a)(1)-(2); that is, DARDs must contain technology that "allows the making of unlimited copies from an original digital recording but prevents any copies being made from those copies."  Hollaar, *supra*, at 151.[4]  Second, every manufacturer or importer of a DARD is required to pay a royalty fee for the manufacture, importation or distribution of each device.  *See* 17 U.S.C. §§ 1003, 1004.  The statute also makes clear, on the copyright-protection side of the statutory compromise, that DARD manufacturers who produce and distribute the devices in accordance with these two requirements cannot be sued for copyright infringement based on their manufacture, importation, or distribution of such devices, nor can consumers be sued for noncommercial use of DARDs. *See* 17 U.S.C. § 1008. However, copyright owners (typically, musicians, producers, and other members of the music industry) are entitled to sue DARD manufacturers and distributors for violations of the AHRA's requirements.  *See id.* §§ 1009(a), 1009(d)(1)(A)-(B).

Thus, the AHRA is best characterized as a carefully crafted "legislative solution[]," S. Rep. No. 102-294, at 31, that seeks to "ensure the right of consumers to make . . . digital audio recordings of copyrighted music for their private,

---

[4] The Senate Report explains that the Serial Copy Management System works by manipulating "the digital subcode" of the recording that is being made, S. Rep. 102-294, at 36 (1992) (citations omitted), to wit:

> [T]he SCMS limits copying to one copy [if the source is an original copyright protected source], or no copies [if the source is a previously made digital copy], or permits unlimited copies [if the source is coded as not copyright protected].  A simple numbers code is utilized to trigger the system.  The input signal is categorized and materials which are identified as copyright protected are "flagged."  The recording device then responds accordingly depending upon the code found in the recording.

*Id.*; *see also* Jacobson, *supra*, at 215-16.

noncommercial use[,]" and at the same time "provide[] modest compensation to the various elements of the music industry for the digital home recordings of copyrighted music[,]" all while effectively "prohibit[ing] the digital serial copying of copyrighted music[,]" *id.* at 30.

### B. The AHRA's DARD Definition

The instant case involves the remarkably complex question of which audio recording devices qualify as DARDs under the AHRA. As noted, Congress has furnished an answer in the statute itself, but discerning its intended meaning requires navigation of an intricate set of interlocking (and "non-intuitive") definitions. Hollaar, *supra*, at 151. The undisputed bird's-eye view is that any machine for private use that has a recording function that is capable of, and has the primary purpose of, making a "digital audio copied recording" by reproducing a "digital music recording" qualifies as a DARD under the AHRA. *See* 17 U.S.C. § 1001. But the statute also parses the terms "digital audio copied recording" and "digital music recording"; therefore, with respect to application of the AHRA's DARD definition, the devil is in the details.

To start, the statute expressly defines a "digital audio recording device" as

> any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a *digital audio copied recording* for private use. . . .

17 U.S.C. § 1001(3) (emphasis added).[5] Put another way, this provision plainly establishes that a DARD is a machine intended for private, individual use that has a

---

[5] The DARD definition includes exceptions for both "professional model products," 17 U.S.C. § 1001(3)(A), and "dictation machines, answering machines, and other audio recording equipment that is designed and marketed primarily for the creation of sound recordings resulting from the fixation of nonmusical sounds," *id.* § 1001(3)(B). Neither of these is at issue in this case.

digital recording function that is (1) capable of making a digital audio copied recording (or DACR), and (2) designed or marketed for the primary purpose of making a DACR.

The statute also defines a DACR (*i.e.*, the DARD's output): a DACR is "a reproduction in a digital recording format of a *digital musical recording*, whether that reproduction is made directly from another digital musical recording or indirectly from a transmission." *Id.* § 1001(1) (emphasis added). In other words, a DACR is a "reproduction" of a "digital musical recording" ("DMR") in a digital recording format.

And, finally, the statute makes clear that the DARD's input—*i.e.*, the "digital musical recording" ("DMR") that the DARD reproduces to make a DACR—must be

> a material object—
>
> (i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, and
>
> (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

*Id.* § 1001(5)(A). Notably, the statute also (somewhat helpfully) specifies what a DMR is *not*. It states that a DMR is *not*

> a material object--
>
> (i) in which the fixed sounds consist entirely of spoken word recordings, or
>
> (ii) in which one or more computer programs are fixed, except that a digital musical recording may contain statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material.

*Id.* § 1001(5)(B).  This means, in essence, that a DMR is a material object that contains only fixed sounds (and various data incidental to those sounds), and that neither material objects that contain spoken word recordings nor those that contain computer programs count as DMRs for AHRA purposes.

When all this is put together, a relatively clear picture of the general relationship between the various defined terms emerges:



The parties in the instant case do not dispute this characterization (at this level of generality); instead, their disagreement centers on whether, and to what extent, the defining characteristics of a DMR must apply to DACRs under the statute.

Specifically, and as referenced above, the AHRA establishes that only *certain* media qualify as DMRs for AHRA purposes; namely, those that are material objects in which "only sounds" and data incidental to those sounds are fixed in a digital recording format.  *Id.* § 1001(5)(B); *see* S. Rep. No. 102-294, at 46 ("The intention is for the term . . . to cover objects commonly understood to embody sound recordings and their underlying works, such as recorded compact discs (CDs), digital audio tapes (DAT's), audio cassettes, and long playing albums (LP's) . . . ; conversely, the term is intended to exclude objects such as recorded videocassettes and multimedia products (i.e., unitary

products which integrate several prominent components such as text, video clips, computer graphics, speech and music)."); *see also id.* (noting that, "if the material object contains computer programs or data bases that are not incidental to the fixed sounds, then the material object would not qualify").  Furthermore, the statute applies only to devices whose recording functions are designed or marketed primarily for making reproductions of these qualifying media.   *See* 17 U.S.C. § 1001(3); *see also* S. Rep. No. 102-294, at 46 (explaining that the statute was intentionally designed "to delineate clearly the types of devices and media subject to [the statute], and to ensure that devices dedicated to the recording of motion pictures, television programs[,] or multimedia works are not covered"); *see also id.* at 48 (noting that, under the prescribed definitions, "neither a personal computer whose recording function is designed and marketed primarily for the recording of data and computer programs, nor a machine whose recording function is designed and marketed for the primary purpose of copying multimedia products, would qualify").

The various restrictions contained in the definitions section of the AHRA were most certainly intended to clarify which recording devices should be excluded from the DARD definition pursuant to the compromise that Congress struck to protect the interests of music industry and high tech industry professionals.  However, in practice, the definitions and their limitations raise a host of questions when applied to modern recording technology that did not exist at the time was statute was enacted.  Indeed, the prototypical example of a DARD in 1992, when the AHRA was passed, was the Digital Audio Tape ("DAT") machine, mentioned above, which could copy a music CD (a DMR) in digital format directly onto a digital audio tape cassette (the DACR), and was

designed and marketed primarily for this type of copying.  *See* S. Rep. No. 102-294, at

17 ("Currently, the predominant type of [digital audio recording] device offered for sale

in the United States is that DAT recorder[.]").  That device is no longer widely utilized

for making individual copies of copyrighted music, and what is at issue in the instant

case is whether the statute's DARD definition applies to modern audio technology that

permits users to copy digital music recordings onto a hard drive for subsequent

playback inside an automobile but does not create a new CD or cassette tape.

### C.      Facts And Procedural History

The Alliance of Artists and Recording Companies ("the AARC")—the core

purpose of which is to collect and distribute royalties under the AHRA, *see* Jacobson,

*supra*, at 215—initially filed the instant action against four vehicle manufacturers and

automobile parts suppliers (GM, Ford, DENSO, and Clarion) on July 25, 2014.  (*See*

GM Compl. ¶¶ 9-12.)  On November 14, 2014, the AARC filed a second, substantially

identical lawsuit against two other manufacturers of vehicles and auto parts: FCA US

LLC (formerly Chrysler Group) and Mitsubishi Electric Automotive Company.  (*See*

FCA Compl. ¶¶ 9-11.)  The latter case was assigned to the undersigned as a related case

and consolidated with the former matter.  (*See* Minute Order of Feb. 10, 2015.)

The gravamen of the AARC's complaint is that Defendants have run afoul of the

AHRA by installing covered digital audio recording devices in the dashboards of

certain vehicles without paying the required royalties or complying with the SCMS

restriction.  (*See* GM Compl. ¶ 3; FCA Compl. ¶ 3.)  Specifically, the AARC claims

that, since at least 2011, GM and DENSO have designed, manufactured, and distributed

a "Hard Drive Device" (HDD) in some GM cars, and that this device "records songs

from CDs to the device's hard drive."  (*See* GM Compl. ¶¶ 24-26.)  To use this device,

according to the AARC, a user inserts a CD into the vehicle's HDD and the device copies the audio files onto the hard drive, after which the user can play the audio files directly from the hard drive inside the vehicle, without the original CD.  (*See id.* ¶ 27.) Likewise, Plaintiff alleges that, since at least 2011, Ford and Clarion have designed, manufactured, and distributed a similar device called "Jukebox" for certain Ford vehicles.  (*See id.* ¶¶ 38-42.)  Like the HDD, the Jukebox allegedly copies songs from CDs onto the device's hard drive for later listening.  (*See id.* ¶ 43.)  The AARC also alleges that Mitsubishi has designed a similar device called the "Media Center" that has been installed and distributed in FCA's vehicles since 2008.  (See FCA Compl. ¶¶ 25-42.)   As alleged, each device is also capable of "automatically identify[ing] the album name, artist name, song title, and genre for each copies song."  (*See* GM Compl. ¶¶ 27, 43; FCA Compl. ¶ 34.)

Notably, the AARC does *not* contend that vehicle dashboard devices such as the HDD, the Jukebox, and the Media Center can reproduce the songs that have been copied onto the hard drive onto a new CD—it is undisputed that once the songs are copied onto the device's hard drive, that is where they stay.  Nevertheless, the AARC maintains that the initial copying function suffices to make these devices DARDs for AHRA purposes, and the organization seeks a permanent injunction and declaratory relief to prevent Defendants from manufacturing and distributing their allegedly offending devices unless they pay the required royalties and conform to the SCMS.  (*See* GM Compl. ¶¶ 66, 74, 80; FCA Compl. ¶¶ 56, 64, 70.)  The AARC also seeks the damages that are authorized by statute: an amount equal to the unpaid royalties plus an additional 50%, as well as $2,500 per device manufactured, imported, or distributed within three years

of the filing of their complaint.  (*See* GM Compl. ¶¶ 71, 77; FCA Compl. ¶¶ 61, 67

(citing 17 U.S.C. § 1009(c)(2), (d)(1)(A), (d)(1)(B)(i)).)

On October 10, 2014, Ford and Clarion filed a joint Motion to Dismiss the

AARC's complaint against them.  (*See* Mem. in Supp. of Ford and Clarion's Mot.

("Ford's Mem."), ECF No. 30-1.)  These defendants assert that their Jukebox device—

which they prefer to call a "navigation system"—is not a DARD at all, but instead, "is a

complex computer" that "includes a central processing unit" and "a 40 GB hard drive

for storage of an operating system, computer software programs, databases, and other

information[.]"  (Ford's Mem. at 5.)  Moreover, the motion maintains that, even

accepting the complaint's allegations as true, the device "do[es] not reproduce digital

music recordings in material[] objects addressed by the statute, that is, CDs, LPs,

cassettes, or digital audio tapes." (*Id.* at 6; *see also id.* at 4 ("Plaintiff admits that

Defendant' complained of 'device' stores music on a hard drive—a hard drive that

houses software programs and other data").  Thus, according to these defendants, their

device is "not capable of making a 'digital audio copied recording' of a 'digital music

recording' as defined under the [AHRA]" (*id.* at 5), and "[a]s such, the device falls

outside of the AHRA's statutory reach, requiring dismissal of Plaintiff's claims" (*id.*

at 4).

For its part, GM opted to file an answer and a counterclaim on October 31, 2014,

seeking a declaratory judgment that its HDD device did not fall under the AHRA.  (*See*

Def. Gen'l Motors LLC's Counterclaim and Am. Answer, ECF No. 40.)  Then, after the

AARC answered the counterclaim, GM filed a motion for judgment on the pleadings.

(*See* Mem. in Supp. of GM's Mot. ("GM's Mem."), ECF No. 48-1.)  Meanwhile, both

DENSO and Mitsubishi filed motions for summary judgment (*see* Def. DENSO Int'l Am. Inc.'s Mot. for Summ. J., ECF No. 58; Def. Mitsubishi Elec. Auto. Am. Inc.'s Mot. for Summ. J., ECF No. 61), and on March 24, 2015, this Court stayed all briefing on the summary judgment motions until the resolution of the pending Rule 12 motions.  (*See* Minute Order of March 24, 2015.)[6]

This Court held a hearing on Ford and Clarion's joint motion to dismiss and GM's motion for judgment on the pleadings on May 5, 2015.

## II.    LEGAL STANDARDS

### A.    A Motion to Dismiss The Complaint Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding whether to grant a motion to dismiss under Rule 12(b)(6), "[t]he court must view the complaint in [the] light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations."  *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 134 (D.D.C. 2013).

---

[6] FCA has filed an answer, and, to date, has not filed any dispositive motions.  (*See* Def. FCA US LLC's Answer, ECF No. 54.)

Even so, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor is the court "bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

### B.     A Motion For Judgment On The Pleadings Under Rule 12(c)

Federal Rule of Civil Procedure 12(c) permits "any party" to file a motion for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial[.]"  Fed. R. Civ. P. 12(c).  A motion brought under 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking at the substance of the pleadings and any judicially noted facts."  *Hebert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990).  Such a motion "only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided[.]"  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367 at 208 (3d ed. 2004).  To prevail, "[t]he moving party must show that no material issue of fact remains to be solved and that it is entitled to judgment as a matter of law."  *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 888 F. Supp. 2d 189, 191 (D.D.C. 2012).

The applicable standard of review for motions filed under Rule 12(c) "is essentially the same as that for motions to dismiss under Rule 12(b)(6)."  *Fay v. Perles*, 484 F. Supp. 2d 12, 14 (D.D.C. 2007).  This means that the non-movant's factual allegations must be accepted as true and all reasonable inferences must be drawn in the non-movant's favor.  *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 222

(D.D.C. 2010).  It also means that any claim for relief "must offer more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Doe v. De Amigos, LLC*, 987 F. Supp. 2d 12, 15 (D.D.C. 2013) (quoting *Iqbal*, 556 U.S. at 678).  A claim for relief must be "plausible" to satisfy Rule 12(c), just as it must be to satisfy Rule 12(b)(6).  *Hall v. District of Columbia*, 73 F. Supp. 3d 116, 199 (D.D.C. 2014)

In deciding a motion to dismiss or a motion for judgment on the pleadings, a court may generally consider only "the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice." *Allen v. U.S. Dep't of Educ.*, 755 F. Supp. 2d 122, 125 (D.D.C. 2010).  However, "a court may consider . . . documents upon which the plaintiff's complaint necessarily relied even if the document is produced . . . by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehabilitation Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks and citation omitted).

## III.   ANALYSIS

The AARC's complaint alleges that GM's HDD, Ford's Jukebox, and FCA's Media Center are "digital audio recording devices" (DARDs) insofar as they are "capable of making a digital audio copied recording for private use" and are "designed for the primary purpose" of making such copies.  (GM Compl. ¶¶ 27-28, 43-44; FCA Compl. ¶¶ 31-32.)  In AARC's view, these facts give rise to these car manufacturers' obligations to pay royalties and to limit the copying capabilities of these devices pursuant to the AHRA.  (GM Compl. ¶¶ 27-28, 43-44; FCA Compl. ¶¶ 31-32.) However, as Ford, Clarion (the maker of Ford's device), and GM view the statute, the

AHRA is addressed to the problem of "serial copying"—*i.e.*, "the creation of copies of a musical recording from another copy of that recording" (Ford's Mem. at 1)—and because the devices at issue here merely "store[] music on a hard drive . . . that houses programs and other data" as described in the complaint, these Defendants assert that "the[ir] device[s] fall[] outside the AHRA's statutory reach[.]" (*Id.*)  Thus, the overarching question before this Court is whether the HDD and Jukebox devices, as described in the complaint, qualify as DARDs for the purpose of the AHRA.

A quick recap of the key statutory terms will help to crystallize the particular issue of statutory construction that this Court must now resolve.  As explained above, the statute is quite clear that, in order to be a DARD, the device must have a recording function that is capable of, and has the primary purpose of, making a DACR (a digital audio copied recording), which is defined as "a reproduction in a digital recording format of a digital musical recording" (DMR).  Based on this definition, Defendants insist that the DACR—*i.e.*, the DARD's output—must itself be a DMR, just like the input; that is, Defendants maintain that the DARD's output must be a "material object" containing, in a digital format, "only sounds" and other data incidental to those sounds, *id.* § 1001(5)(A)(i), and it *cannot* be a material object "in which one or more computer programs are fixed," except for programs incidental to the fixed sounds or needed "to bring about their perception, reproduction, or communication[.]"  *Id.* § 1001(5)(B). (*See* Ford's Mem. at 5 – 6).  The AARC squarely rejects the contention that the DACR must be a DMR. (*See, e.g.,* Plaintiff's Mem. in Opp. to Mot. to Dismiss by Ford and Clarion ("Pl.'s MTD Opp."), ECF No. 52, at 39 (arguing that the correct statutory focus is "on whether the recording made by the device is a reproduction in a digital music format,

not whether a separate material object is produced or whether the reproduction meets the definition of 'digital musical recording'").)

The issue of whether or not a DACR must also be a DMR is not only the primary bone of contention between the parties, it is a crucial question of statutory interpretation at this point in the litigation, because if the device must be capable of producing a DACR that *also* qualifies as a DMR in order to count as DARD under the statute, and if the HDD and Jukebox devices do not make DACRs that also qualify DMRs as these devices are described in the instant complaint, then Defendants' devices are not DARDs as a matter of law.  (*See* Ford's Mem. at 13 (asserting that "the Nav System is, by the Act's definitions, incapable of making a digital audio copied recording and therefore is not a DARD" (emphasis omitted)); GM's Mem. at 20 ("[W]hat few facts AARC has pled establish without dispute that the only material objects on which GM's systems store music are hard drives, and that all hard drives used in GM's systems contain computer programs and materials that are not incidental to the music files stored on them.  Those hard drives therefore do not satisfy the definition of digital musical recordings, and GM's systems are therefore outside of the AHRA" (emphasis omitted)).)

After careful consideration of the parties' arguments and for the reasons explained below, this Court agrees with Defendants that a DACR must itself be a DMR under the plain terms of the AHRA.  Therefore, the statute applies to the devices at issue here only if those devices have a recording function that is capable of creating a material object that satisfies the conditions of 17 U.S.C. §§ 1001(1) and 1001(5) and has the primary purpose of doing so.  *See* 17 U.S.C. § 1001(3).  However, the Court

also finds that Plaintiff has plausibly alleged that at least some version of the described devices satisfies these conditions and, at the very least, there remains "a material issue of fact to be solved" regarding whether the output of some of these devices qualifies as a DMR. *Judicial Watch*, 888 F. Supp. 2d at 191. Therefore, the Defendants' motion to dismiss and motion for judgment on the pleadings must be denied.

### A.    Under The AHRA, A DACR Is Itself A DMR

The battle lines regarding the parties' views of Congress's intent with respect to audio devices that are subject to the AHRA's restrictions have been clearly drawn. Defendants' quiver has two arrows: first, Defendants argue that, to be a DARD, a device's output must be a DMR, meaning that it must be a material object containing only sounds and no unrelated computer programs. (*See* Ford's Mem. at 10 ("In order to be a DARD, the Nav System must be able to reproduce a *digital music recording*."); GM's Mem. at 16 ("That is, both the [DARD's] source and . . . target must be *digital musical recordings*.").) Then, moving in for the kill, Defendants claim that their particular devices cannot be DARDs because the only output here (the device's hard drive with the copied digital music files on it) is not a DMR, given that it contains additional computer programs that are not incidental to any copied music. (*See* Ford's Mem. at 11-13; GM's Mem. at 21-22.) The AARC responds by disputing Defendants' statutory construction, arguing that a DARD need only create a DACR, which need not itself be a DMR. (*See* Pl.'s MTD Opp. at 35-40; Plaintiff's Mem. in Opp. to GM's Mot. for Judgment on Pleadings ("Pl.'s MJP Opp."), ECF No. 53, at 30-33.) Therefore, according to the AARC, even if the HDD and Jukebox devices do not create DMRs, they still fall under the statute because they do create DACRs. Although this case presents a strikingly close question that is debated here by able parties, this Court

believes Defendants have the better of the statutory interpretation argument, in several respects.

    1.    <u>The Text Of The Statute Supports The Conclusion That A DACR Is A DMR</u>

First, and foremost, the plain text of the AHRA indicates that a DACR must also be a DMR. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014) (reiterating that a court looks primarily to the statutory text when addressing a question of statutory interpretation). The most revealing textual clue appears in the definition of a DACR itself: section 1001(1) states that a DACR is "a reproduction in a digital recording format of a digital musical recording, whether that reproduction is made directly from *another* digital musical recording or indirectly from a transmission." 17 U.S.C. § 1001(1) (emphasis added). As Defendants point out, Congress's use of the word "another" when describing a DMR as the source of a DACR indicates that the DACR itself is also a DMR. *See Merriam-Webster's Collegiate Dictionary* 51 (11th ed. 2003) (defining "another" as "being one more in addition to one or more of the same kind"). In other words, the only plausible reason that Congress would specify that a DACR made via direct copy would be from *another* DMR is if the DACR itself is also a DMR; otherwise, the word "another" would serve no purpose in the sentence. *Cf. Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005) ("[Courts] must strive to interpret a statute to give meaning to every clause and word[.]").

Other sections of the AHRA also support this interpretation. For example, the section of the statute that prohibits certain copyright infringement actions (*see* 17 U.S.C. § 1008) appears to assume that DARDs create DACRs that qualify as DMRs. Section 1008 states, in relevant part, that no copyright infringement action can be

brought "based on the noncommercial use by a consumer of [a digital audio recording device] or medium for *making* digital musical recordings or analog musical recordings." 17 U.S.C. § 1008 (emphasis added).  The fact that this section uses the term "digital musical recording," and not "digital audio copied recording," to describe what a DARD makes strongly implies that the latter is a species of the former, rather than a different type of output altogether.

The statute's enumerated civil remedies also suggest that Congress intended that a DARD's output must be a DMR.  The AHRA empowers a court that is adjudicating a claim under the statute to impound "any digital audio recording device, *digital musical recording*, or [device for circumventing the required copying controls] that is in the custody or control of the alleged violator and that the court has reasonable cause to believe does not comply with [the statute]."  17 U.S.C. § 1009(f) (emphasis added). The court can also "order the remedial modification or the destruction of any [of the violator's noncompliant] digital audio recording device[s], *digital musical recording[s]*, or [devices for circumventing the required copying controls]." *Id.* § 1009(g) (emphasis added).  If the AARC is right that digital musical recordings are only a DARD's *input* (not its output), then it makes little sense that Congress would only authorize a court to seize or destroy the DARD and its input (the DMRs), while leaving the illegal copies created by an AHRA violator unscathed, and at the very least, one would expect that the statute would distinguish between DMRs and DACRs (if there is a material distinction, as the AARC claims), by authorizing the seizure and destruction of DACRs in particular, in addition to those illegal copies that also happened to qualify as DMRs. Indeed, it is precisely because the provision at issue targets only DMRs that the far

more natural, and more likely, reading of the statute as a whole is that a DACR is, by definition, a type of DMR, such that all offending DACRs would qualify as DMRs and would be within the court's power to impound or destroy.

> 2.   Reading The AHRA To Require That A DACR Satisfy The Criteria Of A DMR Is Consistent With The Purpose Of The Statute

Because the words that Congress uses must be read "in their context and with a view to their place in the overall statutory scheme," *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)), this Court also notes that interpreting the AHRA to require that a DACR be a DMR is consistent with the purpose of the statute and the circumstances under which it was enacted.  As explained, the AHRA was the carefully calibrated result of extensive legislative negotiations.  *See 1991 Senate Hearing*, *supra*, at 1 (statement of Sen. Dennis DeConcini); *see also id.* at 48-49 (statement of Ralph Oman, Register of Copyrights and Associate Librarian for Copyright Services) ("The Audio Home Recording Act proposal represents a potentially historic compromise among the recording, music, and electronics industries and among the representatives of musical performers and consumers. . . .  [T]he bill apparently brings under its umbrella all affected interests.").  The give-and-take that was required to enact this statute is reflected in the narrowness and precision of the statute's definitions.  The AHRA does not cover every type of audio recording or every type of audio copying device that could possibly raise the specter of serial digital copying; in fact, the one device that poses a clear threat to the recording industry as far as digital reproductions are

concerned—the personal computer[7]—is quite plainly put beyond the statute's reach. *See* 17 U.S.C. § 1001(3) (requiring that a DARD's digital recording function have the "primary purpose of . . . making a [DACR] for private use"); *see also* S. Rep. No. 102-294, at 48 (explaining that "the typical personal computer would not fall within the definition of 'digital audio recording device'" because it would not satisfy the statute's "primary purpose" restriction).

To be sure, it is difficult to say with certainty whether Congress would have intended the AHRA to cover the particular devices at issue in the instant case because audio technology has changed dramatically since 1992. That is, the DAT machines and similar digital audio recording devices that existed at the time the AHRA was enacted typically produced a new cassette tape or CD that contained a reproduction of the digital music recording, in clear contrast to the devices at issue here, which do not produce a separate material object (*i.e.*, here, the recording device and its "output" appear to coexist on the same hard drive). But uncertainty about what the 102nd Congress might have thought of twenty-first century technology is all the more reason to adhere closely to the carefully negotiated statutory text. *Cf. W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991) (explaining that "the purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone," and that "[t]he best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President"). This Court concludes that the plain language of the AHRA demonstrates that Congress intended for the statute to

---

[7] It is a well-known fact that "untold millions of CD and DVD burners have been sold as standard equipment in personal computers and are frequently used to 'burn' music to recordable CDs and DVDs." Fred von Lohmann, *Fair Use As Innovation Policy*, 23 Berkeley Tech. L.J. 829, 833-34 (2008).

cover devices whose recording function is designed and marketed primarily for the purpose of reproducing digital music recordings, as specifically defined in the statute. Thus, interpreting the AHRA to require that the material object the device produces must contain only fixed sounds and not computer programs (just like the types of digital audio copied recordings that were commonly known and available at the time of the statute's enactment) is entirely consistent with that legislative objective.

### 3.   The AARC's Arguments To The Contrary Are Unpersuasive

The AARC seeks to advance several textual arguments that lead to the opposite result, none of which succeeds.  For example, with respect to Congress's use of the word "another" in the DACR definition, the AARC maintains that the insertion of that term is not conclusive of whether a DACR must qualify as a DMR, because Congress also used the word "whether" after its reference to a "digital musical recording" and thus intended to introduce only *examples* of potential DACR sources, not an exhaustive list.  (Pl.'s MTD Opp. at 38-39 ("[A] straightforward and logical reading of the digital audio recording . . . definition . . . would interpret 'whether,' not as introducing an 'exhaustive list,' but rather as examples of types of sources from which a DACR may be produced.") (citations omitted)).  This interpretation strains credulity.  The natural reading of  "whether" in the context of the provision at issue merely establishes two mutually exclusive means of creating the "reproduction" that constitutes a DACR: it is made either "directly" from a DMR, or "indirectly" from a transmission.  There is no indication in the text that these are only illustrative or that any other means of reproduction are permissible.  Moreover, even if direct and indirect reproduction were merely two of many possible means of reproduction, that reading would not change the

role of the word "another" in the sentence: that adjective *still* would indicate that a DACR is a type of DMR.

Next, the AARC argues that this Court's interpretation would render certain statutory text superfluous.  First, it asserts that the entire definition of a DACR would be "read out of the statute," presumably because Congress could have defined DARDs solely in terms of DMRs. (*See* Pl.'s MTD Opp. at 40; Pl.'s MJP Opp. at 33.)  But this is not necessarily so—as Defendants explain, even if DACRs are equated with DMRs, a DACR is still an important rung in the AHRA's chain of definitions because it denotes a *particular type* of DMR: a second-generation, copied DMR.

The AARC also insists that Defendants' interpretation renders superfluous the phrase "in a digital recording format" in the DACR definition, given that DMRs are, by definition, "in a digital recording format[.]" *See* 17 U.S.C. § 1001(5)(A)(i).  In other words, according to the AARC, if DACRs are DMRs, then there would be no need to specify that a DACR must be in a digital recording format.  (*See* Pl.'s MTD Opp. at 40; Pl.'s MJP Opp. at 33.)   This argument is potentially meritorious from a textual standpoint, but the statute's drafting history wholly undermines it.  Specifically, it appears that earlier drafts of the AHRA used the term "audiogram" instead of "digital musical recording" to describe a DARD's input, and this broader term encompassed analog recordings.  *See* S. Rep. No. 102-294, at 4 (1992); *see also id.* at 44 (noting that the term "audiogram" was intended to cover analog sources such as "audio cassettes and long-playing albums").  At the time, a DACR was defined as "a reproduction *in a digital format* of an audiogram . . . regardless of whether the material is reproduced from a digital or analog source[,]"  *id.* at 5 (emphasis added), and in that context, the

phrase "in a digital format" clarified that a DARD's output must be digital even if its input was analog.  Later in the legislative process, Congress changed "audiogram" to "digital musical recording," thereby requiring that both the DARD's input and its output be in a digital format.  But the phrase "in a digital format" remained in § 1001(1)—a relic of the earlier draft, when it had meaning.  (*See* Def. GM's Reply, ECF No. 64, at 11-13; *see id.* at 12 ("[B]ecause of the format-agnostic definition of audiogram, the definition of digital audio copied recording [initially] required the limitation 'in a digital recording format' to meet the intent of the AHRA to regulate only reproductions into a digital format, even for analog sources.").)  Thus, while the AARC is correct that surplusage is to be avoided, that cannot be done "at all costs," *United States v. Ali Research Corp.*, 551 U.S. 128, 137 (2007), and certainly not where the extra verbiage can be adequately explained as a simple scrivener's error.

Finally, although it may be true that Congress clearly intended the AHRA to cover recording devices that can create copies for consumers to listen to while driving, as the AARC asserts (Pl. Opp. at 15 -17), this argument only goes so far, given the relatively narrow point of statutory interpretation that is being analyzed here.  That is, this Court does *not* accept Defendants' suggestion (*see* Ford's Mem. at 10) that the material object that a DARD creates must be a *separate* object from the recording machine itself such that a hard drive storage device could *never* qualify as DARC for the purpose of the statute.  *See Diamond*, 180 F.3d at 1076 (observing that "[t]he typical computer hard drive . . . is, of course, a material object").  But even so, the plain language of the AHRA further delineates *which* digital audio recording machines (whether installed inside an automobile or otherwise) are covered, and its definitions

establish that, in order to be a recording device that triggers the AHRA's obligations, the result of the device's reproduction process (here, the hard drive upon which the digital music recording is reproduced) must be "another" DMR. Thus, as this Court reads it, the statutory text compels the conclusion that a car device for copying music from CDs for later listening while inside a vehicle might possibly qualify as a DARD under the statute notwithstanding the fact that the device does not create a removable material object, and it so qualifies if the device satisfies the statute's DARD definition—*i.e.*, it is machine for use by individuals, the digital recording function of which is designed or marketed for the primary purpose of copying DMRs—and if its output satisfies the definition of a DMR, because it contains only sounds and incidental data, and not computer programs.

In short, this Court is persuaded that the text the AHRA establishes that a DACR is, by definition, a DMR. Therefore, in order for the AARC's complaint to survive the pending Rule 12 motions, it must contain plausible allegations that, if true, would demonstrate that the challenged devices are capable of creating DACRs that satisfy the statutory conditions of DMRs. For the reasons explained below, this Court concludes that the AARC's complaint has mounted this basic hurdle.

### B.    The AARC's Complaint States A Claim Under The AHRA

To recap, by its plain terms, the AHRA applies only to devices with digital recording functions that have the primary purpose of creating a "material object" that conforms to the definition of a DMR—*i.e.*, the object that the device produces must contain "only sounds" and incidental data, *id.* § 1001(5)(A)(i), and cannot contain unrelated computer programs, *id.* § 1001(5)(B)(ii). Defendants insist that their challenged devices cannot be DARDs for AHRA purposes even as described by

26

Plaintiff, because the "material object" these devices create is the digital file on the device's hard drive, and the hard drive contains much more than only sounds and incidental data; it also contains a variety of unrelated computer programs (such as navigation systems).  Defendants' argument that the HDD and Jukebox devices do not produce DMRs is consistent with the only published federal case to consider the limits of the AHRA.  The Ninth Circuit in *Recording Industry Association of America v. Diamond Multimedia Systems Inc.*, 180 F.3d 1072 (9th Cir. 1999), concluded that because the Rio, an early MP3 player, received its music files directly from a personal computer that contained "numerous programs (*e.g.*, for word processing, scheduling appointments, etc.) and databases not incidental to any sound files[,]" the Rio's input was not a DMR and the Rio itself was not a DARD.  *Id.* at 1076, 1081.  Hence, Defendants here credibly maintain that, because their devices' hard drives are chock full of non-music data and computer programs, the output of the HDD and Jukebox cannot be a DMR (even after audio files from a CD have been downloaded onto it), just like the computer hard drive in *Diamond*.[8]

---

[8] To be sure, the *Diamond* court considered whether a challenged device's *input* qualified as a DMR, whereas the instant case turns on the nature of a device's *output*; however, the Ninth Circuit's DMR analysis is seemingly equally applicable.  Furthermore, to the extent that Plaintiff relies on *Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, No. 1:06-cv-03733-LAK, 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007), which is an unpublished case out of the Southern District of New York (*see* Pl.'s MTD Opp. at 27-28; Pl.'s MJP Opp. at 22-24), that reliance is misplaced. The *XM* case is substantially dedicated to a thorough investigation of the scope of the AHRA's copyright protection, and in this Court's view, the AARC has overread the sole footnote on which it relies.  That is, rather than establishing that devices with embedded software programs can be DMRs for the purpose of the AHRA, that footnote was addressed primarily to the fact that the XM devices, unlike the device at issue in *Diamond*, could copy digital music recordings directly from an XM broadcast, not just from personal computers.  *See XM*, 2007 WL 136186, at *4 n.4 (noting that the XM device could "receive from transmission[s,]" as contemplated by 17 U.S.C. § 1001(1), which includes in the definition of DACR a reproduction made "indirectly from a transmission").  The *XM* court did not specifically address whether a DACR is necessarily a DMR, nor did it consider specifically the extent to which any software on the XM devices would have precluded such a classification, or whether such software might instead be "material, statements, or instructions incidental to [the] fixed sounds."  *Id.* § 1001(5)(A).

It is entirely possible that the output of Defendants' devices do, in fact, contain computer programs and other data not incidental to the recorded audio files such that the devices fall outside the AHRA's DARD definition.  But this Court is keenly aware that, at this early stage in the litigation, it must take Plaintiff's well-pled factual allegations as true, and construe all reasonable inferences in its favor.  *See Busby*, 932 F. Supp. 2d at 134.  And applying *that* standard, it finds that the AARC's complaint contains allegations of fact that, along with reasonable inferences drawn in Plaintiffs' favor, are sufficient to support the conclusion that at least some of the challenged devices can produce DMRs within the meaning of the AHRA.

For example, even though the AARC admits that GM's HDD might in some instances be capable of "updating maps for a navigation feature," it also alleges that "a navigation/map feature is not . . . included on every device that has the music copying feature," including certain models of the Cadillac CTS Coupe.  (*See* GM Compl. ¶ 29-30.)  This assertion gives rise to the inference that these navigation-less devices might well qualify as being capable of making DACRs that count as DMRs for the purpose of the AHRA.  As for Ford's Jukebox, the complaint quotes an owner's manual for one vehicle that allegedly states that "[y]our mobile media navigation system has a Jukebox which allows you to save desired tracks or CDs to the hard drive for later access" (GM Compl. ¶ 43), which in and of itself suggests that the Jukebox has the potential to be a DMR (*i.e.,* it is reasonable to infer from this statement that the hard drive of this devices contains only reproductions of such audio files), especially given that the complaint is devoid of any assertion to the contrary.  Thus, while Defendants may well turn out be factually correct when they describe their music-recording devices as

28

sharing a hard drive with a broader "Nav System" (Ford's Mem. at 5) or "on-board, multipurpose computers" (GM's Mem. at 8) in a manner that precludes their output's characterization as a DMR, the exact nature of these devices—and therefore whether they fall within the scope of the AHRA—is a question of fact that must await resolution at the next stage of this litigation.  In the meantime, this Court concludes that the AARC has alleged enough (for now) to state a claim under the statute as this Court has interpreted it. [9]

## IV.   CONCLUSION

The plain text of the AHRA supports Defendants' assertion that, under the statute, a "digital audio recording device" must be capable of producing "digital audio copied recordings"; that these recordings are a type of "digital musical recording"; and that the device's output must therefore comport with the definition of a digital musical recording that is established at 17 U.S.C. § 1001(5).  Thus, the Court rejects Plaintiff's overly broad interpretation of the statute.  However, and nevertheless, the Court concludes the instant complaint has sufficiently alleged facts that, if true, could plausibly demonstrate that Defendants' devices are in violation of the AHRA.

---

[9] The Court will not accede to Defendants' request that it consider additional factual information about the devices at this time.  GM has sought to introduce an affidavit and a copy of a GM press release (*see* GM's Mem. at 19 & n.6), arguing that the AARC quoted that press release in one paragraph of the complaint (*see* GM Compl. ¶ 31); likewise, Ford and Clarion seek to introduce a copy of an owner's manual (*see* Ford's Mem. at 6 & n.3) on the grounds that the AARC quoted from that manual in another paragraph (*see* GM Compl ¶ 43).  This Court finds that the complaint does not "necessarily rel[y]" on these documents, *Ward*, 768 F. Supp. 2d. at 119, nor does it "quote from and discuss [them] extensively," *W. Wood Preservers Inst. v. McHugh*, 292 F.R.D. 145, 149 (D.D.C. 2013), as would be required if the Court is to consider them when evaluating Defendants' Rule 12 motions.  Instead, it appears that the complaint quotes the two documents at issue one time each, and the bulk of its allegations and argument do not rest on the press release or the owner's manual.  *See Patterson v. United States*, 999 F. Supp. 2d 300, 307 (D.D.C. 2013) (finding that a complaint did not necessarily rely on an affidavit that it "minimally quote[d]" for a limited purpose).  That said, a full factual accounting will occur at the next stage of litigation.

Therefore, as set forth in the accompanying order, Ford and Clarion's motion to dismiss and GM's motion for judgment on the pleadings must be **DENIED**.


DATE:  February 19, 2016

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge