**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC.,** | |
| Plaintiff, | Civil Action No. 14-cv-1271 (KBJ) |
| v. | |
| **GENERAL MOTORS COMPANY,** *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>
<u>**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS <span style="float:right">Page</span>

INTRODUCTION ................................................................................................................. 1

UNDISPUTED FACTS COMMON TO ALL DEFENDANTS ..................................................... 2

    A.    Nature of Defendants' Systems ................................................................. 2

    B.    Defendants' Systems' Sound Playback and Recording Capability ...................... 4

    C.    General Characteristics of Hard Disk Drives in Defendants' Systems................. 5

SUMMARY JUDGMENT STANDARD ................................................................................... 9

ARGUMENT ................................................................................................................... 10

I.      DEFENDANTS' SYSTEMS ARE NOT DIGITAL AUDIO RECORDING
      DEVICES SUBJECT TO THE AUDIO HOME RECORDING ACT ........................... 11

II.     THE STATUTORY LANGUAGE OF THE AHRA FORECLOSES THE
      NOTION THAT A PARTITION OF A HARD DISK DRIVE—AS OPPOSED
      TO THE HARD DISK DRIVE ITSELF—IS A "MATERIAL OBJECT." ..................... 13

    A.    The Plain Meaning of the Term "Material Object" As Used in the AHRA
         Is a Tangible Item ............................................................................... 13

    B.    Case Law Confirms Defendants' Interpretation of "Material Object." ............... 15

    C.    The Undisputed Material Facts Show That a Partition Is a Logical
         Construct and Not a Tangible Item ....................................................... 16

III.    PLAINTIFF'S INTERPRETATION IS UNREASONABLE BECAUSE IT
      CONFLICTS WITH THE AHRA'S SCHEME AND LEGISLATIVE HISTORY........ 19

    A.    Defining Material Objects to Include Logical Subdivisions of Digital
         Media Would Render Portions of the AHRA Superfluous and Create
         Inconsistencies Within the Statutory Scheme......................................... 19

    B.    The AHRA's History and Purpose Confirm That Defendants' Systems Are
         Not Capable of Producing DACRs .................................................... 21

CONCLUSION................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .................................................................................16

*Am. Forest & Paper Ass'n v. F.E.R.C.*,
550 F.3d 1179 (D.C. Cir. 2008) ..............................................................................14

*Blackman v. District of Columbia*,
456 F.3d 167 (D.C. Cir. 2006) ...........................................................................19, 21

*Burkhart v. Wash. Metro. Area Transit Auth.*,
112 F.3d 1207 (D.C. Cir. 1997) ..............................................................................18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................9

*Edwards v. Aguillard*,
482 U.S. 578 (1987)................................................................................................18

*Janko v. Gates*,
741 F.3d 136 (D.C. Cir. 2014) ...........................................................................13, 14

*King v. Burwell*,
135 S. Ct. 2480 (2015)............................................................................................22

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)................................................................................................18

*London-Sire Records, Inc. v. Doe 1*,
542 F. Supp. 2d 153 (D. Mass. 2008) .....................................................................15

*McDermott Int'l, Inc. v. Wilander*,
498 U.S. 337 (1991)..........................................................................................10, 18

*Paige v. Drug Enforcement Admin.*,
665 F.3d 1355 (D.C. Cir. 2012) ...............................................................................9

*Perrin v. United States*,
444 U.S. 37 (1979)..................................................................................................13

*Reckitt Benckiser, Inc. v. Jackson*,
762 F. Supp. 2d 34 (D.D.C. 2011) ..........................................................................19

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,
    180 F.3d 1072 (9th Cir. 1999) ...................................................................... *passim*

*San Antonio Gen. Maint., Inc. v. Abdnor*,
    691 F. Supp. 1462 (D.D.C. 1987) ...................................................................10, 18

*U.S. Postal Serv. v. Postal Regulatory Com'n*,
    640 F.3d 1263 (D.C. Cir. 2011) ...............................................................................14

**Federal Statutes**

17 U.S.C. § 1001(5) ...................................................................................................1, 2

17 U.S.C. § 1001(5)(A).............................................................................1, 11, 13, 19

17 U.S.C. § 1001(5)(B).............................................................................1, 11, 13, 19

17 U.S.C. § 1001(5)(C)..............................................................................................11

17 U.S.C. § 1003 ........................................................................................................20

17 U.S.C. § 1004 ........................................................................................................20

17 U.S.C. § 1009(f) ....................................................................................................20

**Rules**

Fed. R. Civ. Pro. 56...................................................................................................9

**Other Authorities**

H.R. Rep. 102-780 (1992)..........................................................................................22

H.R. Rep. 102-780(I) .................................................................................................23

Hearing on H.R. 3204 before the Subcomm. on Intellectual Property and Judicial
    Administration of the Comm. on the Judiciary, 102d Cong. 77 (1992) .................21

Hearing on S. 1623 Before the Subcomm. on Patents, Copyrights and Trademarks
    of the Comm. on the Judiciary, 102d Cong. 23 (1991)........................................22

S. Rep. 102-294..................................................................................................22, 23

Webster's Third New International Dictionary, Unabridged (2002)...........................14

## INTRODUCTION

Defendants are entitled to Summary Judgment that their respective automobile navigation and entertainment systems are not Digital Audio Recording Devices ("DARDs") subject to the Audio Home Recording Act of 1992 ("AHRA").[1]  The AHRA does not apply to Defendants' systems because, as confirmed through discovery, their digital recording function is capable of storing fixed sounds only on hard disk drives that contain materials that are not incidental to those fixed sounds, such as computer programs, other data, or images.  This undisputed fact takes Defendants' systems outside the narrow class of products to which the AHRA applies.

This conclusion flows directly from the Court's earlier rulings regarding the statutory terms Digital Audio Copied Recording ("DACR") and Digital Musical Recording ("DMR").  Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 26.  As the Court recognized, Defendants' systems fall within the AHRA only if they are "capable of creating DACRs that satisfy the statutory conditions of DMRs." *Id.*  DMR has a precise statutory definition:  It is a "material object" "in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds." 17 U.S.C. § 1001(5)(A).  The definition further explicitly excludes any material object in which "one or more computer programs are fixed," with certain exceptions not pertinent here.  *Id.* § 1001(5)(B).

Discovery has now conclusively established that all of Defendants' systems contain computer programs and/or data that are not incidental to sounds fixed on the hard drives.  Plaintiff Alliance of Artists and Recording Companies ("AARC") does not and cannot dispute this fact. The hard disk drives, therefore, fall outside the definition of a DMR in § 1001(5), and those hard disk drives also cannot be DACRs.  Because Defendants' systems are not capable of making

---

[1] Defendants file this Motion jointly because the arguments apply equally to all of Defendants' systems.  Defendants reserve the right to file separate reply briefs if necessary or appropriate.

DACRs, the systems are not, as a matter of law, DARDs subject to the AHRA.  See Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 6-9, 19-25.  Not only does this conclusion flow from a correct and careful application of the statutory language, but it also makes sense:  Defendants' systems are onboard automotive computers that are very different than the digital audio tape recorders, minidisc recorders, or CD duplicators that Congress intended to make subject to AHRA.

In an effort to avoid summary judgment, AARC argues that a "partition"—a logical organization of files on a hard disk drive—is itself a "material object" within the definition of DMR.  It is not.  A partition logically organizes data storage locations *on* a material object (i.e., the platter of a hard disk drive in Defendants' Systems), but the partition itself is neither material nor an object.

The sole dispute remaining for the Court is whether a logical abstraction can constitute a "material object" under 17 U.S.C. § 1001(5).  The plain meaning of this statutory term, other sections of the AHRA, and case law interpreting the statute all confirm that it cannot.  Accordingly, the Court should grant summary judgment in Defendants' favor and end this litigation.[2]

## UNDISPUTED FACTS COMMON TO ALL DEFENDANTS

### A.    Nature of Defendants' Systems

Defendants' navigation and/or entertainment systems at issue (hereinafter "Defendants' Systems" or "Systems") are computers that provide a broad array of functions for the automobiles in which they are installed.  *See* SUF ¶¶ 1-2.  The Systems contain processors, volatile memory, an optical drive, and (for Phase 1 systems) a hard disk drive—all common components of standard personal computers.  Exhibit 1 (Jones Decl.) ¶ 12; *see* Exhibit 4 (Ogasawara Decl.) ¶ 16; Exhibits

---

[2] Defendant General Motors has a few systems with flash drives rather than hard disk drives, but a decision in Defendants' favor on Plaintiff's "partition" theory ultimately will compel a decision for General Motors on the flash-based systems as well.

6-7 (Monteaglre Decls.) ¶ 3; Exhibit 8 (Ray Decl.) ¶ 5. Computer programs or other data that provide or enhance the Systems' various capabilities are loaded onto the Systems' hard drives during manufacturing. SUF ¶ 3; Exhibit 1 (Jones Decl.) ¶ 15.

In response to the Court's request for facts regarding the nature of the Systems (Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 29), the following are examples of the various computer programs or data that are not incidental to fixed sounds on the hard drives of one or more of the Systems:

- Navigation programs and/or data, including a visual representation of current location and directions via a map and navigational voice guidance, route and points of interest searches, a map database, a points of interest database, address books, traffic information, and GPS position;

- Computer programs and data controlling traditional and satellite radio, CD, and/or DVD playback;

- Computer programs and/or data for voice recognition and hands-free calling;

- Computer programs and data to control playback of compressed digital music files (independent of any recording function) from external sources such as CDs and/or USB devices;

- File systems used to store and administer files consisting of all types of data;

- Backup copies of the automobile system software;

- Navigation log files retrievable in the event of system failure;

- Graphics and/or audio cues;

- Computer programs and data controlling rear seat entertainment and rearview video camera operation; and

- A Gracenote® music search database, which is contained on the hard disk drive of all Defendants' systems, much of (and sometimes all of) which is unrelated to any sounds fixed on the drive.

For purposes of this Motion, it is sufficient that each of Defendants' Systems fixes sounds in a hard disk drive that also contains computer programs and/or other material that is not incidental to the fixed sounds on the hard disk drive.[3]

> ### B.        Defendants' Systems' Sound Playback and Recording Capability

Each of Defendants' Systems has an optical disc drive (i.e. CD/DVD player) that can be used to load software and other material onto the hard disk drive.  The optical disk drive also is capable of playing sounds from audio CDs over the automobile's speaker system, and a consumer can use it to store music or other sounds from CDs onto the Systems' hard disk drives.  Exhibit 3 (Jones Dep.) at 146:9-14; Exhibit 4 (Ogasawara Decl.) ¶¶ 27-30; Exhibit 5 (Lewicki Decl.) ¶ 7; Exhibit 6 (Montealegre Decl.) ¶ 6; Exhibit 7 (Montealegre Decl.) ¶ 7; Exhibit 8 (Ray Decl.) ¶ 12; Exhibit 9 (Hipp Decl.) ¶ 14(k)-(l).  It is undisputed that under the Systems' typical operation, sound data that a user elects to store to the hard disk drive, such as from an optical disc drive or other source such as a USB memory device, is first transferred to the System's volatile memory, which is simultaneously used to store copies of various computer programs and other data related to the Systems' various capabilities other than sound recording, where the data can be operated upon (e.g., processed, decoded, compressed, or encoded).  *See, e.g.*, Exhibit 4 (Ogasawara Decl.) ¶ 29; *see also* Loy Mar. 17, 2017, Rbtl. Rpt.¶ 3.  The sounds are stored, or fixed, on the "platter" within the hard disk drive.  SUF ¶ 5; Exhibit 1 (Jones Decl.) ¶ 17; Exhibit 2 (Loy Dep.) at 94:15-95:5; Exhibit 3 (Jones Dep.) at 13:13-20.  Defendants' Systems can store sound files only to the Systems' hard disk drives, and those sounds on the hard disk drive cannot be transferred by the user to another device.  SUF ¶ 5.

---

[3] The types of computer programs or other material on the Systems of each Defendant vary.  To the extent the Court would like more information on the types of computer programs or non-incidental data stored on the hard disk drives of Defendants' Systems, it is set forth in declarations submitted with Defendants' Motion. *See* SUF ¶¶ 1-4 (collecting Defendants' declarations).

C.      **General Characteristics of Hard Disk Drives in Defendants' Systems**

In Defendants' Systems, data stored on the hard disk drive are organized in a hierarchical fashion.   The following section provides a general description of that organization from the lowest level to the highest level.[4]

1.      **The Hard Disk Platter**

Defendants' Systems' hard disk drives store data on a single "platter."  The platter is a disk of metal or glass substrate coated with a magnetically sensitive material on one or both sides.  SUF ¶ 6.  A motor rotates this platter at several thousand rotations per minute (RPM) during operation, and an arm mechanism with one or more magnetic "heads" hover over the surface of the platter as it spins to read or write data thereon.  Exhibit 1 (Jones Decl.) ¶ 18; *see* Exhibit 2 (Loy Dep.) at 153:21-24; Exhibit 3 (Jones Dep.) at 72:6-15.

The hard drive platter stores data digitally as a series of 0's and 1's.  SUF ¶ 7.  The heads record digital data on the platter by changing the polarity of the magnetic coating (i.e., North or South) at specified locations on the platter in order to represent a 0 or a 1.  SUF ¶ 7; Exhibit 1 (Jones Decl.) ¶ 18.  The heads can then read back the recorded digital data by reading the magnetic polarity from specific locations on the platter.  Exhibit 2 (Loy Dep.) at 25:25-28:13; Exhibit 3 (Jones Dep.) at 14:10-21; Exhibit 1 (Jones Decl.) ¶ 18.  The process of reading and writing changes the magnetic polarity of particular spots on the platter, but does not otherwise physically alter the platter.   Accordingly, absent defect, the same spot on a platter may be rewritten and read indefinitely.  SUF ¶ 7.  Data encoded on the platter have no separate existence apart from the platter and the polarity on its thin magnetic coating.  SUF ¶ 8.  There is no way to physically carve

---

[4] In light of AARC's contention that a partition of a hard disk drive qualifies as the relevant "material object" under the AHRA, Defendants have provided technical background that may be helpful to informing the Court about the nature of partitions.  The key fact is that a partition is a logical organization, not a physical object separate from the hard disk platter.

up a hard disk drive platter without destroying it, thus rendering the hard disk drive, the platter,
and the data useless.  SUF ¶ 26.

### 2.      Bits, Bytes, and Sectors

The smallest unit of information that the hard drive can store is a "bit"—a single spot on
the platter representing a single 0 or 1.  Exhibit 2 (Loy Dep.) at 29:13-30:21; Exhibit 3 (Jones
Dep.) at 17:13-18:11; Exhibit 1 (Jones Decl.) ¶ 20.  Eight bits make up a "byte," and, in the hard
drive disks at issue here, 512 bytes make up a "sector."  *Id.*  The manufacturer of the hard disk
drive formats the platter of the hard disk drive into a series of concentric circles known as "tracks,"
with each track containing a number of sectors.  *See* Exhibit 2 (Loy Dep.) at 33:13-35:10; Exhibit
3 (Jones Dep.) at 15:10-16:2; Exhibit 1 (Jones Decl.) ¶ 20.

### 3.      Logical Block Addressing

When a computer's operating system or a software application stores or reads data on the
hard disk drive, the software sends a command to the hard disk's internal electronics—the disk
controller—which in turn moves the magnetic heads to particular locations on the platter and has
them read or write the data as requested.  *See* Exhibit 3 (Jones Dep.) at 21:3-14, 23:3-13; Exhibit
2 (Loy Dep.) at 51:3-53:16; Exhibit 1 (Jones Decl.) ¶ 21.  When communicating with the hard disk
controller, the software uses an abstraction called a "logical block address"—a number created by
the disk controller that functions as an address—to specify where information should be written or
read.  SUF ¶ 9.  This logical block addressing scheme significantly simplifies the storage and
retrieval of data, because software accessing the hard drive does not need to know the exact
physical location of each piece of data on the hard disk drive platter.  *See* Exhibit 3 (Jones Dep.)
at 21:3-14, 23:3-13; Exhibit 2 (Loy Dep.) at 51:3-53:16; Exhibit 1 (Jones Decl.) ¶¶ 21-22.  Instead,
the software only needs to track a single logical address or set of logical addresses, and the hard

disk controller will translate that logical address into a particular physical location or locations at which data is written or read.

The logical block addressing concept is especially useful for handling physical flaws on the platter that inevitably occur in manufacturing or with use over time.  The hard disk drive cannot write to or read from sectors within these physically flawed or damaged areas of the platter.  *See* Exhibit 3 (Jones Dep.) at 39:3-16, 69:2-11; *see* Exhibit 2 (Loy Dep.) at 61:2-62:5; Exhibit 1 (Jones Decl.) ¶ 22.  The disk controller will identify and keep a list of these "bad sectors," and will redirect from the bad sectors into "spare" sectors that are reserved on the platter for this purpose.  *See* Exhibit 3 (Jones Dep.) at 39:3-16; Exhibit 2 (Loy Dep.) at 61:2-62:5; Exhibit 1 (Jones Decl.) ¶ 22. When a spare sector replaces a bad sector, the disk controller remaps the logical block address of the bad sector to the spare sector that replaced it.  *See* Exhibit 3 (Jones Dep.) at 39:3-16; Exhibit 2 (Loy Dep.) at 61:2-62:5; Exhibit 1 (Jones Decl.) ¶ 22.  Thus, logical block addressing allows the software to use the same set of addresses for data, even as the physical location of the data on the platter changes as the disk controller remaps the addresses to avoid bad sectors.  This also illustrates how sequential logical block addresses may not be in physically contiguous locations on the platter, because spare sectors are typically taken from another part of the platter to avoid any physical flaw or degradation that caused the bad sector to appear. SUF ¶ 10; *see* Exhibit 3 (Jones Dep.) at 39:3-9; Exhibit 2 (Loy Dep.) at 61:2-62:5; Exhibit 1 (Jones Decl.) ¶ 22.

### 4.    Files

A file is simply a set of data stored on the hard drive.  Exhibit 1 (Jones Decl.) ¶ 23.  A file can represent many different kinds of information, including a map, a picture, a piece of text, or a sound.  If the hard drive does not have a single continuous block of space large enough to store a full file, the file can be split into pieces small enough to fit in the spaces available.  This is called

"fragmentation." *Id.* ¶ 25; *see* Exhibit 2 (Loy Dep.) at 106:21-107:14; Exhibit 3 (Jones Dep.) at 113:23-115:1.

### 5.    File Systems

All data stored to a hard drive must be organized in some fashion in order to be useable. The logical method used to organize and keep track of files stored to the hard drive is the "file system." *See* Exhibit 3 (Jones Dep.) at 46:6-17; Exhibit 2 (Loy Dep.) at 49:9-50:17; Exhibit 1 (Jones Decl.) ¶ 25.  The file system keeps track of the set of logical block addresses that make up each file.  SUF ¶ 11.  The file system information is also stored on the hard drive, and this information is updated whenever files are created, modified, or deleted.  SUF ¶ 12.  The file systems used in the Defendants' Systems are general purpose in nature, meaning they can store any type of digital file.  SUF ¶ 13.

### 6.    Partitions

Sometimes it may be useful or necessary to have more than one file system on a hard drive. The organizational layer that allows software accessing the hard drive to distinguish one file system from the next is a partition.  SUF ¶ 14.  Because a hard disk drive must have at least one file system to organize any stored data, each hard disk drive must have at least one partition.  *See* Exhibit 2 (Loy Dep.) at 37:13-39:22; Exhibit 3 (Jones Dep.) at 31:8-18; Exhibit 1 (Jones Decl.) ¶ 27.  A partition therefore can encompass part or all of a platter; indeed, because partitions are logical constructs, they can encompass multiple platters in the same disk drive or in multiple disk drives.

A "partition table" creates the partition by storing the relevant information about each partition, namely what kind of file system is used and the range of logical block addresses associated with the partition.  SUF ¶ 18.  Each hard disk drive contains a partition table stored in

a defined area of the platter known as the "Master Boot Record." SUF ¶ 17. The partition table in the Master Boot Record is only large enough to contain information about four partitions. SUF ¶ 19. If more partitions are needed, one of the partitions can be defined as an "extended partition." *Id*. An extended partition can hold additional logical partitions, referred to in the computer science industry as "logical drives." SUF ¶ 20.

Changing the values in the partition table that define the range of logical block addresses associated with the partition can change the "size" of the partition. SUF ¶ 25. For example, one partition could be split into two, or two partitions could be merged into one, simply by changing the values in the partition table specifying the range of logical block addresses associated with each partition. *See* Exhibit 2 (Loy Dep.) at 155:16-156:2. In such a case, the physical location of the data stored on the platter does not change at all, even though the platter address for the data may change significantly. SUF ¶¶ 24-25.

The partitions on the hard disk drives in Defendants' Systems are not materially different from partitions on the hard disk drives of general purpose computers. Exhibit 1 (Jones Decl.) ¶ 13.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is required against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Paige v. Drug Enforcement Admin.*, 665 F.3d 1355, 1358 (D.C. Cir. 2012) (quotation marks omitted). When the party moving for summary judgment shows that the plaintiff cannot prove an "essential element" of its case, "[t]he moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted) (noting that the Rule 56 standard "mirrors the standard for a directed verdict"). "In such a situation, there can be no genuine

issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and the moving party is entitled to summary judgment. *Id.* at 322-23. The meaning of statutory terms, such as "material object," is a question of law that is appropriate for summary judgment. *E.g., McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991); *San Antonio Gen. Maint., Inc. v. Abdnor*, 691 F. Supp. 1462, 1473 (D.D.C. 1987) (ruling that "interpretation of relevant statutory provisions are questions of law appropriate for resolution on a motion for summary judgment").

## ARGUMENT

As the AHRA makes clear, and as this Court has twice held, a device is subject to the AHRA only if it is "capable of creating DACRs that satisfy the statutory conditions of DMRs." Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 26. Defendants' Systems cannot create DMRs because the only material object to which sounds can be fixed is the hard disk drive platter, which also contains computer programs or other materials that disqualify the Systems from the explicit statutory definition of DMR. To avoid summary judgment, AARC argues that a partition of a hard disk drive—i.e., one of the logical organization methods described above—may satisfy the plain statutory requirement that a DMR must be a "material object." That position defies the common meaning of "material object" as a tangible, physical item. That position is also inconsistent with other provisions in the AHRA that describe distribution, selling, and impoundment of a material object: those are impossible acts with respect to a logical partition, apart from the platter on which it resides. AARC's novel argument does not comport with the plain meaning of the statute, with the AHRA's statutory scheme, and with precedent interpreting the AHRA. As a result, AARC's argument fails as a matter of law, and Defendants are entitled to summary judgment.

I.      **DEFENDANTS' SYSTEMS ARE NOT DIGITAL AUDIO RECORDING DEVICES SUBJECT TO THE AUDIO HOME RECORDING ACT.**

The Court previously found that in order to be a DARD subject to the AHRA, a device must be capable of making a DACR, which is a type of DMR.  A DMR is defined as follows:

(A)     A "digital musical recording" is a material object—

(i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, and

(ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

(B)     A "digital musical recording" does not include a material object—

(i)  in which the fixed sounds consist entirely of spoken word recordings, or

(ii) in which one or more computer programs are fixed, except that a digital musical recording may contain statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material.

17 U.S.C. § 1001(5)(A)-(B); *see* Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 17-26.  Based on these definitions, this Court previously ruled that an object can be a DMR if it "contain[s] '*only* sounds' and incidental data" but *not* if it contains any computer programs that are not incidental to those fixed sounds.[5]  Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 26 (citations omitted & emphasis added); *see also Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1076 (9th Cir. 1999) (holding that hard disk drives cannot be DMRs if they "contain numerous programs (e.g., for word processing, scheduling appointments, etc.) and databases that are not incidental to any sound files that may be stored on the hard drive").

The determinative question for this Motion is whether Defendants' Systems "are capable

---

[5] The statute defines "incidental" for purposes of the DMR definition as "related to and relatively minor by comparison."  17 U.S.C. § 1001(5)(C)(ii).  For any data or computer programs to be incidental to fixed sounds as required by the DMR definition, the data or programs must be both related to the fixed sounds and relatively minor by comparison to the fixed sounds.

of creating DACRs that satisfy the statutory conditions of DMRs." Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 26. The basic facts relevant to this Motion are undisputed. All of Defendants' Systems are computers that provide a range of multimedia functionality. *See* SUF ¶¶ 1-3 (collecting citations to Defendants' declarations). That functionality varies by System, but each is capable of some subset of the following, among others: providing navigation information including maps and directions; playing DVDs; playing audio CDs and displaying detailed information about those albums; and accessing AM/FM and satellite radios. SUF ¶¶ 1-2. To provide these functionalities, each of Defendants' Systems relies on computer programs, file systems, or other data that are stored on the hard disk drives, as listed above.[6]

All of these programs and non-incidental data are loaded on the Systems at the time of manufacture, exist on the hard disk drive at the point of sale, and cannot be removed by the end user.[7] SUF ¶ 3, 5; *see, e.g.*, Exhibit 4 (Ogasawara Decl.) ¶¶ 34-36. By contrast, the presence of fixed sounds on Defendants' Systems depends solely on a consumer's choice to store music or other fixed sounds from CDs. Thus, although it is uncertain whether any particular System will ever be used by a user to store a sound file, it is certain that each System's hard disk drive is fixed from the time of installation in the vehicle and before delivery to dealers with computer programs, databases, or other material that is not incidental to fixed sounds ever stored on the hard disk drive. SUF ¶¶ 1-6. For this reason, AARC does not contend that the hard disk drives as a whole in any of Defendants' Systems satisfies the requirement of a DMR, because they do not "contain 'only

---

[6] For example, all of Defendants' Systems also include the Gracenote database, which includes metadata for hundreds of thousands of songs that allows song information to be identified as a CD is played, whether by inserting it or retrieving it from storage on the hard drive. SUF ¶ 2. This database exists on the hard drive, and may be accessed by the Systems, even if the user never records a single song to the hard drive from a CD. Consequently, these data are not incidental to the fixed sounds on the hard disk drive of a system.

[7] In some Systems, the recording function is used to load all data to the hard disk drive, while for other Systems the data are initially imaged to the hard disk drive during manufacture and the recording function may then be used to update data including during manufacture or after sale. *See, e.g.*, Exhibit 4 (Ogasawara Decl.) ¶ 20.

sounds' and incidental data." *See* Mem. Op. (Feb. 19, 2016) (ECF No. 73) at 27 ("Defendants here credibly maintain that, because their devices' hard drives are chock full of non-music data and computer programs, the output of the HDD and Jukebox cannot be a DMR").

Because Defendants' Systems contain computer programs or other data that are not incidental to fixed sounds and/or is not used to bring about the perception, reproduction or communication of fixed sounds, these Systems thus cannot produce DMRs or DACRs under Sections 1001(5)(A) and (B) and thus cannot be DARDs subject to the AHRA.  Accordingly, Defendants are entitled to summary judgment.

## II.   THE STATUTORY LANGUAGE OF THE AHRA FORECLOSES THE NOTION THAT A PARTITION OF A HARD DISK DRIVE—AS OPPOSED TO THE HARD DISK DRIVE ITSELF—IS A "MATERIAL OBJECT."

Seeking to overcome the AHRA's computer program exception and the limitation of DMRs to objects that contain only fixed sounds and material incidental to those fixed sounds, AARC has proposed that one of the *logical* constructs used by computer programs to organize data on a hard disk drive's platter can itself constitute a second *material object* separate from the rest of the hard disk drive platter.  Mem. ISO Mot. for Clarification (ECF No. 82-1) at 1.  Not so.  The plain meaning of "material object" is a physical, tangible item.  There is no reason to deviate from the plain meaning of the statutory text, and every reason not to, for this plain language definition makes sense within the statutory scheme and does not create conflict with any other language in the statute.

### A.   The Plain Meaning of the Term "Material Object" As Used in the AHRA Is a Tangible Item.

Unless otherwise defined, "words will be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Janko v. Gates*, 741 F.3d 136, 142 n.4 (D.C. Cir. 2014) (quoting *Perrin v. United States*, 444 U.S. 37 (1979))

(alterations omitted); *Am. Forest & Paper Ass'n v. F.E.R.C.*, 550 F.3d 1179, 1182 (D.C. Cir. 2008) ("the words of statutes should be interpreted where possible in their ordinary, everyday senses"). "The rule emanates from the common-sense notion that the Congress, like any speaker, desires to be understood, and in the absence of contrary indication, uses words in the way they are ordinarily used and understood." *Janko*, 741 F.3d at 140 (quotation marks and citations omitted). The plain meaning of a statute's terms is often established by referencing the dictionary definition of the terms. *See, e.g.*, *Am. Forest*, 550 F.3d at 1179 (relying on Black's Law and Webster's dictionaries); *U.S. Postal Serv. v. Postal Regulatory Com'n*, 640 F.3d 1263, 1267 (D.C. Cir. 2011) (defining "due to" by reference to Webster's Dictionary).

A "material object," according to its common definition, refers to a physical, tangible item. "Material" means "of, relating to, or consisting of matter: physical." Webster's Third New International Dictionary, Unabridged (2002) 1392. An "object" is "something that is put or may be regarded as put in the way of some of the senses: a discrete visible tangible thing." *Id.* at 1555. Taking the two words together, a "material object' is a tangible, physical item made of matter. As AARC's expert acknowledged, matter is "anything that occupies space and exhibits inertia." Exhibit 2 (Loy Dep.) at 88:23-89:1.

AARC's argument that a partition—a logical organization of data—is a "material object" would stretch this definition of "material object" far beyond its common meaning into something that is neither "material" nor an "object." Established rules of statutory interpretation do not permit such a result. AARC and its expert have conceded that the term "material object" has no special meaning in computer science that would apply to storage of information in digital format. SUF ¶ 21. Under the plain meaning of the term, an abstract organizing concept devoid of matter, such as a partition, cannot constitute a "material object."

**B.     Case Law Confirms Defendants' Interpretation of "Material Object."**

The few cases that have interpreted the AHRA confirm that the everyday meaning of "material object" controls.  The Ninth Circuit twice has considered a hard disk drive—not some abstract subsection thereof—to be the relevant material object when rejecting arguments that a hard disk drive that simultaneously contains fixed sounds and computer programs or non-incidental material such as databases could be a DMR under the AHRA.[8]

In *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1076 (9th Cir. 1999), the Ninth Circuit held that "[t]he typical computer hard drive … is, of course, a material object," which "ordinarily contain[s] much more than 'only sounds, and material, statements, or instructions incidental to those fixed sounds.'  Indeed, almost all hard drives contain numerous programs … and databases that are not incidental to any sound files that may be stored on the hard drive."

In *Diamond*, AARC and its co-plaintiff RIAA argued, much as AARC argues now, that the "computer program" exemption in the definition of DMR should be interpreted without referencing the entire material object on which the computer program is fixed.  The AHRA therefore would exempt the copying of computer programs, but would not exempt the copying of fixed sounds in the form of digital files from a hard disk drive, even if other portions of that drive contained computer programs.  *Id.* at 1077.  *Diamond* rejected AARC's interpretation of the AHRA, explaining "a computer program is not a material object, but rather, a literary work, that can be fixed in a variety of material objects.  The plain language of the exemption at issue does

---

[8] AARC previously implied, relying on *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153 (D. Mass. 2008), that a single digital music file could constitute a separate material object from the rest of a hard disk drive for purposes of the AHRA, *see* Mem. ISO Mot. for Clarification, ECF No. 82-1, at 7.  *London-Sire* does not concern the AHRA but, in any event, there is no support for the assertion that each digital file on a hard disk drive can constitute a separate material object.  Furthermore, AARC's own expert conceded that, if Defendants' systems contained a single partition, they could not be DARDs under the AHRA.  SUF ¶ 27.

not exclude copying of programs …, and instead extends to *any* copying from a computer hard drive." *Id.* at 1077-78 (citations omitted, emphasis added).  The exemption at issue in *Diamond* was the same exemption in the definition of DMR at issue now.  There is no basis to distinguish the material object from which data is retrieved from that to which it is being stored—the statute makes no such distinction—and the *Diamond* holding applied to this case shows that a computer hard disk drive that contains non-incidental material such as databases or any computer programs cannot be a DMR.

Although *Diamond* concerned files *from* a hard disk drive, the Ninth Circuit also considered the AHRA's applicability to files stored *to* a hard disk drive, and the result was the same.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).  *Napster* specifically rejected the contention that sound files copied *to* a hard disk drive could create a DMR (or DACR), and thus held that the AHRA did not apply.  *Id.* at 1024 (holding that "computers do not make 'digital music[al] recordings' as defined by the Audio Home Recording Act").  The recording technology in *Napster* was peer-to-peer file sharing software that allowed users to create a "user library" to which fixed sounds, including music, in digital format could be downloaded when shared by others using the Napster software.  *Id.* at 1012.  There was no reason to store non-sound files in the user library because such files would not work with the Napster software.  *Id.* (noting that files would transmit only "[i]f in the correct MP3 [sound file] format").  The Ninth Circuit rejected the possibility that the AHRA applied in part because computer hard disk drives are not DMRs, citing its reasoning in *Diamond* and the AHRA's plain language to affirm that a hard disk drive cannot be a DMR.  *Id.* at 1024-25.

> **C.    The Undisputed Material Facts Show That a Partition Is a Logical Construct and Not a Tangible Item.**

The parties' experts agree on the relevant technical characteristics of the hard disk drives

in Defendants' Systems.  In particular, the experts agree that a partition has no physical definition, but instead is defined only by a "table" (a list of numeric values) that designates logical addresses on a hard disk drive.  SUF ¶¶ 18, 22.  Although the logical addresses may be used by a computer program associated with the hard disk drive controller to identify corresponding locations on the platter to store or read data within the partition, there is no identifiable physical barrier or separation between one partition and another.  SUF ¶ 9; Exhibit 1 (Jones Decl.) ¶ 31; Exhibit 2 (Loy Dep.) at 63:1-7, 72:15-73:10; Exhibit 3 (Jones Dep.) 36:5-13.

If the partition table is deleted, all of the partitions on the drive cease to exist, but data that were recorded there remain untouched.  SUF ¶ 24.  The data capacity of a partition can be increased (the partition grown) or decreased (shrunk) without making any physical change to the platter on which the data associated with the partition is contained.  SUF ¶ 25.  Because it is an abstraction, it is possible for a partition to span multiple material objects, even multiple hard disk drives.  SUF ¶ 16.

Finally, the data associated with a partition has no substance apart from the platter onto which it is encoded.  As AARC's expert acknowledged, matter is "anything that occupies space and exhibits inertia."  Exhibit 2 (Loy Dep.) at 88:23-89:1.  Because changing the encoded data on the platter does "not change the initial characteristics of the material," and "the information stored on a partition does not have inertia," a partition of such data cannot be "material."  Exhibit 2 (Loy Dep.) at 95:12-25.  Thus, a partition has no matter and cannot be "material."  *See* Exhibit 2 (Loy Dep.) at 88:23-89:1.  Nor is there any genuine dispute that a partition is inseparable from the platter on which it is encoded.  SUF ¶ 26.

It is also not possible to physically remove for use a contiguous section of the platter that contains a partition.  Exhibit 2 (Loy Dep.) at 49:9-16; 65:24-66:11; Exhibit 3 (Jones Dep.) 95:23-

96:12; Exhibit 1 (Jones Decl.) ¶ 34.  The resultant shard of the platter could be inaccessible and unusable, and it may omit the replacement sectors that were substituted for the partition's bad sectors over time because they would be located on another physical location on the platter.  *See* SUF ¶¶ 10, 26; Exhibit 1 (Jones Decl.) ¶ 34.  Moreover, the partition itself would not exist on the shard because the partition is defined solely by a partition table that is itself located on another physical portion of the platter.  *See* SUF ¶¶ 17-18, 22; *see also* Exhibit 2 (Loy Dep.) at 37:13-39:23, 111:15-17; Exhibit 1 (Jones Decl.) ¶ 34.

Where AARC and its expert disagree with Defendants is on the ultimate question of law, whether those technical characteristics meet the legal definition of "material object" under the AHRA.  That legal issue, however, is for the Court to decide and cannot preclude summary judgment.  *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 594-97 (1987) (upholding district court's grant of summary judgment where the court "in its discretion, properly concluded that a Monday-morning 'battle of the experts' over possible meanings of terms in the statute would not illuminate" legislative purpose); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426-27 (2007) (holding that an expert dispute on the "legal determination" of "obviousness" did not preclude summary judgment where the underlying facts were not in dispute); *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1214 (D.C. Cir. 1997) (finding error in the admission of expert testimony on an ultimate legal issue).  Indeed, the interpretation of statutory terms is appropriately done on summary judgment.  *E.g., McDermott Int'l*, 498 U.S. at 356; *San Antonio Gen. Maint.*, 691 F. Supp. at 1473 (D.D.C. 1987).

*        *        *

In sum, a partition has no independent physical existence.  It is a mutable logical construct that is used conceptually to organize data.  Given the plain meaning of "material object," there is

no genuine dispute of fact that a hard drive partition is not a material object.

## III.   PLAINTIFF'S INTERPRETATION IS UNREASONABLE BECAUSE IT CONFLICTS WITH THE AHRA'S SCHEME AND LEGISLATIVE HISTORY.

### A.   Defining Material Objects to Include Logical Subdivisions of Digital Media Would Render Portions of the AHRA Superfluous and Create Inconsistencies Within the Statutory Scheme.

Characterizing hard disk drive partitions as separate "material objects" not only conflicts with the plain language, but also conflicts with the statutory scheme of the AHRA by rendering phrases and entire subsections of the statutory text superfluous. *See Reckitt Benckiser, Inc. v. Jackson*, 762 F. Supp. 2d 34, 42 (D.D.C. 2011) (statutory interpretation should avoid rendering portions of the statute superfluous); *Blackman v. District of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) (statutes should be interpreted in the context of the statute as a whole).

AARC's argument cannot be squared with the statutory limitations Congress imposed on the definition of DMR.  Section 1005(A)(i) contemplates that the relevant "material object" can contain "*only* sounds" and programs and material incidental to those fixed sounds.  If it were appropriate, as AARC suggests, to subdivide a single digital medium based on the portions that contain particular types of files to the exclusion of others, then the limiting language of § 1001(5)(A)(i) would have no meaning—a "material object" could never contain both digital sounds and disqualifying non-incidental materials.  AARC's interpretation also effectively misreads § 1001(5)(B) as though it exempted material objects "in which *only* one or more computer programs are fixed."  The absence of such a limitation demonstrates the broader intent to view the material object as an entirety, regardless of how the programs and other files might be organized.  Section 1001(5)(B) further expressly states that a DMR cannot be fixed with "*one or more* computer programs."  17 U.S.C. § 1001(5)(B)(ii) (emphasis added).  This makes clear that the material object for purposes of the DMR definition is the material object on which these

programs are stored, not the programs themselves.  The same logic pertains regardless of the stored data—*a DMR is the object on which data is stored, not the data itself*.  Moreover, the reference to computer programs further suggests that the organization of those programs on the storage medium is irrelevant to the definition.  Computer programs or non-incidental data almost always consist of multiple digital files, contained in separate directories or folders, which may be associated with more than one hard disk drive partition.  Exhibit 1 (Jones Decl.) ¶ 35.  This is the case today, and it has been true for decades—it was certainly the state of the industry at the time the AHRA was passed.  *Id*.  Acting in that context, Congress could not have intended that arbitrary subdivisions used logically to organize data, e.g., directories, folders, or partitions, would have any relevance to the definition of a DMR.

Finally, the idea that a single digital medium such as a hard disk drive (or its platter) can be divided into separate material objects—through abstract concepts used to categorize and organize data—conflicts with other provisions of the AHRA.  For example, obligations under the AHRA result from the importation and distribution, or manufacture and distribution, of DARDs.  17 U.S.C. §§ 1003 and 1004.  The imposition of such obligations, and the apportionment of royalties, make sense only where the "material object" being imported, manufactured, or distributed is an entire tangible device, not a partition, byte, or atom.

Similarly, the impoundment remedy in 17 U.S.C. § 1009(f), which permits courts to order the impoundment of, *inter alia*, DMRs, contemplates that a DMR is physical, tangible item that can be collected for impoundment.  When asked how a court could order impoundment of a partition, AARC originally suggested two ways: "the court could exercise its equitable discretion to either require the impoundment of the entire hard disk drive … or it could attempt to separate the contiguous portion of the hard disk drive that comprises the partition and order its

impoundment."   AARC Jan. 10, 2017, Response to FCA's Interrogatories.   Yet a logical abstraction such as a partition or a file system directory cannot be collected and impounded because it has no existence separate from the medium in which it is recorded—and it cannot be separated from the medium in any usable format.   Exhibit 2 (Loy Dep.) at 171:18-173:1; Exhibit 1 (Jones Decl.) ¶ 34.   AARC's expert conceded that the only way to impound a partition is by taking the entire hard drive in the first place.   *See* Exhibit 2 (Loy Dep.) at 171:18-173:1.   Only if a DMR "material object" is a tangible thing (like a hard disk drive or platter) does the impoundment remedy make sense.   Adhering to the plain language of the AHRA by not treating logical abstractions used for organizing data as "material objects" avoids this conflict.

### B.      The AHRA's History and Purpose Confirm That Defendants' Systems Are Not Capable of Producing DACRs.

The statutory definition of DMR is unambiguous: it defines DMRs as material objects with sounds fixed in a digital recording format that contain only those fixed sounds and material incidental to those fixed sounds; the definition also specifically excludes material objects that contain any relevant computer programs.   See *Diamond*, 180 F.3d at 1076-77 (finding no ambiguity in the definition of DMR).   The Court's interpretive task ends with the statute's unambiguous language.   *See, e.g.*, *Blackman*, 456 F.3d at 176 ("We start with the plain meaning of the text, looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.   If the language has a plain and unambiguous meaning, our inquiry ends so long as the resulting statutory scheme is coherent and consistent." (internal citations and quotation marks omitted)).   But if the legislative history were relevant, it too shows that Congress never intended hard disk drives such as those in Defendants' systems to be DMRs.   "[T]he words that Congress uses must be read 'in their context and with a view to their place in the overall statutory scheme.'"   Mem. Op. (February 19, 2016) (ECF No. 73) at 21

(quoting *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015)).

It is clear from the legislative history (and the statutory text) that the AHRA is not meant to apply to "multimedia products or general purpose computer programs," H.R. Rep. 102-780 (1992) at 19, or personal computers "either directly or indirectly through their general purpose interfaces," H.R. Rep. 102-780 at 27. The then-Register of Copyrights presented the Copyright Office's analysis at subcommittee hearings before both the Senate and the House of Representatives that computers were intended to be unaffected by the AHRA: "The technical requirements and royalty obligation [of the AHRA] apply only to digital audio recording technology. Neither applies to any analog audio recording products, or to professional equipment, telephone answering machines, dictating machines, video recording product, or computer equipment."[9]

In defining what sorts of items qualify as products exempt from the AHRA, the legislative history focuses consistently on "unitary products," and offers no examples where a medium is divided up into multiple material objects based on nonphysical attributes such as a hard disk drive partition, CD track, or other logical concept used to organize data. Instead, the legislative history refers to examples of "digital audio recording media" by the entire "material object" comprising the media, not a subset or portion thereof. S. Rep. 102-294 at 53 ("The intention is for the term 'audiogram' to cover objects commonly understood to embody sound recordings and their underlying works, such as recorded compact discs (CD's), digital audio tapes (DAT's), audio cassettes and long-playing albums (LP's), and in the near future, digital compact cassettes (DCC's)

---

[9] Audio Home Recording Act of 1991: Hearing on H.R. 3204 before the Subcomm. on Intellectual Property and Judicial Administration of the Comm. on the Judiciary, 102d Cong. 77 (1992) (statement of Ralph Oman, Register of Copyrights); The Audio Home Recording Act of 1991: Hearing on S. 1623 Before the Subcomm. on Patents, Copyrights and Trademarks of the Comm. on the Judiciary, 102d Cong. 23 (1991) (statement of Ralph Oman, Register of Copyrights).

and mini-discs (MD's); conversely, the term is intended to exclude objects such as recorded videocassettes and multimedia products (i.e., unitary products which integrate several prominent components such as text, video clips, computer graphics, speech and music).").

Moreover, the legislative history refers to computers as unitary products, although they are themselves made up of components such as random access memory, hard disk drives, and processors.  S. Rep. 102-294 at 48 (discussing a personal computer's "recording function," although the recording function is in reality a product of individual components such as disk drives, processors, and RAM); H.R. Rep. 102-780(I) at 27 (same).  Where Congress declined to break a computer down into its constituent components when debating and drafting the AHRA—a relatively easy task compared to breaking down a hard disk drive or its platter into smaller pieces based on highly technical logical constructs—there is no reason to think that it would be within Congressional intent to do so now.  Congress was focused on the plain, everyday meaning of "material object."  Where a medium, such as a computer hard disk drive, was intended to be permanently installed in a device and used only with that device, such as with a personal computer, Congress referenced the entire device and affirmed repeatedly that such devices are not subject to the AHRA.  Defendants' Systems are exactly such devices.

## **CONCLUSION**

For the foregoing reasons, Defendants' systems are not subject to the AHRA, and Defendants are entitled to judgment as a matter of law.

Dated April 11, 2017                                Respectfully submitted,


/s/ Annette L. Hurst                               /s/ Van Beckwith
Annette L. Hurst (admitted *pro hac vice*)         Van Beckwith (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP                 Paul J. Reilly (admitted *pro hac vice*)
405 Howard Street                                  Baker Botts L.L.P.
San Francisco, CA 94105-2669                       2001 Ross Avenue
(415)-773-5700                                      Dallas, TX 75201-2980
*ahurst@orrick.com*                                Telephone: (214) 953-6500
                                                   Facsimile:  (214) 661-4505
                                                   E-mail:  *Van.Beckwith@bakerbotts.com*
Steven John Routh (D.C. Bar No. 376068)            E-mail:  *Paul.Reilly@bakerbotts.com*
Diana S. Fassbender (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW                               Lauren B. Emerson (admitted *pro hac vice*)
Washington, DC 20005                               BAKER BOTTS L.L.P.
Telephone: (202) 339-8400                          30 Rockefeller Plaza
Facsimile: (202) 339-8500                          New York, NY 10112
*srouth@orrick.com*                                Telephone: (212) 408-2533
*dszego@orrick.com*                                Facsimile: (212) 259-2533
                                                   *Lauren.Emerson@bakerbotts.com*

James Mitchell Burger (D.C. Bar No. 151720)
Thompson Coburn LLP                                Joshua H. Packman (D.C. Bar No. 1015463)
1909 K Street, NW, Suite 600                       BAKER BOTTS L.L.P.
Washington, DC 20006-1167                          1299 Pennsylvania Ave., NW
Telephone: (202) 585-6909                          Washington, DC 20004
Facsimile: (202) 318-8809                          Telephone: (202) 639-7726
*jburger@thompsoncoburn.com*                       Fax: (202) 585-1053
                                                   *Joshua.Packman@bakerbotts.com*

*Counsel for Defendant Denso International*
*America, Inc.*                                    *Counsel for Defendant Clarion*
                                                   *Corporation of America*

24

/s/ Ellen S. Kennedy

Ellen S. Kennedy (D.C. Bar No. 461670)
*ellen.kennedy@hoganlovells.com*
E. Desmond Hogan (D.C. Bar No. 458044)
*desmond.hogan@hoganlovells.com*
Ryan Lee Ford (D.C. Bar No. 1004141)
*ryan.ford@hoganlovells.com*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910

*Counsel for Defendant Ford Motor Company*

/s/ Andrew P. Bridges

Andrew P. Bridges (Bar No. AR0002)
David L. Hayes (Bar No. 476119)
Jedediah Wakefield (admitted *pro hac vice*)
Amy E. Hayden (admitted *pro hac vice*)
Armen N. Nercessian (admitted *pro hac vice*)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350
*abridges@fenwick.com*
*dhayes@fenwick.com*
*jwakefield@fenwick.com*
*ahayden@fenwick.com*
*anercessian@fenwick.com*

*Counsel for Defendant General Motors LLC*

/s/ Megan S. Woodworth

Megan S. Woodworth (D.C. Bar No. 488775)
VENABLE LLP
600 Massachusetts, NW
Washington, DC 20001
Telephone: (202) 344-4507
Facsimile: (202) 344-8300
*MSWoodworth@Venable.com*

*Counsel for Defendant FCA US LLC*

/s/ Seth D. Greenstein

Seth D. Greenstein (D.C. Bar No. 416733)
Robert S. Schwartz (D.C. Bar No. 283713)
David D. Golden (D.C. Bar No. 985047)
CONSTANTINE CANNON, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501
*sgreenstein@constantinecannon.com*
*rschwartz@constantinecannon.com*
*dgolden@constantinecannon.com*

*Counsel for Defendant Mitsubishi Electric
Automotive America, Inc.*