**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**GENERAL MOTORS COMPANY, *et al.*,**<br><br>Defendants. | Civil Action No. 14-cv-1271 (KBJ) |

**DEFENDANT DENSO INTERNATIONAL AMERICA, INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
<u>DENSO INTERNATIONAL AMERICA, INC.'S DEVICES</u>**

**PUBLIC VERSION - REDACTED**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

    A.    The Nature Of Hard Disk Drives And Partitions. ................................... 2

    B.    The DENSO Systems. ............................................................................ 6

ARGUMENT ....................................................................................................... 8

I.    THE ORDINARY MEANING OF THE TERM MATERIAL OBJECT AS USED IN THE STATUTE PRECLUDES AARC'S INTERPRETATION. ................................ 9

    A.    AARC's Interpretation Conflicts With The Statutory Text And Purpose. .......... 10

    B.    AARC's Interpretation Conflicts With Settled Case Law And Would Improperly Jeopardize Markets Relying Upon It. ............................................... 15

II.    AARC'S ATTEMPTS TO CIRCUMVENT THE ORDINARY MEANING OF THE AHRA SHOULD BE REJECTED .......................................................... 17

    A.    AARC Improperly Relies Upon Inadmissible (And Ultimately Unhelpful) Evidence Of A Special Meaning To The Term Material Object. ........................ 17

    B.    The "Doctrine Of Equivalents" Is Not A Principle Of Statutory Construction And It Has No Application In The AHRA .................................... 19

    C.    AARC's Attempt To Import A Second *De Minimis* Exception Into The AHRA In Addition To Those Expressly Included By Congress Effectively Concedes That AARC's Claims Fail Under The AHRA's Plain Language. ....... 22

III.    CONGRESS INTENDED FOR THE AHRA TO BE A REGULATORY SCHEME RELATED TO BUT DISTINCT FROM OTHER PROVISIONS OF THE COPYRIGHT ACT. .............................................................................. 25

    A.    The Definition Of Digital Musical Recording In The AHRA Must Be Interpreted To Create A Coherent Statutory Scheme In The AHRA, And Although Different In Purpose, Can Be Interpreted Consistently With The Remainder Of Title 17. ............................................................................ 25

    B.    Cases Published Decades After The AHRA Was Passed Interpreting Terms Not Used In The AHRA Cannot Be Used To Alter The Plain Text Of The AHRA. .................................................................................. 28

        1.    *London-Sire* And Later Cases Have No Application To The AHRA And Were Wrongly Decided. ................................................. 29

        2.    Applying The Cases Cited By AARC To The AHRA Contravenes Congressional Intent. ....................................................... 32

# TABLE OF CONTENTS
(continued)

IV.   EVEN UNDER AARC'S FAULTY INTERPRETATION OF THE STATUTE,
      IT CANNOT WIN SUMMARY JUDGMENT AGAINST DIAM ON THE
      CAPABILITY ISSUE ................................................................................................... 34

     A.   The DENSO Systems Store Sounds On A Partition That Contains Multiple
           Computer Programs. ........................................................................................... 34

     B.   Each Partition Contains A General Purpose Computer File System That Is
           A Computer Program Not Incidental To Fixed Sounds ...................................... 35

     C.   Plaintiff's Interpretation Of "Material Object" Proves Too Much. .................... 39

CONCLUSION ..................................................................................................................... 41

# TABLE OF AUTHORITES

**Cases** **Page(s)**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ........................................................................15

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
96 F.3d 60 (2d Cir. 1996).........................................................................32, 33

*Ala. Power Co. v. U.S. EPA*,
40 F.3d 450 (D.C. Cir. 1994) .........................................................................18

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*,
155 F.3d 612 (2d Cir. 1998)..............................................................................8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................8

*Apple Comput., Inc. v. Formula Int'l, Inc.*,
562 F. Supp. 775 (C.D. Cal. 1983) ..........................................................26, 34

*Apple Comput., Inc. v. Franklin Comput. Corp.*,
714 F.2d 1240 (3d Cir. 1983)..........................................................................26

*Blackman v. District of Columbia*,
456 F.3d 167 (D.C. Cir. 2006) ...............................................................9, 11, 14

*Bragdon v. Abbott*,
524 U.S. 624 (1998).........................................................................................26

*Capitol Records, LLC v. ReDigi Inc.*,
934 F. Supp. 2d 640 (S.D.N.Y. 2013).................................................29, 31, 32

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013).............................................................................32

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................8

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002).........................................................................................20

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
339 U.S. 605 (1950).........................................................................................19

*Greene v. Dalton*,
164 F.3d 671 (D.C. Cir. 1999) ...........................................................................8

*Janko v. Gates*,
  741 F.3d 136 (D.C. Cir. 2014) ...............................................................................13, 17, 19

*Jones v. Virgin Records, Ltd.*,
  643 F. Supp. 1153 (S.D.N.Y. 1986) ...................................................................................26

*Kimble v. Marvel Entm't, LLC*,
  135 S. Ct. 2401 (2015) .......................................................................................................16

*London-Sire Records, Inc. v. Doe 1*,
  542 F. Supp. 2d 153 (D. Mass. 2008) .......................................................................... *passim*

*Lotus Dev. Corp. v. Paperback Software Int'l*,
  740 F. Supp. 37 (D. Mass. 1990) .......................................................................................35

*Luck's Music Library, Inc. v. Ashcroft*,
  321 F. Supp. 2d 107 (D.D.C. 2004) ...................................................................................20

*MAI Sys. Corp. v. Peak Comput., Inc.*,
  991 F.2d 511 (9th Cir. 1993) ..............................................................................................39

*Matthew Bender & Co. v. W. Pub. Co.*,
  158 F.3d 693 (2d Cir. 1998)..........................................................................................26, 27

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994)........................................................................................................13, 26

*Oracle Am., Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014)...........................................................................................36

*Reckitt Benckiser, Inc. v. Jackson*,
  762 F. Supp. 2d 34 (D.D.C. 2011) .....................................................................................12

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,
  180 F.3d 1072 (9th Cir. 1999) ...................................................................................... *passim*

*Salinger v. Random House, Inc.*,
  811 F.2d 90 (2d Cir. 1987)..................................................................................................20

*Sony BMG Music Entm't v. Tenenbaum*,
  660 F.3d 487 (1st Cir. 2011)...............................................................................................32

*U.S. W. Commc'ns, Inc. v. FCC*,
  177 F.3d 1057 (D.C. Cir. 1999).........................................................................................27

*United States v. Am. Soc'y of Composers, Authors, Publishers*,
  627 F.3d 64 (2d Cir. 2010)..................................................................................................31

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) ...................................................................................26, 29

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997).........................................................................................................19

**Statutes**

17 U.S.C. § 101 .................................................................................................... *passim*

17 U.S.C. § 102 ..................................................................................................27, 39

17 U.S.C. § 106 ..............................................................................................25, 29, 31

17 U.S.C. § 111(e)(4) ................................................................................................27

17 U.S.C. §§ 502-505 ................................................................................................25

17 U.S.C. § 1001 .........................................................................................................1

17 U.S.C. § 1001(3) ..................................................................................................34

17 U.S.C. § 1001(4) ..................................................................................................13

17 U.S.C. § 1001(5) ............................................................................................ *passim*

17 U.S.C. § 1004(b) ............................................................................................13, 14

17 U.S.C. § 1008 ........................................................................................................25

17 U.S.C. § 1009 ...................................................................................................14, 25

**Other Authorities**

H.R. Rep. No. 94-1476 (1976) (*reprinted at* 1976 U.S.C.C.A.N. 5659).......................................27

S. Rep. No. 102-294.............................................................................................13, 22, 32, 38

## <u>INTRODUCTION</u>

Congress passed the Audio Home Recording Act of 1992, 17 U.S.C. §§ 1001 et seq., (the "AHRA") to regulate digital recording technology such as Digital Audio Tape and Digital Cassette Recorders.  The present suit by Plaintiff Alliance of Artists and Recording Companies, Inc. ("AARC") is an effort to expand the AHRA far beyond its statutory text by turning the statute on its head so that common and widespread logical structures of digital storage become "material objects."  As the Court has already found, the AHRA excludes a "material object," such as the hard disk drive in Defendants' Systems, that contains either (1) data other than "sounds" and data "incidental to those fixed sounds," or (2) which contains "one or more computer programs."  17 U.S.C. § 1001(5).  Indeed, the computer industry wrangled this concession from the music industry as a condition of withdrawing its objections to the statute.  But AARC would undo that concession with this lawsuit, turning every personal computer into a digital audio recording device under the statute in clear violation of Congressional expectations at the time and nearly twenty years of settled law.

To avoid the ordinary meaning of the statute, AARC attacks the statutory text with a proposed meaning of "material object" unknown to the Congress that drafted the AHRA and not used anywhere in the relevant industries.  Indeed, AARC admits that no special meaning of the term "material object" should be used under the statute.  Despite this concession, under AARC's remarkable view, a logical structure known as a "partition" on a hard drive becomes a material object.  But a partition is simply a logical method of organizing data on a hard drive and is no more a material object than a system of numbers.  The *characterizations* of Plaintiff's expert to the contrary are no more than that, and can safely be disregarded by the Court in its role to interpret the statute.  There is no genuine dispute of fact between the sides on the nature of hard drives and partitions.  Even AARC's expert admits that partitions are made of data that have no

mass or physical existence independent of the hard disk drives they are used to organize.

Finally, even were AARC correct in its interpretation, it still would not be entitled to summary judgment against DENSO International America, Inc. ("DIAM"). Even accepting AARC's view that a partition is a material object, the DENSO Systems sold by DIAM store computer programs and other non-incidental data on the same extended partition that is used to store any fixed sounds. In addition, while processing the fixed sounds onto that same extended partition, they are stored in other forms of memory with computer programs and non-incidental data. Either of these conditions precludes the DENSO Systems' hard disk drives from qualifying as a digital musical recording ("DMR"). The DENSO Systems are not digital audio recording devices ("DARDs"). Thus, even under AARC's faulty definition of the term "material object," DIAM should prevail in this lawsuit.

After a full opportunity to conduct discovery, the undisputed facts still show that the DENSO Systems are not DARDs within the meaning of AHRA. AARC's Motion should be denied, and DIAM's motion should be granted.

## STATEMENT OF FACTS[1]

### A.    The Nature Of Hard Disk Drives And Partitions.

It is undisputed that a hard disk drive is a physical object that takes up space and has mass. AARC Mem. In Support of Summary Judgment ("AARC Mem.") AARC Mem. at 6; DIAM's Resp. to AARC's Stmt. of Mat. Facts ("Resp. SUF") No. 3. That a hard disk drive is a material object has been settled law for nearly twenty years. *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1076 (9th Cir. 1999) ("The typical computer

---

[1] AARC filed a consolidated Motion on its claims against GM and DIAM. DIAM and GM filed separate oppositions because AARC's claims against GM also involve systems supplied by non-party Alpine Electronics of America, Inc. Alpine and DENSO are competitors, and DENSO was reluctant to share its confidential technical information with a nonparty to the lawsuit.

hard drive from which a Rio directly records is, of course, a material object."). It is further undisputed that a hard disk drive is a unitary device that consists of several components, with the relevant component for purposes of this Motion being the platter from which the hard disk drive reads and to which it records data. AARC Mem. at 6; Resp. SUF No. 4, Add'l Fact No. 13.

Both sides agree: hard disk drives, and the platters of those drives in particular, are material objects that can be used to store digital data. Resp. SUF No. 4 (undisputed fact); Declaration of Diana Fassbender in Support of DIAM's Opposition to AARC's Motion for Summary Judgment ("Fassbender Decl."), Ex. A (Transcript of the March 20, 2017, Deposition of Gareth Loy ("Loy Depo.")) 66:12-13, 153:21-24. The HDD platter is a substrate of metal or glass, coated with a magnetic substance, upon which data can be stored in binary fashion. Resp. SUF Nos. 5-7 (undisputed facts), Add'l Facts Nos. 13-14; Fassbender Decl. Ex. A (Loy Depo.) at 94:15-95:5. The substrate of the platter serves as the "foundation" of any partition or other organizational structure. *See* Fassbender Decl. Ex. A (Loy Depo.) at 91:7-19, 92:10-17. The data are organized and stored using various structures known as bits, bytes, files, directories, file systems, logical drives, extended partitions and primary partitions. Data stored on a platter might be part of multiple structures at the same time, including files, folders, directories, logical drives, and extended partitions. *See generally* ECF No. 111-4 (Jones Decl.) ¶¶ 20-27; Fassbender Decl. Ex. A (Loy Depo.) at 29:13-30:21, 42:5-43:10, 49:18-50:17. Plaintiff's expert admits that while such data can be part of multiple organizational structures on a disk, it would be double or even triple counting to consider any such data to be part of multiple material objects. Fassbender Decl. Ex. A (Loy Depo.) at 126:3-12; Resp. SUF Add'l Fact No. 23. Plaintiff's expert also admits that the boundaries of a partition could be readily revised without affecting the underlying data. Fassbender Decl. Ex. A (Loy Depo.) at 65:5-12, 112:14-113:15.

All of this is agreed.

"Material" means made of matter.  Fassbender Decl. Ex. C (Webster's Third New International Dictionary, Unabridged (1986)) at 1392.  As Dr. Loy, AARC's expert, testified at his deposition, an item consists of "matter" if it "occupies space and exhibits inertia." Fassbender Decl. Ex. A (Loy Depo.) at 88:23-89:1.  Thus, a hard disk drive platter "has a certain mass," *id.* at 36:24-25, and it can be identified by sight or touch in a disassembled hard disk drive, and it can be held in one's hand, *id.* at 28:14-29:12.  Data, on the other hand, do not. Resp. SUF Add'l Fact No. 15.

Data are recorded to a platter by changing the magnetic polarity of portions of the magnetic coating, that is, "storing information" on a hard disk drive is done through "a property change of the medium of -- [the] physical medium upon which it's being recorded."  Fassbender Decl. Ex. A (Loy Depo.) at 31:10-19.  Specifically, the magnetic coating is polarized to be a positive or negative charge, corresponding to a 1 or a 0.  *Id.* at 31:20-25.  Changing the magnetic polarity of a portion of the platter coating does not, however, change the *mass* of the coating.  *Id.* at 37:1-12.  Thus, data recorded onto a hard disk drive platter have no mass that is separate from the magnetic coating itself—the data are simply a property of the matter that makes up the platter's magnetic coating.  *Id.* at 95:12-20.  Data thus have no inertia, they occupy no space separate from the coating, and they have no material existence separate from the coating of which they are a property.  *Id.* at 95:12-24 ("Q.  So the information stored on a partition does not have inertia; correct?  A.  I believe that's correct.").  According to Plaintiff's expert's own definition of matter, data recorded on a hard drive are not material.

Plaintiff's expert likewise admits that a partition on a hard disk drive is itself made up of data, nothing more.  To create a partition on a drive, one causes values corresponding to a range

of logical blocks of data, known as "Logical Block Addresses" or "LBAs," to be recorded in a partition table located in a hard drive's "Master Boot Record." *See* Fassbender Decl. Ex. A (Loy Depo.) at 64:16-22; ECF No. 115-9 (Oakes Decl.) Ex. F ("Oakes Decl. Ex. F") (Jones Depo.) at 23:21-24:1 ("The partition is defined in a partition table or tables on a hard drive, and it's a range of logical block addresses that are defined as part of the partition."); Resp. SUF Add'l Facts Nos. 16, 24-26, 30, 32.  To delete a partition, one can delete the data associated with the partition or the partition can be made "non-existent" by "changing its entry in the master boot record." Fassbender Decl. Ex. A (Loy Depo.) at 64:16-22.  A partition, however, is not separable from the platter's magnetic coating, and it has no separate existence from the coating and the platter on which the coating rests.  *Id.* at 94:16-95:5.  Thus, where a hard drive is a physical object that can be held in one's hand, a partition has no such physical existence.  *See Id.* at 63:1-7.  Without a physical object such as a hard disk drive platter to act as the "foundation" for the partition, you cannot have a partition.  *Id.* at 92:10-17, 93:2-7 ("The partition consists of the substrate and the magnetized constituents thereof together.  And so the whole is a physical object."); Resp. SUF Add'l Facts Nos. 29-30.

Dr. Loy likewise admitted in his deposition that a partition is neither "discrete" nor "contiguous."  For example, Dr. Loy conceded that a single partition could span two platters within the same drive or span two entirely different drives.  Fassbender Decl. Ex. A (Loy Depo.) at 142:22-143:2 ("They may not be topologically contiguous."), *id.* at 144:2-16 (conceding that a partition can span two drives); Oakes Decl. Ex. F (Jones Depo.) at 41:8-18 (noting that partitions "typically go to the other side of the platter").

A partition cannot be separated from a hard disk drive platter because there is no evidence that doing so is possible.  To be sure, both experts testified that there was a theoretical

possibility that the magnetic coating containing LBAs assigned to a partition could be separated from the substrate of the platter.  But it was purely a theoretical question, with neither expert aware of any way in existence to actually do so.  Fassbender Decl. Ex. A (Loy Depo.) at 65:24-66:11 (speculating that with "enough money and time and inclination, a way could probably be found."); Oakes Decl. Ex. F (Jones Depo.) at 78:9-81:6 (discussing the possibility, using an imaginary laser, that portions of a platter associated with a partition could be separated).  No such method exists, and removing a platter—let alone a portion of a platter—from a hard disk drive renders it unusable under any normal scenario.  Fassbender Decl. Ex. A (Loy Depo.) at 48:9-16; Oakes Decl. Ex. F (Jones Depo.) at 83:7-22.

## B.    The DENSO Systems.

AARC and DIAM agree that the DENSO Systems are formatted such that if a consumer elects to store fixed sounds to the HDD, those sounds will be stored in ▆▆▆▆▆ Resp. SUF No. 4.  In calling this the "music storage," however, AARC's description is both argumentative and woefully incomplete.  AARC fails to provide the complete organization of the material on the DENSO Systems' hard disk drives, omitting the structure and content of the entire partition to which the DENSO Systems can store music data.  *See* Resp. SUF Nos. 68-74.  AARC also omits important details about the mechanism by which sounds are fixed onto the systems' hard disk drives in the event a consumer elects to use the systems' recording functionality.



The DENSO Systems' hard disk drives contain ▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ECF No. 119-1 (Ogasawara Decl.) ¶ 20. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* ¶ 21. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆ *Id.*  To be sure, if a consumer elects to store fixed sound data, they will be stored to ▆▆▆. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ ECF No. 119-1 (Ogasawara Decl.) ¶ 21;

Resp. SUF Add'l Fact Nos. 1-5.

These slots are logical drives. *Id.* ¶ 9; *see* Oakes Decl. Ex. F (Jones Depo.) at 188:17-23.

Logical drives are not defined, like a regular partition or extended partition, in the hard disk

drive's Master Boot Record. Fassbender Decl. Ex. A (Loy Depo.) at 41:17-42:2. They are

"contained within the extended partition." Oakes Decl. Ex. F (Jones Depo.) at 25:24-26:3; Resp.

SUF Add'l Fact No. 27. Dr. Loy concedes that if a regular partition is a material object, so is an

extended partition—because its existence likewise depends entirely on a definitional entry in the

hard disk drive's Master Boot Record. Fassbender Decl. Ex. A (Loy Depo.) at 119:6-10. Thus,

even if AARC's theory of the case were correct, the DENSO Systems have computer programs

and other data unrelated to the storage of fixed sounds on the very same partition (material

object) any music would be stored.

Furthermore, the fixed sound data is stored with computer programs and other non-

incidental data before it ever reaches ████ of the DENSO Systems. When a consumer elects to

record an audio CD to the hard disk drives in a DENSO System, the music data is not transferred

directly to the hard drive. ████████████████████████████████████

████████████████████████████████████

███████████████████ ECF No. 119-1 (Ogasawara Decl.) ¶ 29. ████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████ *Id.*; Resp. SUF Add'l Fact No. 6. ████████████████████

7



ECF No. 119-1 (Ogasawara Decl.) ¶ 29. █████████████████

█████████████████████████████████████

███████████████ *Id.* ██████████████████

████████████████████████████████████

████████ *Id.* ¶¶ 29-30; Resp. SUF Add'l Fact No. 7.  In other words, the fixed sound data is stored repeatedly in the DENSO System with computer programs and other non-incidental data before it comes to a final resting place in ████ of the extended partition on the DENSO Systems' hard disk drives.  Even under AARC's theory whereby various types of memory structures are material objects, at all times the fixed sound data is stored on the DENSO Systems with computer programs and other non-incidental data.

## ARGUMENT

As the moving party, AARC "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The burden to win summary judgment corresponds to the ultimate burdens that the parties will face at trial.  AARC is the plaintiff, and therefore bears the overall burden of persuasion on its claims.  As such, AARC must come forward with evidence sufficient to meet the standard required for a directed verdict in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (The summary judgment "standard mirrors the standard for a directed verdict … which is that the trial judge must direct a verdict if … there can be but one reasonable conclusion as to the verdict.");  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998) ("Where the movant has the burden

8

[on a claim at trial], its own submissions in support of the [summary judgment] motion must

entitle it to judgment as a matter of law."); *see also Greene v. Dalton*, 164 F.3d 671, 674–75

(D.C. Cir. 1999) (reversing grant of summary judgment where movant failed to establish it was

entitled to judgment as a matter of law on second element of affirmative defense on which it bore

the burden of persuasion at trial).

AARC's Motion for Summary Judgment falls far short of the applicable standard.  At the

outset, AARC's motion is predicated on a statutory interpretation of the AHRA that contradicts

not only the statutory text's plain meaning, but also the only appellate authority addressing the

scope of the statute and the statute's legislative history.  Beyond the legal questions, AARC also

fails to support its motion with adequate evidence, relying primarily on the unsworn expert

report of Dr. Loy, whose sworn deposition testimony contradicted his written report in material

respects.  *See* Resp. SUF at 2-7.  Additional facts supplied by DIAM in opposition to AARC's

Motion also make clear that, even under AARC's theory of the case, it cannot prevail.  Thus,

under either side's view of the nature of partitions, AARC cannot, as a matter of law, establish

that the DENSO Systems are DARDs pursuant to the AHRA, and its motion must be denied.

## I.     THE ORDINARY MEANING OF THE TERM MATERIAL OBJECT AS USED IN THE STATUTE PRECLUDES AARC'S INTERPRETATION.

The parties agree that the plain language of the AHRA controls because there is no

indication that Congress was aware of or considered a specialized meaning of the term "material

object" when it drafted the AHRA.  Since the parties agree that the AHRA defines "material

object" by its ordinarily understood meaning, the only thing left for the Court to do is determine

whether a reasonable jury could, on the evidence presented by AARC, conclude that a partition

is a material object according to the plain meaning of that term.  *See Blackman v. District of*

*Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) ("We start with the plain meaning of the text,

looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. If the language has a plain and unambiguous meaning, our inquiry ends so long as the resulting statutory scheme is coherent and consistent." (internal citations and quotation marks omitted)).

Under the plain meaning of "material object," the relevant item to consider is the hard disk drive, or, more specifically, the platter on which the drive encodes data, which even AARC concedes is a material object.  The alternative offered by AARC is a logical structure that has no physical existence apart from the magnetic coating on the hard disk drive platter.  It cannot be a material object as that term is plainly understood nor as it was used by Congress in the AHRA. AARC's proposal conflicts with the statutory text, contravenes appellate authority interpreting the AHRA, causes conflict in the AHRA's statutory scheme and the statutory scheme of the Copyright Act as a whole, and has no basis in the legislative history.  AARC's argument is predicated entirely on inapposite cases that postdate the AHRA by decades, addressing the scope of a term not used in the AHRA, and which Congress could not have considered when drafting the text of the AHRA.

A. **AARC's Interpretation Conflicts With The Statutory Text And Purpose.**

The parties agree that the term "material object," as used in the AHRA, should be defined by the ordinary meaning of the term, as defined by common dictionaries.  AARC Mem. at 14-15 (citing Merriam-Webster's Dictionary).  Thus, a "material" object means "something material that may be perceived by the senses," which is "relating to, derived from, or consisting of matter; *especially:* physical."  *Id.* (emphasis original); *accord* Fassbender Decl. Ex. C (Webster's Third New International Dictionary (1986)) at 1392.  It is made of stuff.  And, as an "object," it is a unitary thing.  Fassbender Decl. Ex. C (Webster's Third New International Dictionary (1986)) at 1555 (defining "object" as "something that is put or may be regarded as put in the way of some

of the senses: a discrete visible tangible thing."). Put together, a "material object" is a discrete

thing made of matter, stuff. It is the CD, not the sound waves emanating from speakers. It is the

pyramid, not the geometric formula used to prove the volume of a triangular prism. It is a hard

disk drive platter, but not the logical formulation known as a partition.

A material object is "discrete," which is defined as "constituting a separate entity:

individually distinct." Fassbender Decl. Ex. C (Webster's Third New International Dictionary

(1986)) at 647. A hard drive platter is such an object—it can be removed from a hard drive and

held in one's hand, and it can thus be perceived by the senses. Oakes Decl. Ex. F (Jones Depo.)

at 72:3-5; Fassbender Decl. Ex. A (Loy Depo.) at 36:24-25. A partition cannot. AARC's expert

admits that removing a partition from a hard disk platter is not possible. *Id.* at 65:24-66:11.

Removing from the platter those sectors corresponding to a partition's logical block addresses

destroys it. Resp. SUF Add'l Fact No. 33. The "foundation" cannot be separated from the

partition data. Fassbender Decl. Ex. A (Loy Depo.) at 91:7-19. If removal of a portion of an

object destroys the nature of the thing, then *a fortiori* it cannot be a discrete object.

Moreover, the only aspects of a partition that can be characterized as "material" are

derived solely from the platter itself. A thing is "material" if it is made up of matter. Matter

must have inertia. Fassbender Decl. Ex. A (Loy Depo.) at 88:23-89:1. A partition is made up of

data in a table encoded as magnetic fields on a disk's platter. Resp. SUF Add'l Fact No. 29.

Such fields have no mass and changing the magnetic polarity of a hard drive segment does not

change the mass or inertia of the platter. Fassbender Decl. Ex. A (Loy Depo.) at 37:1-12, 95:12-

20. A partition thus has no inertia, and no matter. *Id.* at 93:5-7 ("The partition consists of the

[platter's] substrate and the magnetized constituents thereof together. And so *the whole* is a

material object." (emphasis added)). The same is true of a digital file—such files are "material"

only to the extent they are encoded magnetically onto the hard disk drive platter, like the data

that define a partition and like all other data stored on a hard disk drive.  *See* ECF No. 111-4

(Jones Decl.) ¶ 23.

All of the provisions of the AHRA are consistent with defining "material object" by its

ordinary meaning as a discrete tangible item, such as a hard disk drive or hard disk drive platter.

*See Blackman*, 456 F.3d at 176 (D.C. Cir. 2006) (Statutes should be interpreted in the context of

the statute as a whole.).  The fundamental definition of DMR provided in the AHRA requires, in

order to determine if the object in question constitutes a DMR, consideration of information

stored on a discrete physical object as a whole.  *See* 17 U.S.C. § 1001(5).  First, a DMR is itself

defined by the material stored on the entire object, which may include digital sounds and

"material, statements, or instructions incidental to those sounds."  17 U.S.C. § 1001(5)(A)(i).  If

each abstraction, such as an electronic sound file, were a separate material object, then

considering whether a medium contains other incidental material would be unnecessary and that

portion of the definition of DMR would improperly be rendered superfluous.  *Reckitt Benckiser,*

*Inc. v. Jackson*, 762 F. Supp. 2d 34, 42 (D.D.C. 2011) (Statutory interpretation should avoid

rendering portions of the statute superfluous.).

Second, determining if a material object is excluded from the definition of DMR requires

consideration of what else, other than sounds, is stored on the particular object.  To determine if

the exclusion in § 1001(5)(B)(ii) applies to a material object, one must look past the fixed sounds

on a particular object to consider other material stored there.  *Id.*  One must exclude from DMR

any object on which is stored computer programs.  This is where AARC's interpretation clearly

proves too much.  If a material object under the AHRA could be any organizational method used

on a hard disk drive, such as individual files, folders, or directories, then the computer program

exemption in § 1001(5)(B)(ii) would become meaningless.  One could always find a lower level of organization on any object that included only fixed sounds and ignored the nearby "one or more computer programs."

Indeed, as AARC's expert admitted, under his interpretation, it is simply a "matter of perspective."  One could view the binary digits stored on the platter's magnetic coating as the smallest material object.  Under this interpretation, any bit, byte, digital music file, or folder would be a DMR, regardless of whether it is stored on a discrete thing that also contains computer programs or other material not incidental to fixed sounds.  The key definition of the AHRA—excluding from its reach objects containing computer programs—would be rendered superfluous under AARC's interpretation of "material object."

Disregarding the fundamental definitional aspect of DMR to exclude the computer program limitation would be wholly inconsistent with the circumstances that led to the passage of the AHRA.  The computer industry was deeply concerned about exactly this outcome and protested the bill.  Sen. Rep. No. 102-294 at *35-36 (reprinting letter from the Computer and Business Equipment Manufacturers Association expressing concern with broad definition of "phonorecord").  The drafters made clear that computers were not supposed to be included.  Only *after* this limitation was created did the bill contain the necessary compromise among the computer and entertainment industries to achieve passage.  *Id.* (rejecting "phonorecord" for AHRA as "overly broad" after "consultation with the computer and telecommunications industry," and choosing a different term "to distinguish clearly between the devices and media which the bill affects, and those it does not.").  For AARC to seek to undo this Congressional compromise and rewrite the bill exclusively in its favor decades later is wholly inappropriate. *See, e.g.*, *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) (holding that

the relevant plain meaning is that existing at the time the statute was passed); *Janko v. Gates*, 741 F.3d 136, 142 n.4 (D.C. Cir. 2014) (Statutes are interpreted by their "common meaning … at the time Congress enacted the statute.").

The AHRA's focus on the entire material object at issue, rather than some abstract subpart, is consistent throughout the remainder of the statute.  Section 1001(4)(A) defines a "digital audio recording medium" ("DARM") by reference to an entire material object and what it does, or does not, contain.  *Id.*; § 1001(4)(B)(ii) (A DARM "is any material object … that is primarily marketed or most commonly used … for the purpose of making [DACRs]" but "does not include any material object" "that embodies a sound recording at the time it is first distributed"); *see also* 17 U.S.C. § 1004(b) (imposing royalties on DARMs on a per-unit basis). Under AARC's approach, a medium could be a DARM even if fixed with a sound recording at the time of distribution because it may contain identifiable unused portions of the medium that do not contain fixed sounds.  Under the same reasoning, a single medium might constitute multiple DARMs if the unused portions of the medium were discontinuous and thus separately identifiable.  A single medium would then potentially be subject to multiple royalties.  The same reasoning is true of the impoundment remedy in 17 U.S.C. § 1009(f), which allows a court to order impoundment of DMRs.  A partition or digital file, lacking any material existence apart from the hard drive platter, cannot be collected for impoundment on its own.  The only way to impound a partition (or, by extension, a digital file) is to collect the hard disk drive on which the associated data are stored.  Fassbender Decl. Ex. A (Loy Depo.) at 171:18-173:1.  Reconciling these provisions with AARC's proposal that "material object" can encompass abstract concepts like a partition requires using a different meaning of material object depending on which statutory section applies, thus violating a basic canon of statutory interpretation that a statutory

scheme should be interpreted to be coherent and consistent.  *Blackman*, 456 F.3d at 176 (The

plain meaning of a term should be interpreted in "the specific context in which that language is

used, and the broader context of the statute as a whole.").

**B.**      **AARC's Interpretation Conflicts With Settled Case Law And Would Improperly Jeopardize Markets Relying Upon It.**

For nearly twenty years, courts and industry have understood that a hard disk drive, and

not some logical subpart, is the material object for purposes of the AHRA.  In *Recording Indus.*

*Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, the only appellate decision to offer a detailed

interpretation of the AHRA, the court rejected arguments from AARC similar to the ones AARC

makes here.  180 F.3d 1072 (9th Cir. 1999).  In *Diamond*, AARC and its co-plaintiff contended

that the AHRA should be expanded beyond the plain meaning of its text to regulate a portable

music player that could play only digital sound files copied from a computer hard drive.  *Id.* at

1074-75.  To accomplish this expansion of the AHRA, AARC, as it does here, tried to break

apart a material object—the computer hard drive—into individual portions based on individual

digital files stored on the hard drive in order to circumvent Section 1001(5)(B)(ii)'s computer

program exemption.  AARC suggested that the AHRA exempts only the copying of computer

programs, and that a digital music file on a hard drive is a DMR with regard to the computer

programs and other material stored there.  *Id.* at 1077-78.

The Ninth Circuit disagreed with AARC and held that the entire material object, the

computer hard drive, was the relevant item to consider, explaining "[t]he typical computer hard

drive from which a Rio directly records is, of course, a material object.  However, hard drives

ordinarily contain much more than 'only sounds, and material, statements, or instructions

incidental to those fixed sounds.'"  *Id.* at 1076 (quoting 17 U.S.C. 1001(5)(A)(i).  Thus, under

the plain language of the AHRA, a computer hard drive could not be a DMR, music files copied

from it could not create a DACR, and neither a computer nor an MP3 player could be a DARD. *Id.*

Although the plain language of the statute controlled, *Diamond* also considered the legislative history, *id.* at 1077-1078, before concluding, "There are simply no grounds in either the plain language of the definition or in the legislative history for interpreting the term "digital musical recording" to include songs fixed on computer hard drives." *Id.* at 1077.  In a later case, the Ninth Circuit considered whether its prior holding that files copied *from* a computer hard drive also applied under the same reasoning to files copied *to* a computer hard disk drive from another source.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024–25 (9th Cir. 2001).  *Napster* held that the AHRA categorically exempts from its regulatory scope hard disk drives that contain computer programs and that files copied to or from a computer hard disk drive do not create a DMR or DACR under the AHRA.  *Id.*

These cases have been the law for nearly two decades.  *Stare decisis* is at its strongest in the legislative context, because there is another coequal branch of the government with the ability to correct a mistake—Congress.  *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015) ("[S]*tare decisis* carries enhanced force when a decision … interprets a statute" because "Congress can correct any mistake it sees.").  AARC has not obtained an amendment from Congress to overrule the *Diamond* case, and, indeed, it has stood by while car infotainment systems were marketed for a decade before bringing this suit.  In the meanwhile, numerous other products and industries have relied upon the understanding adopted in *Diamond* and there are billions of devices on the market capable of storing both music files and computer programs in segregated folders.

AARC's proposed rewrite of the AHRA would have sweeping consequences.

Subsequent to *Diamond*, computer-based products with billions of users have been released on the understanding that sounds fixed on computer hard disk drives neither consist of DMRs nor are capable of being used to create DACRs. Smartphones, tablets, and personal computers in numerous different flavors rely upon this understanding in offering "apps" such as iTunes, Google Play Store and Spotify—all of which can store music on computer memory containing a bunch of other programs. Popular apps collect and organize music files in "music folders" or directories on personal computers from which they can be transferred to any of these multipurpose devices or dedicated music players such as iPods. Jones Opp. Decl. ¶ 9. Home entertainment systems such as SONOS incorporate these apps into their controller software. Under AARC's interpretation, a computer's music folder becomes a DMR and all of these devices become DARDs. *See* Fassbender Decl. Ex. A (Loy Depo.) at 106:21-107:2 (characterizing a computer folder as a material object).

Nearly any computing device could be converted into a DARD under AARC's interpretation, as long as one file containing fixed sounds is stored there. The AHRA's categorical exemption of computers, which was affirmed by the *Diamond* decision, and relied on heavily by the computer industry, would cease to exist if AARC's contention that an abstract portion of a computer hard disk drive can be a material object separate from other data stored on the same drive were adopted. This is not what Congress intended, and it flies in the face of case law settled eighteen years ago and never challenged since.

## II.     AARC'S ATTEMPTS TO CIRCUMVENT THE ORDINARY MEANING OF THE AHRA SHOULD BE REJECTED.

### A.     AARC Improperly Relies Upon Inadmissible (And Ultimately Unhelpful) Evidence Of A Special Meaning To The Term Material Object.

The parties agree that the "ordinary, contemporary, common meaning" of material object "at the time Congress enacted the [AHRA in 1992]" controls. *Janko,* 741 F.3d at 142 n.4. There

is no evidence that a specialized meaning of the term exists, let alone was considered by Congress or incorporated into the AHRA.  The undisputed facts show that, under the term's ordinary meaning, a virtual abstraction with no discrete physical existence such as a hard disk drive partition cannot be a material object.  AARC is thus not entitled to summary judgment under a plain reading of the AHRA's statutory text, and the Court's inquiry can end here with denial of AARC's Motion.  *Id.* at 139-40 ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.  Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").

Much of AARC's argument, however, ignores the fundamental canon of statutory interpretation and relies on specialized literature from the computer science industry.  *See* AARC Mem. at 7 (relying on "[t]he computer science literature").  As an initial matter, this literature cannot be considered when interpreting the AHRA because there is no evidence that these materials were before Congress in 1992 when the AHRA was passed.  *See id.*; AARC's Statement of Material Facts ("AARC SUF") ¶¶ 29-37 (citing literature from 2009-2017); *cf. Ala. Power Co. v. U.S. EPA*, 40 F.3d 450, 454 (D.C. Cir. 1994) (noting that an industry term of art informs statutory interpretation only when Congress explicitly incorporated it into the statute).  Moreover, it is improper to use this hearsay for the truth in describing the nature of a partition, or to use industry literature to impart a specialized, industry-specific meaning to a term such as "material object" when all agree that no such specialized definition exists in the industry.  Fassbender Decl. Ex. A (Loy Depo.) at 87:6-88:10, 99:22-101:8; ECF No. 111-4 (Jones Decl.) ¶ 36; Resp. SUF Add'l Fact No. 28.  Finally, even if the literature cited by AARC were considered, it undercuts AARC's argument.  The literature only demonstrates that a partition

"functions as though," "can be accessed as if," "acts as," or can "function as if" it were a separate hard disk.  AARC Mem. at 7.  This equivalency language is an implicit concession that a partition is not, in fact, a hard drive.

AARC's argument that a partition "acts as" a hard drive has nothing to do with the plain text of the AHRA.  *Cf. Diamond*, 180 F.3d at 1078 (noting that the AHRA was "expressly designed to create this loophole," allowing any device to evade the AHRA simply by passing music through a hard disk drive).  Indeed, AARC's argument rests on the faulty assumption that because a partition is used to emulate, in some respects, a computer hard drive, the two things are equivalent.  They are not, as the literature cited by AARC shows, and even if they were, to side with AARC, the Court would have to read into the AHRA a "doctrine of equivalents" that has no basis in the text of the AHRA.  For the reasons discussed in the next section, doing so would be improper.

**B.    The "Doctrine Of Equivalents" Is Not A Principle Of Statutory Construction And It Has No Application In The AHRA.**

AARC's motion suggests that a doctrine unique to patent law should guide the Court's interpretation of the AHRA.  The Copyright Act, let alone the AHRA, is entirely separate from the Patent Act, and AARC offers no reason why a doctrine developed over decades of judicial interpretation in the patent context should apply to the AHRA.

The doctrine of equivalents is a patent-specific doctrine that is meant to prevent "fraud on a patent" by an infringer that evades the scope of a patent's claims by making minor alterations in order to conceal piracy of a patented invention.  *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607-08 (1950) ("The essence of the doctrine is that one may not practice a fraud on a patent.").  Determining infringement of a patent, as the Court is aware, is a different exercise from statutory interpretation.  The claims, drafted by the patentee in the back and forth

19

of the prosecution process, and issues such as obviousness in light of the prior art govern the

scope of a patent grant and determine whether someone has infringed.  *See, e.g.*, *Warner-*

*Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30–31 (1997).  A patent can be

invalidated because it fails to meet various statutory requirements, but a statute cannot, absent

some conflict with the Constitution.  Certainly, using a doctrine of equivalents to end-run

statutory language violates "[t]he preeminent canon of statutory interpretation … that the

legislature says in a statute what it means and means in a statute what it says there."  *Janko*, 741

F.3d at 139-40.

Moreover, the doctrine of equivalents arose in light of concerns peculiar to patent,

making it especially improper to apply it in the context of the AHRA.  *See Luck's Music Library,*

*Inc. v. Ashcroft*, 321 F. Supp. 2d 107, 116–17 (D.D.C. 2004) (rejecting patent precedent as

"inapplicable" to a copyright case where it "concerns specific requirements unique to patent

law.").  Namely, the "temporary monopoly" granted by a patent is a "property right," and "its

boundaries should be clear," which is "essential to promote progress, because it enables efficient

investment and innovation."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S.

722, 730-31 (2002).  Thus, patentees are required to publicly disclose their inventions "in full,

clear, concise, and exact terms."  *Id.* at 731 (quoting 35 U.S.C. § 112).  But a patentee, due to

this disclosure requirement, "bears the risk that others will devote their efforts toward exploiting

the limits of the patent's language."  *Id.*  To keep the balance of incentives in the patent system,

"[t]he scope of a patent is not limited to its literal terms, but instead embraces all equivalents to

the claims described."  *Id.*at 732.  There is no similar consideration under the Copyright Act or

the AHRA.  Copyright protects eligible works whether they are publicly disclosed or not.  *See,*

*e.g.*, *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (recognizing that the value

of a copyrighted work "is not lessened by the fact that their author has disavowed any intention

to publish them during his lifetime."). And the AHRA is not generally concerned with

"equivalents" because the entire point of the statute was to address exact copies of sound

recordings enabled by certain digital technology. *See* Mem Op. (Feb. 19, 2016) at 3-4

(describing the AHRA as a "'grand compromise'" to address "new digital recording technology

[that] could produce a copy of an original audio recording, then copy that copy of the original …

and forth and so on, and the copies sounded just as good as the original recording").

In any event, a partition and a hard disk drive are not equivalent. A hard drive is a

discrete material object that can read and write data for persistent storage. Resp. SUF No. 2. A

partition is not separable from the hard drive on which it is used to organize, and it stores no data

at all. Fassbender Decl. Ex. A (Loy Depo.) at 65:24-66:11 ("I suppose if you had enough money

and time and inclination, a way could probably be found" to separate a partition from a hard disk

platter), *id.* at 48:9-16 (Dr. Loy is "not aware of any" "consumer technology" that permits

reading data from a platter removed from a hard disk drive); Oakes Decl. Ex. F (Jones Depo.) at

83:7-22 (The shards of a platter containing a partition "have zero utility" separated from the

platter.). A partition is an abstraction used to organize file systems on a hard disk drive. A hard

drive is a discrete unitary device. A partition is neither of these things. A partition need not (and

usually does not) occupy a contiguous physical space and may even span across two different

hard drives. Fassbender Decl. Ex. A (Loy Depo.) at 144:2-16; ECF No. 111-4 (Jones Decl.) ¶

27; Resp. SUF Add'l Fact No. 17. If a partition is deleted from a hard disk drive, the data stored

by the hard disk drive remains on the drive's platter untouched. Resp. SUF Add'l Fact No. 31.

The doctrine of equivalents is a patent-specific doctrine developed to address

considerations unique to the Patent Act's public disclosure requirements. It has not been

expanded to other areas, and doing so here would contravene well-established doctrines of statutory interpretation. Moreover, applying it to the facts presently before the Court, the undisputed facts show that partitions and hard disk drives are not equivalent.

**C.     AARC's Attempt To Import A Second *De Minimis* Exception Into The AHRA In Addition To Those Expressly Included By Congress Effectively Concedes That AARC's Claims Fail Under The AHRA's Plain Language.**

Congress included two *de minimis* exceptions expressly in the definition of DMR, and now because the DENSO Systems do not fall under either exception, AARC proposes adding a third. The Court should decline AARC's invitation and hew closely to the statutory text of the AHRA.

The first *de minimis* exception is in § 1001(5)(A)(i), and it makes clear that "material, statements, or instructions incidental to those fixed sounds" on a material object do not disqualify the object from meeting the definition of a DMR. Thus, even though a DMR is supposed to contain "only sounds," Congress recognized that other material such as "textual and graphic materials commonly embodied on (or inserted inside) album covers, CD boxes and audio cassette packages, such as title and artist information, biographies and still photos of the performers, and lyrics of the musical works" might be included with a DMR, and that such material would not be disqualifying. S. Rep. No. 102-294 at 46 (1991). Likewise, "'statements or instructions' is intended to refer to such items … that may accompany the fixed sounds for purposes of providing functional information or instructions of the operation of the machine on which the 'audiogram' is played," which would also not be disqualifying. *Id.* The second *de minimis* exception is to the computer program exemption, which provides that statements or instructions that accompany fixed sounds will not disqualify an object from being a DMR even if such statements or instructions technically constitute a computer program. *See* 17 U.S.C. § 1001(5)(B)(ii).

Realizing that the data and computer programs fixed on the DENSO Systems' hard disk drives categorically exclude the drives from being DMRs under the statute, AARC suggests that a third exception, extrinsic to the statutory text, should be read into the statute. *See* Resp. SUF Add'l Facts Nos. 8-12, 34. The Court has already rejected such an approach, Mem. Op. (Feb. 19, 2016) at 22 ("[U]ncertainty about what the 102nd Congress might have thought of twenty-first century technology is all the more reason to adhere closely to the carefully negotiated statutory text."), and held that "interpreting the AHRA to require that the material object the device produces must contain only fixed sounds and not computer programs (just like the types of [DACRs] that were commonly known and available at the time of the statute's enactment) is entirely consistent" with the AHRA, *id.* at 23. Moreover, the AHRA was drafted to exclude general purpose computers and their components from its scope. *Diamond*, 180 F.3d at 1078 (recognizing that the AHRA exempts "computers generally from the Act's ambit"). In order to achieve this categorical exclusion, Congress used a specific definition of DMR that sweeps objects commonly understood to contain sounds—LPs, CDs, DATs—into the scope of the Act, and categorically excludes computer components like hard disk drives that can (and do in this case) store all sorts of data unrelated to sounds. The fact that the DENSO Systems have the capability to, and in fact do, store non-incidental material on the music partitions shows that they fall within the categories of objects that cannot be DMRs.

What is more, the material identified by AARC cannot be characterized as *de minimis* under the undisputed facts. First, it is undisputed that the hard disk drives at issue are the same components used in personal computers, which the AHRA excludes from its scope. The DENSO Systems moreover use multiple computer programs to provide multiple functions unrelated to any recording function at all, such as navigation, GPS location, point of interest

search, and voice recognition.  ECF No. 119-1 (Ogasawara Decl.) ¶ 29.  The computer programs

necessary to provide this functionality are stored on a computer hard disk drive, which is the

same object onto which sounds are recorded by the system if a consumer elects to do so.  *Id.*  The

systems also use the general-purpose FAT32 file system stored on the same hard disk drive, itself

a computer program necessary to organize and store data on a hard disk drive, without which

none of the systems' many functions would work at all.  *Id.*  With multiple computer programs

fixed on the same object to which sounds may be recorded, the DENSO Systems' hard drives are

categorically exempted from the definition of DMR, and thus the systems cannot be DACRs.  It

would be anomalous to characterize such materials as *de minimis* when they fall squarely within

the sorts of disqualifying materials identified by Congress.

The application of *de minimis* reasoning in this case is also another basis upon which the

Court should deny AARC's Motion.  Indeed, if *de minimis* reasoning were used to interpret the

AHRA's plain language, it would undermine AARC's entire premise that a partition is a material

object sufficient to isolate the many computer programs stored on the DENSO Systems' hard

drives from recorded music a consumer may elect to create.  It is undisputed that a partition,

defined remotely by a table in the Master Boot Record, creates no physical separation between

the data stored on a hard disk drive platter.  Fassbender Decl. Ex. A (Loy Depo.) at 63:1-7.  A

partition, moreover, depends entirely on the presence of a hard disk drive for its existence.  *Id.* at

92:10-17.  If a partition is deleted, the data associated with the deleted partition (and the file

system) remain on the hard drive platter without change.  Res. SUF Add'l Fact No. 31.

Moreover, the data used to define a hard drive partition, consisting primarily of a range of logical

block addresses, are infinitesimal in size compared to a file system, which AARC characterizes

as *de minimis*.  Jones Opp. Decl. ¶ at 3 (partition table is 64 bytes); Oakes Decl. Ex. F (Jones

Depo.) at 197:2-18 (a file system is 10 mb, or 10,000,000 bytes.).  Under AARC's own proposed

definition, a hard disk drive partition is trivial and *de minimis*, and if the Court is inclined to

consider a *de minimis* exception to the AHRA, it might apply to a file folder on the DENSO

Systems' hard drives, but it would certainly exclude the possibility that an abstraction with no

physical existence could constitute a material object sufficient to alter the fundamental nature of

a hard disk drive under the AHRA.

### III.   CONGRESS INTENDED FOR THE AHRA TO BE A REGULATORY SCHEME RELATED TO BUT DISTINCT FROM OTHER PROVISIONS OF THE COPYRIGHT ACT.

The AHRA is part of Title 17, which contains the Copyright Act.  But Congress made

clear that while the AHRA and the rest of Title 17 are interrelated, the AHRA was designed to

accomplish a very specific compromise that included manufacturers of digital recording

technology, the interests of consumers, the technology industry, and the music industry.  Mem.

Op. (Feb. 19, 2016) at 4 ("It is well-established that the AHRA was a "grand compromise"

between the stakeholders insofar as the statute was designed to address the [music industry's]

serial copying problem that concerned the music industry and the high-tech industry's fear of

widespread copyright infringement liability.").  Accordingly, the AHRA was drafted with a

"particular and carefully defined scope," giving effect to which requires careful consideration of

the plain text of the AHRA and its purpose in light of the other provisions of Title 17.  *Id.*

#### A.   The Definition Of Digital Musical Recording In The AHRA Must Be Interpreted To Create A Coherent Statutory Scheme In The AHRA, And Although Different In Purpose It Can Be Interpreted Consistently With The Remainder Of Title 17.

The AHRA is part of Title 17, but in many important aspects, it is distinct from and

serves different purposes from Title 17's other provisions, which comprise the Copyright Act.

The AHRA does not modify any of the exclusive rights of copyright in 17 U.S.C. § 106.  Indeed,

the point of the AHRA was to provide an immunity against such acts as contained in 17 U.S.C. § 1008 for those complying with the statute.  Section 1008 precludes liability for contributory copyright infringement arising from use of DARDs, DARMs, analog recording devices and mediums, and exempts from direct infringement actions noncommercial copying by consumers using the same devices.  The distinct nature of the statutory schemes contained in the AHRA and Copyright Act is further underscored because each contains separate remedies in civil actions, § 1009 and §§ 502-505, respectively, and defenses under the Copyright Act are not available to actions brought to enforce the AHRA's royalty and Serial Copying Management System ("SCMS") requirements.

These are distinct statutes, but related to be sure.  To the extent the AHRA incorporates some of the same terms used in the Copyright Act, the AHRA should be interpreted to use the meanings of those terms as commonly understood at the time Congress enacted the AHRA.  *See MCI Telecomms. Corp.*, 512 U.S. at 228 (holding that the relevant meaning is that existing at the time the statute was passed); *see Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (noting that where a statutory term is subject to judicial interpretation those, interpretations are presumptively incorporated when Congress reuses the term).

When Congress drafted the AHRA, no court decision came close to suggesting that "material object" could include anything without a physical existence, such as partitions on a computer hard disk drive or individual digital files.  *See, e.g.*, *Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1153, 1157 n.7 (S.D.N.Y. 1986) (exemplar material objects are "cassette tapes and records"); *see Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693, 703 n.18 (2d Cir. 1998) (citing the legislative history of the 1976 act for the proposition that a copyrighted work must be fixed on a "physical object," whether that fixation be "written, printed, photographic, sculptural,

punched, magnetic, or any other stable form"). The copyright cases involving copyrighted works stored in digital media as of 1992 likewise defined "material object" by its plain meaning to include discrete physical objects such as memory chips, floppy diskettes, hard disk drives, and magnetic tapes. *See Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1249 (3d Cir. 1983) (Read Only Memory chip); *Apple Comput., Inc. v. Formula Int'l, Inc.*, 562 F. Supp. 775, 777 (C.D. Cal. 1983) (ROM chips and diskettes); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 264-65 (5th Cir. 1988) (cataloging the material objects in which computer programs can be fixed as "including floppy diskettes, hard disks, non-erasable read only memory ('ROM') chips, and a computer's random access memory, and may appear only as printed instructions on a sheet of paper"). Nowhere, as of 1992, had a court suggested or implied that a "material object" for purposes of the Copyright Act might include a method of organization such as a partition. Instead, the term "material object" was understood by its plain meaning in the Copyright Act in 1992 to include only discrete tangible items, which is the meaning Congress presumptively intended when it used that same term in the AHRA.

The text of § 101 further defines "material object," through example, to include only discrete physical objects. "Audiovisual works" are fixed by example in "material objects, such as films or tapes." The definition of "[l]iterary works" lists items "such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards." "Sound recordings" lists "material objects, such as disks, tapes, or other phonorecords." And "videotape" lists "tapes or films." 17 U.S.C. § 111(e)(4). None of these exemplar "material objects" consists of a portion of an object or an abstract construct.

The manner in which the term "material object" is used differs between the AHRA and the rest of Title 17. The Copyright Act uses the terms "copy" and "phonorecord" because they

include "all of the material objects in which copyrightable works are capable of being fixed."

H.R. Rep. No. 94-1476, at 53 (1976), *reprinted at* 1976 U.S.C.C.A.N. 5659, 5666.  Thus, for

purposes of § 101, "copy," "phonorecord," and "material object" are used to define the fixation

requirement in § 102, which is necessary to create copyright protection in the first instance.

*Matthew Bender*, 158 F.3d at 702 ("The sole purpose of § 101's definitions of the words 'copies'

and 'fixed' is to explicate the 'fixation' requirement, *i.e.*, to define the material objects in which

copyrightable and infringing works may be embedded and to describe the requisite fixed nature

of that work within the material object.").  By contrast, "material object" in the definition of

DMR serves a completely different purpose.  *See U.S. W. Commc'ns, Inc. v. FCC*, 177 F.3d

1057, 1060 (D.C. Cir. 1999) ("[A]lthough we normally attribute consistent meanings to statutory

terms, identical words may have different meanings where the subject-matter to which the words

refer is not the same in the several places where they are used, or the conditions are different."

(quotation and alterations omitted)).  A DMR is a narrower subset of objects that are relevant to a

separate statutory royalty scheme.  In order to accomplish its purpose of identifying that

narrower subset of objects, the definition of DMR refers to multiple works or other material

(whether copyrightable or not) that may be fixed on a single material object, including computer

programs, fixed sounds, incidental, and non-incidental material.  17 U.S.C. § 1001(5).  Thus, the

AHRA necessarily requires the further analytical step of determining *what else* is fixed on the

same object.  *See* Mem. Op. (Feb. 19, 2016) at 27 ("Because their devices' hard drives are chock

full of non-music data and computer programs, the output of the HDD and Jukebox cannot be a

DMR.").  There is no similar consideration in the other provisions of Title 17.

### B.  <u>Cases Published Decades After The AHRA Was Passed Interpreting Terms Not Used In The AHRA Cannot Be Used To Alter The Plain Text Of The AHRA.</u>

AARC's argument that an abstract method for organizing data on a computer hard disk

drive can be a material object is not based on any authority that existed in 1992 when Congress passed the AHRA, but is instead based on court decisions issued 15 to 20 years later, which Congress could not have considered when drafting the AHRA and which interpreted terms Congress expressly chose not to include in the AHRA.  The cases that AARC relies on do not support the expansive definition of "material object" proposed by AARC for the following reasons.

### 1.    *London-Sire* **And Later Cases Have No Application To The AHRA And Were Wrongly Decided.**

It is contrary to the language of the AHRA to use cases that interpret "phonorecord" to determine the meaning of DMR, since Congress expressly chose not to use that term to avoid the very sorts of ambiguities and imprecisions that AARC attempts to introduce here.  *Compare, e.g.*, *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 650 (S.D.N.Y. 2013) (characterizing the relevant "material object" under § 101 to include "the user's computer" and a "server") *with id.* at 649 (implying that the relevant material object is the "appropriate segment of the hard disk").  Congress could not have considered the cases cited by AARC when it passed the AHRA in 1992 because they, without exception, postdate the enactment of the AHRA.  *See* AARC Mem. at 14-20 (citing cases dated 1996-2015).  Further, it was the exact scenario that AARC presents that Congress sought to avoid by using the term DMR rather than the expansively defined "phonorecord."

The cases relied on by AARC are further distinguishable because they reflect the courts' struggle with new technological problems that have no bearing on interpretation of the AHRA. *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153 (D. Mass. 2008), for example, was confronted with an argument that a purely electronic transmission of a digital file containing a copyrighted work could not infringe the exclusive right to distribution in 17 U.S.C. § 106(3).  *Id.*

at 172.  *London-Sire* rejected the argument.  The electronic transmission was the distribution of a phonorecord because at the start of the transaction, the relevant file was fixed to user A's hard disk drive, and at the end, a new phonorecord was fixed to user B's hard disk drive.  *Id.* at 172. *London-Sire*'s persuasiveness ends here.  By the time *London-Sire* wrestled with this "novel" problem, it had been undisputed for decades that unitary digital storage devices such as hard disk drives, memory chips, and diskettes constituted "material objects," which could be a "phonorecord" if fixed with a sound recording.  *See, e.g.*, *Vault Corp.*, 847 F.2d at 264-65. *London-Sire* had no reason to consider whether a digital file constituted a material object (it does not), and any holding to that effect is pure dicta.

Moreover, at no time was it material to the decision in *London-Sire* whether any other content other than the infringed song was fixed to the hard drives at either end of the transaction, which is the *determinative* question under the AHRA.  The fact that concerns under the AHRA were not at play is illustrated by the imprecision with which *London-Sire* refers to what constitutes the relevant material objects.  At times, "[e]lectronic [f]iles [a]re [m]aterial [o]bjects," at others, the material object is the "hard disk."  542 F. Supp. 2d at 170-72.  At points *London-Sire* implies that the infringing phonorecords were the electronic transmissions themselves, *see id.* at 170 ("It makes no difference that … the [infringing] items are electronic sequences of data rather than physical objects."), but at others it recognizes, as it must, that a phonorecord is a physical object fixed with the infringing work, *id.* at 171 (characterizing the hard disk as the relevant material object) and at 174 ("What matters in the marketplace is not whether a material object 'changes hands,' but whether, when the transaction is completed, the distributee has a material object," *i.e.*, a hard disk fixed with the copyrighted work).

*London-Sire* and the cases that rely on it also mistakenly conflate "material object" and

the terms defined under § 101 to consist of material objects, "copies," and "phonorecords."  For

instance, *London-Sire* mistakenly suggests, and AARC adopts this mistake wholesale, that

creation of an infringing phonorecord creates a "new material object."  *Id.* at 173 ("[T]here is no

reason to limit "distribution" to processes in which a material object exists throughout the entire

transaction—as opposed to a transaction in which a material object is created elsewhere at its

finish."); *see also* AARC Mem. at 18 ("The focus … on the creation of a 'new material object' is

important." (citing *ReDigi*)).  Of course, the Copyright Act is unconcerned with the creation of

material objects.  Infringement of a photograph or novel does not require creating paper from

scratch, it only requires copying the protected photo or words of the novel onto preexisting

paper.  No material object is "created" under the statute, but an infringing *copy* is.

AARC knows this, yet conflates the concepts anyway because its entire motion rests on

the fallacy that "material objects," rather than copies and phonorecords, are "created" under the

Copyright Act.  *See* AARC Mem. at 5 (recognizing that copies and phonorecords are created

when a work is "recorded or otherwise fixed to a material object").  A partition, which consists

only of data recorded to a disk platter, cannot constitute the "creation" of a "material object," just

as writing words to a page does not "create" the paper on which the words are written.  The same

is true of digital files.  *See, e.g.*, 17 U.S.C. § 106(3) ("[T]he owner of the copyright under this

title has the exclusive right[] to … reproduce the copyrighted work in *copies or phonorecords*,"

not material objects) (emphasis added)); *see also United States v. Am. Soc'y of Composers,*

*Authors, Publishers*, 627 F.3d 64, 71 (2d Cir. 2010) (Internet "downloads create *copies* of the

musical works." (emphasis added)).  *London-Sire*, in dicta, made its illogical leap by conflating

the term "phonorecord" with the material object in which a work may be fixed, and this Court

should not double down on *London-Sire*'s mistake, especially not when interpreting a term,

31

DMR, that was not even considered in *London-Sire*.

### 2. Applying The Cases Cited By AARC To The AHRA Contravenes Congressional Intent.

The path taken by courts such as *London-Sire* and *ReDigi*, dealing with seemingly egregious acts of copyright infringement enabled by new technology, underscores Congress's prescience in choosing to adopt a distinct term, DMR, for purposes of the AHRA rather than to import "phonorecord" from the Copyright Act. The imprecision with which *London-Sire* and *ReDigi* interpreted "material object" and "phonorecord" for purposes of the Copyright Act has no place in a statutory scheme like the AHRA, which is existentially defined by exactly what it does, and does not, regulate.

Importing cases dealing with "phonorecord" into the AHRA when Congress expressly chose not to use that term would introduce the exact "ambiguities" Congress wished to avoid. S. Rep. No. 102-294, at 36. Moreover, to the extent *London-Sire* has some persuasive value for interpretation of terms used in § 101 of the Copyright Act, the portions AARC seeks to rely on from that opinion are pure dicta when applied to the AHRA. The definition of DMR is unique to the AHRA, and so too is the concept that a DMR is defined by all the material fixed to a material object. 17 U.S.C. § 1001(5). Under the Copyright Act, the question is only whether an object is fixed with the particular infringed work at issue—and infringement does not depend on what else may be fixed to the same object. Thus, a single collage can incorporate multiple copyrighted works, *see Cariou v. Prince*, 714 F.3d 694, 699–700 (2d Cir. 2013) (artist incorporated images from various photographs into one collage), just as a single hard drive can constitute a phonorecord infringing many different songs, *see Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 493 n.5 (1st Cir. 2011) (noting that user had 1,148 infringing songs in a single shared

directory on his computer).[2]  For purposes of the Copyright Act, there is no need to define the physical bounds of a particular material object, but under the AHRA such an analysis is a central question.  Cases such as *London-Sire* and *ReDigi* are thus inapposite because they considered an entirely different question than what is presently before the Court.

The danger of relying on interpretations arising under the Copyright Act to interpret the AHRA is shown clearly by *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60 (2d Cir. 1996), a case relied on by AARC, AARC Mem. at 20.  There, the defendant sought to expand the definitions in the Copyright Act by referencing the AHRA and suggesting that if Congress were presented with modern technological developments, it would amend the definition of phonorecords to accord with the definition of DMR in the AHRA.  *Id.* at 65.  *ABKCO* rejected the argument because Congress used distinct terms in the AHRA to avoid impacting the Copyright Act, thereby separating the statutory schemes from judicial interpretations of terms unique to one or the other.  *Id.* at 65-66.  Similarly, *Diamond*, which categorically exempts hard disk drives from the scope of the AHRA, has been the law for nearly twenty years, and Congress has done nothing to alter that status quo.

\*        \*        \*

The parties agree that the language of the AHRA is unambiguous, and DIAM submits that the Court should apply the plain meaning of "material object" to reject AARC's contention that a single material object can be divvied up by the type of data stored therein based on abstract organizational concepts such as hard disk drive partitions.  There is no good reason to look past the plain language of the statutory text, but the legislative history supports the same conclusion.

---

[2] Such a directory, under AARC's faulty logic, is a material object fixed with "only sounds" and is also a DMR for purposes of the AHRA.

**IV.    EVEN UNDER AARC'S FAULTY INTERPRETATION OF THE STATUTE, IT CANNOT WIN SUMMARY JUDGMENT AGAINST DIAM ON THE CAPABILITY ISSUE.**

As set forth in the preceding sections, a partition cannot be a material object under the AHRA's plain language.  Without that possibility, all agree that a hard disk drive's platter is a material object and the Court's analysis can end there, as it is undisputed that the DENSO Systems' platter contains multiple disqualifying computer programs.  But even taking AARC's interpretation for sake of argument, characterizing a partition as a material object does not change the ultimate outcome that the DENSO Systems are not capable of making DACRs and thus are not DARDs subject to regulation under the AHRA.  Even the partition to which the DENSO Systems record music contains computer programs needed to power the systems' navigation functions, and every partition relevant to this case contains a file system, which is itself a computer program unrelated to fixed sounds.  Additionally, the DENSO Systems do not copy directly from audio CDs to hard disks, first transferring all music data to two RAM modules that contain computer programs.  Under AARC's expansive reading of "material object," these modules are the material objects from which sound data is copied to the systems' disk drives.  They are not DMRs and thus cannot be used to make a DACR.

**A.    The DENSO Systems Store Sounds On A Partition That Contains Multiple Computer Programs.**

As AARC acknowledges, partitions defined in a hard disk drive's Master Boot Record can be "primary" or "extended" partitions.  AARC Mem. at 7-8; Fassbender Decl. Ex. A (Loy Depo.) at 119:6-10; Oakes Decl. Ex. F (Jones Depo.) at 25:10-23.  Under AARC's logic, a partition, whether primary or extended, is a "material object" for purposes of the AHRA.  Fassbender Decl. Ex. A (Loy Depo.) at 119:11-13 ("Is an extended partition, in your view, a material object?  A.  Yes.").  This admission means that even if a partition could be a material

object, AARC's claims fail because it is undisputed that the DENSO Systems store music on the same material object, the extended partition, as computer programs and other material used to power the systems' other functionality unrelated to the systems' music recording function, such as navigation, voice recognition, GPS location, animation images and audio cues, and the CDDB Database.  ECF No. 119-1 (Ogasawara Decl.) ¶ 21.  Under the definition of DMR in § 1001(5) and AARC's proposed special meaning of "material object," AARC's claims fail because the DENSO Systems contain "one or more computer programs" on the same partition where any music data may be stored, meaning the partition cannot be a DMR.  The DENSO Systems, incapable of making a DMR, cannot be DARDs.  17 U.S.C. § 1001(3); Mem. Op. (Feb. 19, 2016) at 26-27 (recognizing that a device cannot be a DARD if it is only capable of copying music to the same object that contains one or more computer programs).

## B.    Each Partition Contains A General Purpose Computer File System That Is A Computer Program Not Incidental To Fixed Sounds.

Congress amended the Copyright Act in 1980 to add the definition of "computer program" to § 101.  *See Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F. Supp. 37, 50 (D. Mass. 1990).  "A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101; *Formula Int'l*, 562 F. Supp. at 779 (Congress "added a broad definition of 'computer program' to 17 U.S.C. § 101.").

A general purpose file system, such as the FAT32 file systems used on each partition within the DENSO Systems, easily meets the definition of 'computer program.'  Each partition "encloses" a file system, Fassbender Decl. Ex. A (Loy Depo.) at 56:2-5, which is "a set of data structures that are incorporated into a partition to allow units of files[,] which could also be characterized as directories[,] to be stored in a fashion such that they can be named, attributes

can be supplied to them, and their exact coordinates in the geometry of the partition can be ascertained and they can also be expanded and subtracted." *Id.* at 236:11-24.  Modern file systems include journaling capability for "automatic recovery and fail safe." *Id. at* 239:23-240:21.  File systems contain "machinery … to gather metadata about files that exist … and characterize the information which is stored in the file system." *Id.* at 242:14-243:2.  This machinery exists whether or not a single file is ever stored through the file system. *Id.* at 245:17-246:1.  A file system includes a directory structure from the moment it is created, and provides "important reliability for the files stored on a partition." *Id.* at 246:25-247:2, 247:25-248:3; *see generally* Resp. SUF Add'l Facts Nos. 18-22.

The characteristics of file systems show that they are computer programs.  Through the statements and instructions in a file system, the computer operating system is able to represent the data stored on a hard disk drive as a highly organized hierarchy of directories containing individual files that are easily understood by the system's user.  That is to say, a file system is a "set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101.  The particular FAT32 file systems used in the DENSO Systems are general purpose systems, meaning they store data without regard to the type of data being stored.  Oakes Decl. Ex. F (Jones Depo.) at 156:12-23.  A FAT32 file system is itself a nontrivial program, as it provides crucial functionality that allows the system—including all of its non-sound-related functions—to operate, and, beyond the directory structure and data accessibility features, provides failsafe protection in case of an error.  A FAT32 requires a nontrivial amount of space, approximately 10 megabytes for a 10 gigabyte partition, which is space sufficient to store multiple music files. *Id.* at 197:2-198:7; *see also, e.g.*, *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1379 (Fed. Cir. 2014) (affirming finding of infringement for

copying a computer function consisting of nine lines of source code).

AARC's argument that a file system is incidental to the music data stored on the DENSO Systems is incorrect.  First, the FAT32 file systems are themselves computer programs, they disqualify the DENSO Systems' hard disk drives from the definition of DMR whether they are incidental or not.  *See* 17 U.S.C. § 1001(5)(B)(ii) (excluding as DMRs objects "in which one or more computer programs are fixed").[3]

Second, the file systems are not "incidental" to music, which "means related to and relatively minor by comparison."  17 U.S.C. § 1001(5)(C)(ii).  The general-purpose FAT32 file systems are not related to music files, because the file systems are agnostic to the data being stored, unlike, for instance, file systems designed specifically to store music.  Oakes Decl. Ex. F (Jones Depo.) at 155:8-156:11.  Indeed, the same FAT32 file system is used on every partition in the DENSO System, even those partitions that will never contain a fixed sound at all.  ECF No. 115-14, Oakes Decl. Ex. K (Ogasawara Depo.) at 40:18-20.  It is true that without a file system, no fixed sounds could be recorded to the DENSO Systems, but that is also true for every other sort of data.  The systems simply would not function in any respect without the use of file systems.  Characterizing a program that is so fundamental to the operation of the entire system as "incidental" makes as much sense as saying electricity is "incidental" to fixed sounds stored on a hard drive because electricity takes up no space and is used to read and write fixed sounds.  The systems would be expensive bricks without either electricity or file systems, so neither can be seriously characterized as "incidental."

Third, there are many general-purpose computer programs that can be used to manipulate

---

[3] Section 1001(5)(B)(ii) repeats that a DMR can contain incidental material or statements or instructions used to bring about perception of fixed sounds, but the statutory text does not include in that exception any computer program.

data in a variety of ways, which under AARC's argument, would all be characterized as incidental because they *could be* used with data constituting fixed sounds.  Take, for instance, a program used to create .zip archives for data compression and storage.  Under AARC's reasoning, such a general-purpose program would be incidental to fixed sounds because it could be used to create an archive of sound data.  Or an email program would be incidental because one could use it to attach a digital sound file to send to a friend, despite the fact that email programs are used to send and receive all sorts of other data.

Moreover, there are numerous other methods to store music in digital format other than a general-purpose file system.  Digital music does not need to be stored in files at all.  Oakes Decl. Ex. F (Jones Depo.) at 153:25-154:13.  There are also file systems designed specifically to store fixed sounds, unlike the general-purpose file systems used in the DENSO Systems.  *Id.* at 153:25-154:13, 155:8-156:11 (describing a file system designed by Dr. Loy that "is for storing, retrieving and manipulating music files.  That's all it does.").  Another example is the "Red Book" audio CD standard, which was custom-designed for storing sound files as opposed to the ISO-9660 file system used to store various sorts of data.  *See* AARC Mem. at 31.  Indeed, AARC's suggestion that it would be irrational to exclude "a CD-ROM that is entirely filled with MP3 recordings" from the AHRA based on the type of sound file it contains should be rejected because that is the exact holding of *Diamond*.  *See id.*  Per *Diamond*, MP3 files copied from a computer cannot possibly create a DMR or DACR.  *Diamond*, 180 F.3d at 1076.  AARC's argument also fundamentally misunderstands the careful balance of the AHRA's statutory scheme, which is unconcerned with what two material objects look like, but is concerned with the contents of those objects.  Thus, it is true that a data CD containing MP3 files is *not* a DMR

under the AHRA because of the type of files it contains.[4]

The fact that the DENSO Systems are computers that use a general-purpose file system, which is itself a computer program, shows that the systems are not DARDs under the AHRA, because the only place they can possibly store fixed sounds is a material object that also contains one or more computer programs or other non-incidental material.

### C.      Plaintiff's Interpretation Of "Material Object" Proves Too Much.

AARC offers an atomistic interpretation of the AHRA that converts any conceivable space occupied by digital sound data into a material object.  *See, e.g.*, Fassbender Decl. Ex. A (Loy Depo.) at 66:12-67:21 (characterizing disks, the substrate (hard disk platter), the magnetic coating on the substrate, a sector, and individual bit as "material objects"), *id.* at 105:20-106:6 (An atom is a material object, so is a logical drive.), *id.* at 106:21-107:14 (characterizing a file system folder, a digital file, and a digital file with zero length as material objects), *id.* at 144:6-16 (explaining that two hard disk drives that together comprise a single partition are a single material object).

The problem for AARC, however, is that if its proposed special meaning of "material object" is accepted, the normal operation of the DENSO Systems eliminates the possibility that they are DARDs capable of making DMRs under the AHRA.  All sound data destined for the systems' hard drives is initially fixed in RAM modules, which are physical objects, ████████ ████████████████████████████████████████████████████████████████ ████████  Oakes Decl. Ex. F (Jones Depo.) at 182:15-20 ("RAM's a physical object."); *see,*

---

[4] Again, this interpretation is also consistent with the AHRA's legislative history, which made clear that "[T]he AHRA establishes that only *certain* media qualify as DMRs for AHRA purpose; namely … 'objects commonly understood to embody sound recordings and their underlying works, such as recorded compact discs (CDs), digital audio tapes (DAT's), audio cassettes, and long playing albums (LPs) …; conversely, the term is intended to exclude objects such as recorded videocassettes and multimedia products (*i.e.*, unitary products which integrate several prominent components such as text, video clips, computer graphics, speech and music).'" Mem. Op. (Feb. 19, 2016) at 8-9 (quoting S. Rep. No. 102-294, at 46).

*e.g.*, *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993) (Loading data

into RAM creates a "copy" under the Copyright Act.). ██████████████████████████



████████████████████████████████████████ ECF No. 119-1 (Ogasawara Decl.) ¶ 29.  The RAM

modules are not partitioned, so all the music data is necessarily first fixed in a partitionless

material object that also contains "one or more computer" programs before they are recorded to

the systems' hard disk drives.

Under the Court's interpretation of the AHRA, RAM modules fixed with computer

programs cannot be DMRs, and the devices that record data to such a RAM module cannot be a

DARD.  Mem. Op. (Feb. 19, 2016) at 26 ("[T]he object that the device produces must contain

'only sounds' and incidental data, and cannot contain unrelated computer programs." (citing 17

U.S.C. §§ 1001(5)(A)(i), 1001(5)(B)(ii))).  As *Diamond* explained, "the Act seems designed to

allow files to be 'laundered' by passage through a computer," which applies equally to the

systems' RAM modules, which are not DARDs or DMRs because, like the hard drives in

*Diamond*, they contain "one or more programs."  180 F.3d at 1076, 1079.  Thus, if AARC is

correct, and the AHRA will support a definition of "material object" that encompasses a method

of organization such as a partition, then it certainly encompasses the RAM modules in the

DENSO Systems.  Since all music data must first pass through RAM modules that contain

various computer programs, ████████████████████████████████████████████████

the resultant output cannot be a DMR or DACR because the fixed sounds recorded to the hard

disk drive are not copied from an object that meets the definition of a DMR. *See Id.* (finding that a device that "does not record 'directly' from 'digital music[al] recordings' … could not be a digital audio recording device").

## **CONCLUSION**

For the foregoing reasons, DIAM respectfully submits that AARC's Motion for Summary Judgment should be denied and Defendants' Motion for Summary Judgment granted.


Dated: May 22, 2017           Respectfully submitted,


              */s/ Annette L. Hurst*
              Annette L. Hurst (admitted *pro hac vice*)
              ORRICK, HERRINGTON & SUTCLIFFE LLP
              405 Howard Street
              San Francisco, CA 94105-2669
              (415) 773-4585
              ahurst@orrick.com

              Steven J. Routh (D.C. Bar No. 376068)
              Diana M. Fassbender (admitted *pro hac vice*)
              ORRICK, HERRINGTON & SUTCLIFFE LLP
              1152 15th Street, NW
              Washington, DC 20005
              (202) 339-8509
              srouth@orrick.com
              dszego@orrick.com

              *Counsel for Defendant DENSO International America, Inc.*